**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re:

REDEMPTION AND RELEASE, LLC (DE),

      Debtor.

_____/

Case No. 19-14609

Chapter 11

**Emergency Hearing Requested**

**EMERGENCY INTERIM MOTION OF WYNDHAM VACATION OWNERSHIP, INC.,
WYNDHAM VACATIONS RESORTS, INC., WYNDHAM RESORT DEVELOPMENT
CORPORATION,  AND SHELL VACATIONS, LLC FOR AN ORDER APPOINTING
AN INTERIM CHAPTER 11 TRUSTEE OR EXAMINER**

---

**Basis For Emergency Relief**

Pursuant to Local Rule 9075-1, Movant respectfully submits that emergency relief is necessary to avoid the continuing direct, immediate, substantial, and irreversible harm to the Movants and to the public.  The Debtor cannot account for approximately $20,000,000 in funds a significant amount of which are owed to their customers as guaranty liabilities.  Further, as described further below, the Debtor's business is part of an overall fraudulent scheme that continues to injure Wyndham's business interests and defraud members of the public.  The longer the Debtor stays under the control of current management, it is anticipated more harm to the Movants and the public will occur and any remaining assets may be absconded with or any assets that have been transferred to insiders will be more difficult to recover or lost entirely.   It is respectfully requested that the Court set this matter for hearing on or before **April 19, 2019**.

---

Wyndham Vacation Ownership, Inc., a Delaware Corporation; Wyndham Vacation Resorts, Inc., a Delaware Corporation; Wyndham Resort Development Corporation, an Oregon Corporation; and Shell Vacations, LLC, an Arizona limited liability company (collectively referred to herein as ("Wyndham"), by and through the undersigned counsel, hereby submit this motion (the "Motion") for an order pursuant to sections 105(a), 1104(a), and 1104(c) of Title 11 of the United States Code (the "Bankruptcy Code") appointing an interim chapter 11 trustee or examiner, and granting such other relief as may be appropriate.

In support of this Motion, Wyndham respectfully states as follows:

1

## PRELIMINARY STATEMENT

1.      This newly filed bankruptcy case is not a typical chapter 11 proceeding.  The above-captioned debtor REDEMPTION AND RELEASE, LLC (DE) and several related entities who have also filed for protection under chapter 11 of the Bankruptcy Code[1] (collectively, the "Debtors") and its management have committed outright fraud by conducting a business that is actively injuring members of the public and Wyndham, by transferring operations to new business entities in an attempt to escape liability, and by apparently distributing millions of dollars of profits to insiders with full knowledge that millions of dollars of guaranty liabilities will be due to their victims in the coming months.  Without immediate judicial intervention, Wyndham fears that it and the general public will be irreparably harmed.  Accordingly, Wyndham respectfully requests immediate assistance in the manner set forth below.

## JURISDICTION

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

4.      The statutory predicates for the relief sought herein are §§105(a), 1104(a) and 1104(c) of the Bankruptcy Code.

---

[1] The following related entities have filed chapter 11 bankruptcy cases before this Court and make-up the Debtors: 1) Redemption Holdings USA, LLC (Case No. 19-14610); 2) Vacation Properties For Less, LLC (Case No. 19-14612); 3) American Resource Management, LLC (DE) (Case No 19-14605); 4) Boomtown Holding Group, LLC (DE) (Case No. 19-14608); 5) Resort Exit Team LLC (FL) (Case no. 19-14611); 6) VPL Holdings, LLC (FL) (Case No. 19-14613);   7) American Resource Management, LLC (IL) (Case No. 19-14606); 8) American Resource Management Group, LLC (FL); (Case No. 19-14607); and 9) Redemption and Release, LLC (DE).  A motion for joint administration has not yet been filed, but Wyndham anticipates one will be filed.  Out of an abundance of caution this Motion was filed in each bankruptcy case and relates to each of the Debtors because all of the Debtors participate in a single fraudulent scheme (described in more detail below).  An organization chart provided by the Debtors in discovery is attached hereto as Exhibit 13.

## BACKGROUND

5.      The Debtors are several interrelated entities that filed chapter 11 bankruptcy petitions on April 9, 2019, each of which is merely a participant in an overall scheme that has defrauded thousands of timeshare owners out of millions of dollars by selling illusory "timeshare exit" or "timeshare cancellation" services.  The overall scheme that the Debtors perpetrate in order to defraud timeshare owners is described in detail below, and is corroborated by sworn Declarations signed by three of the Debtors' former employees, Dennis Lange, Kimberley Skerritt, and Brooks Nunez.  Those Declarations are attached hereto as **Exhibits "1," "2," and "3,"** respectively.

## I.      The Formation of "Resort Release."

6.      The architects of the Debtors' fraudulent scheme are husband and wife Eric and Shyla Cline (the "Clines"), and Larry Scott Morse ("Morse").[2]  In 2012, the Clines first formed American Resource Management, LLC, an Illinois limited liability company ("ARMG IL") in Rockford, Illinois.  [E. Cline Dep, at 21:7–21].[3]  ARMG IL is an entity that markets and offers timeshare "resolutions" to consumers.  [E. Cline Dep., at 22:25].   ARMG IL was formed in Illinois because Eric Cline had been arrested in Florida for operating an unlicensed telemarketing business, Skyline Marketing Group, LLC.  [Ex. 1, at ¶ 9].  The Clines formed ARMG IL outside of Florida to avoid registration and licensure requirements.  [Ex. 1, at ¶ 9].

7.      A year later, Eric and Shyla Cline moved back to Fort Lauderdale, Florida and formed another limited liability company with the exact same name, American Resource Management Group, LLC, a Florida limited liability company ("ARMG FL").  [E. Cline Dep., at

---

[2] The Clines and Morse are individual Defendants in the District Court case pending before Judge Middlebrooks. While each of their entities has filed for Chapter 11 bankruptcy, these individuals have not themselves filed for bankruptcy.

[3] The relevant excerpts from Eric Cline's deposition testimony are attached as **Exhibit "4."**

103:15–17]. Both ARMG IL and ARMG FL continued to operate in tandem, offering the same services to timeshare owners through both entities.

8.    Even after moving their primary business to Fort Lauderdale, the Clines continued to market and brand their company as based on in Rockford, Illinois to appear as a mid-western company to gain the trust of consumers. [Ex. 1, at ¶ 16]; [Ex. 3, at ¶ 6]. The sales staff for ARMG FL was even provided with a "fact sheet" that sales representatives in Fort Lauderdale could reference during sales calls so that timeshare owners would believe the company was based in Rockford, Illinois. *See* [Ex. 1, at ¶ 16].

9.    Beginning in 2015, both ARMG IL and ARMG FL began to operate under the d/b/a Resort Release, and are referred to collectively as "Resort Release." [E. Cline Dep., at 24:4–14].

## II.    Resort Release's Illusory and Deceptive Timeshare Exit Services

10.    Resort Release advertises and sells two separate services to timeshare owners: (1) an "attorney solution" for timeshare owners whose timeshares are encumbered by a mortgage; and (2) a "transfer" service for timeshare owners whose timeshares are not subject to an encumbrance. [Ex. 1, at ¶ 18]; [Ex. 2, at ¶¶ 10–11]; [Ex. 3, at ¶ 7]. Each of these purported services is described in detail below.

### A.    *The Illusory "Attorney Solution" Service.*

11.    For timeshare owners whose timeshare is encumbered by a mortgage, Resort Release sells timeshare owners an "attorney solution," sometimes referred to as the "cancellation" service. [Ex. 1, at ¶¶ 21-22]; [Ex. 2, at ¶11]; [Ex. 3, at ¶ 9]. This service begins with an online advertising campaign that guarantees the ability to relieve a timeshare owner of his or her contractual obligations surrounding the timeshare. For example, Resort Release's

website  www.resortrelease.com  contains,  or  has  contained  false,  misleading,  and  deceptive

statements, which include, but are not limited to the following:

i. "What does Resort Release do? We are a timeshare release company that helps remove timeshare owners from their unwanted timeshare properties. We guarantee to get you out of your timeshare contract. Period.";

ii. "LEGAL CANCELLATION. Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.";

iii. "Is ResortRelease.com a legitimate solution to removing my family from our timeshare contract? We are proud to say that we are one of the only A+ rated, BBB accredited timeshare release companies in the industry. We have already helped thousands of people legally and permanently get out of their timeshare. We always put our clients first and all of our services are guaranteed.";

iv. "GUARANTEED RESULTS.  We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.";

v. "GUARANTEE POLICY: Legally and permanently getting out of your timeshare has never been this easy.";

vi. "Guaranteed Contract Termination.  Your attorneys will diligently, competently, and effectively represent you in seeking the termination of your timeshare contract."; and

vii. "We are so confident in our services that we give you three separate 100% guarantees. Over the past 6 years we have helped over 12,600 desperate families transfer out of their timeshare properties. If you are not timeshare free at the end of our service, we will refund 100% of your money."

(emphasis added).  True and correct copies of Resort Release's advertisements containing these

false statements are attached hereto as **Exhibit "5."**

12.     After the timeshare owner responds to Resort Release's online advertising, the

timeshare owner is read one of several versions of a script consisting of leading questions that

suggest to the consumer that their consumer rights were violated when they purchased their

timeshare.  [Ex. 1, at ¶ 23].   The sales representatives then pretend that they are discussing the

consumer's case with an attorney, when no such conversation is actually occurring. According to Dennis Lange, the former Director of Sales for Resort Release, "consumers would be so confused they could call back asking to speak to the attorney they had spoken to (which was actually just the sales person)." [Ex. 1, at ¶ 17]; *see also* [Ex. 3, at ¶ 10]. This was a ploy designed to string along timeshare owner and give the impression that Resort Release might not take their case, when, in fact, "ARMG was going to take any consumer that called them." [Ex. 1, at ¶ 17]; [Ex. 3, at ¶ 10].

13.     As part of the sales process, Resort Release would then induce the timeshare owner to default on his or her timeshare obligations, including their mortgage. [Ex. 1, at ¶ 26]. One way that Resort Release induces timeshare owners to cease making payments on their mortgages is to tell owners that "the overwhelming majority of our clients do make the decision to stop making their payments" and "those who stop making payments do get their cancellation quicker than those who do not." [Ex. 1, at ¶ 27].

14.     Once the timeshare owner decides to sign up for Resort Release's "attorney solution" service, the timeshare owner is referred to an attorney that sends formulaic demand letters to the timeshare developer (i.e., Wyndham) threatening legal action. [Ex. 3, at ¶ 11]. However, these attorneys rarely take any legal action. Instead, the demand letters are designed to give the appearance that an effort is being made to "exit" the owner from his or her timeshare. [Ex. 1, at ¶ 28]. Often, the attorney is merely waiting for the timeshare developer to foreclose on the defaulted loan so that Resort Release can represent to the timeshare owner that the service they purchased has been successfully. [Ex. 3, at ¶ 11].

15.     Resort Release refers timeshare owners to one of two law firms that assist in the scheme. The law firms that Resort Release associates with to carry on its "cancellation" scheme

are Totten Franqui Davis and Burk, LLC ("TFDB") and US Consumer Attorneys, P.A. ("USCA"). [Ex. 2, at ¶¶ 11–16]. Timeshare owners referred to USCA enter into a Timeshare Cancellation Agreement. However, USCA's performance under the Timeshare Cancellation Agreement involves nothing more than a campaign of cease and desist letters to the timeshare developer while the foreclosure of the timeshare is pending.

16.    For those timeshare owners referred to TFDB, Resort Release purports to enroll those timeshare owners in a Group Legal Services Plan (the "GLSP"). The GLSP that is sold to timeshare owners, however, is an illusory marketing ploy. No document exists that establishes the GLSP's existence, governs its operation, sets forth its membership criteria, or otherwise establishes policies, procedures, or guidelines that apply to the GLSP. Further, the GLSP has never been approved by any state bar association or regulator as a valid legal services plan, and in fact, the Florida Bar has twice denied approval of the GLSP. Nonetheless, Resort Release continues to market, advertise, and sell timeshare owners' enrollment in to the GLSP.

17.    Once the timeshare owner defaults, resulting in foreclosure of their timeshare interest, Resort Release and the attorneys then represent to the timeshare owner that they have successfully "exited" their timeshare. Furthermore, Resort Release has produced emails in the District Court where the attorneys it associates with have explained that they consider foreclosure of the timeshare owner's interest a successful "exit" from their timeshare. True and correct copies of these emails will be filed as **Composite Exhibit "6."**[4]

18.    Several timeshare owners have discovered that they have been deceived into foreclosure and have contacted Resort Release over the years expressing that they have been the

---

[4] Exhibits 6, 7, 10, 11, and 13 are the subject of a Stipulated Protective Order in the District Court case pending between Wyndham and the Debtor. Wyndham is in the process of seeking expedited relief from that Stipulated Protective Order so that these exhibits may be used in this case. Once leave is obtained, Wyndham will file Exhibits 6, 7, 10, 11, 13, and 14 separately.

victims of Resort Release's false promises.   True and correct copies of emails and other correspondence from the victims of Resort Release's "attorney solution" scam will be filed as Composite **Exhibit "7."**

> B.    *The "Transfer" Service*

19.    The second service Resort Release offers is a "transfer" service for timeshare owners whose interest is not encumbered by a mortgage.  [E. Cline Dep., at 25:18–26:4].  In order to convince timeshare owners that they need to transfer ownership of their timeshares, Resort Release makes a number of deceptive statements in their advertising as scare tactics aimed at the consumer, including that the timeshare owner's children will be forced to inherit the timeshare and perpetually pay the maintenance fees associated therewith, and that there is no limit on how high a developer may raise maintenance fees.  A true and correct copy of Resort Release's website advertisements in this regard are attached hereto as **Exhibit "8."**

20.    Resort Release also makes false statements in its advertising regarding the consumer's own ability to sell their timeshare, stating that no resale or secondary market for timeshares exists [Ex. 3, at ¶ 8]; that Resort Release does not resell the consumer's timeshare on the open market (because they have already represented that no such market exists); and that Resort Release is only able to sell the consumer's timeshare because it maintains a proprietary relationship with certain third-parties that Resort Release has to pay to take the timeshares.  [Ex. 3, at ¶ 8].  True and correct copies of Resort Release's advertisements with these deceptive statements are attached hereto as Composite **Exhibit "9."**

21.    After a consumer contacts Resort Release, they are read a predetermined script that creates a false sense of urgency for the consumer to hire Resort Release.  The script contains standard statements that are read to consumers indicating that additional information is needed to

evaluate whether Resort Release can take on the timeshare owner as a customer, but Resort Release takes virtually any timeshare owner willing to pay its fee.  [Ex. 4, Lange Decl., at ¶ 17]. A true and correct copy of one of Resort Release's "transfer scripts" will be filed as **Exhibit "10."**

22.     Ultimately, the timeshare owners pays Resort Release thousands of dollars to effectuate a "transfer" of their timeshare that they could have (1) accomplished themselves, (2) accomplished through one of several free programs Wyndham offers itself (known as Wyndham Cares and Wyndham Ovation), or (3) accomplished through a legitimate timeshare resale company.

23.     Resort Release has produced at least one email in the District Court from a former employee to Eric Cline explaining that Resort Release falsely states in its advertising that no resale market for timeshares exists, when Eric Cline himself is the part owner of a company that participates in the resale market (Vacation Properties for Less, LLC).  A true and correct copy of this email will be filed as **Exhibit "11."**

### The Additional Co-Conspirators

24.     Over time, other entities joined Resort Release in its scheme to defraud timeshare owners through the sale of illusory services.  Redemption Holdings USA, LLC f/k/a Redemption and Release, LLC ("Redemption FL") was formed in Florida in 2011 by Larry Scott Morse ("Morse").  Prior to 2015, Redemption FL was a competitor to Resort Release that offered the same illusory services.  In 2015, however, Morse met with Eric and Shyla Cline and partnered their operations.  Redemption FL eventually moved its offices to the same physical location as Resort Release's offices.  True and correct copies of the sunbiz.org filing for Resort Release and Redemption FL showing the same address are attached hereto as **Exhibit "12."**

25.     Although not entirely clear as to the division of operations between Redemption FL and Resort Release,[5] Redemption FL controls or has controlled numerous websites and domain names that were used to market to timeshare owners.

26.     Redemption FL and Morse engage in a process they refer to as "Confusion Marketing," which is "the creation of landing pages and websites that tricked timeshare owners into believing that they had reached the website of ARMG's more well-known competitors." [Ex. 1, at ¶ 12].

27.     Once those timeshare owners respond to Redemption FL's advertisements, they are funneled to Resort Release's call center in Fort Lauderdale, where Resort Release's employees carry out the remainder the scheme described above.  [Ex. 1, at ¶ 15].  Redemption FL also receives fees from USCA law firm for timeshare owners that are referred to USCA for representation.  [E. Cline Dep., at 51:12–19].

28.     Additionally, VPL Holdings, LLC, a Florida limited liability company, f/k/a Vacation Properties for Less, LLC ("VPL FL") is an entity created by Eric Cline and Morse to further perpetuate the misrepresentation to timeshare owners that Resort Release does not resell timeshares.  According to Resort Release's former employees, timeshare owners would contact Resort Release (after having being told by Resort Release that a resale market did not exist) and complain that they had been lied to.  [Ex. 2, at ¶ 8].  Therefore, VPL FL was created so that timeshare properties could be listed for sale in a name other than Resort Release's name, thus creating a layer of separation between Resort Release and its deceptive acts.  [Ex. 2, at ¶ 8].

**The Creation of the Delaware Entities**

29.     In 2018, ARMG FL, Redemption FL, and VPL FL underwent a corporate

---

[5] Redemption FL filed its bankruptcy petition on the eve of the deposition of its corporate representative in the pending action in the District Court.

restructuring designed to thwart creditors.  In summary, the Debtors created new entities and transferred operations to those entities in order to curtail Wyndham's litigation efforts (discussed in more detail below).  On February 28, 2018, three new Delaware limited liability companies were formed with the exact same names as the existing Florida companies: American Resource Management Group, LLC ("ARMG DE"); Redemption and Release, LLC ("Redemption DE"); and Vacation Properties for Less, LLC ("ARMG DE").  A fourth Delaware limited liability company, Boomtown Holdings, LLC ("Boomtown DE") was formed as became the sole member of ARMG DE, Redemption, DE, and VPL DE.  Additionally, on October 19, 2018, the Florida companies each registered name changes with the Florida Division of Corporations and became members in Boomtown DE.  Finally, a series of revocable, irrevocable, and family trusts were created to hold interests in the Florida companies.

30.     At some time after the formation of the three Delaware companies, all of the assets, liabilities, operations, and customers of the Florida entities were transferred to the entity bearing their former name (e.g., ARMG FL transferred its assets, liabilities, operations, and customers to ARMG DE).

31.     Each of the Delaware entities formed on February 28, 2018 has also filed bankruptcy; however, none of the trusts that are the ultimate beneficiaries of this restructuring have sought bankruptcy protection.

32.     An organizational chart demonstrating the overall organization and interrelatedness of the corporate structure will be filed as **Exhibit "13."**

### Mismanagement of Corporate Assets

33.     In addition to the above-described scheme, Resort Release has engaged in corporate mismanagement of assets, and operates in the nature of a Ponzi scheme.

34.     Resort Release has a contract with a law firm, Totten Franqui Davis & Burk, LLC (the "Totten Firm"), by which the Totten Firm represents timeshare owners under the purported Group Legal Services Plan.  Resort Release pays the Totten Firm a fixed monthly retainer fee for its representation of clients.  However, that retainer fee is not tied to the representation of any specific client, and is due to be paid regardless of how long the client is represented by the Totten Firm or the individual circumstances of the client's case.  A true and correct copy of the Totten Firm's agreement with Resort Release will be filed as **Exhibit "14."**  Additionally, the Totten Firm has virtually no source of income other than the monthly payments it received from Resort Release.

35.     By acting as the attorneys for the timeshare owners in the Group Legal Services Plan, the Totten Firm is purportedly endeavoring to obtain rescissions of the timeshare owners' timeshare contracts on their behalf.  However, as the Totten Firm's own expert witness acknowledges in the District Court matter, "[t]he overwhelming majority of the Wyndham [timeshare owners' cases] have not progressed beyond a demand letter being sent to Wyndham." *See* [**Ex. 15**].  In fact, of the over 500 Wyndham timeshare owners represented by the Totten Firm, approximately twenty (20) cases or arbitrations have been brought, typically at or near the expiration of statutes of limitation, and of those, none have resulted in the termination of a timeshare contract.

36.     Under the arrangement above, Resort Release and the Totten Firm's ability to continue servicing its existing clients is entirely dependent on Resort Release's ability to continue marketing its illusory timeshare exit services and enroll additional timeshare owners into the Group Legal Services Plan.  The funds collected from each new enrollee Group Legal Services Plan go to funding the ongoing representation of the prior timeshare owner enrollees.

Once the Totten Firm's client base reaches a critical mass and Resort Release is no longer able to collect fees from new timeshare owners, the Group Legal Services Plan will collapse under its own weight for lack of funding.  Hence, the Ponzi like nature of the Debtors' scheme.

37.    To exacerbate matters, Resort Release gives each of these timeshare owners a 100% money-back guarantee of the fee that is paid if they are not "exited" from their timeshare in eighteen (18) months.[6]  [Ex. 1, at ¶ 24]. As it exists now, Resort Release's own expert witness in the District Court calculates that Resort Release's refund liability to Wyndham timeshare owners alone exceeds $3.3 million.  *See* [Ex. 15, at p. 14].  For perspective, Wyndham timeshare owners represent slightly less than 15% of Resort Release's overall r.  Thus, Resort Release's total refund liability likely exceeds $20 million.[7]

38.    Resort Release has no ability to refund its customers that have fallen prey to its advertisements if its refund liability were to accrue.  As disclosed in the bankruptcy petition, Resort Release does not have any cash-on-hand.  Additionally, Shyla Cline testified that none of the monies that Resort Release receives from its customers are held in an escrow reserve to cover Resort Release's refund liabilities.  Shyla even testified that Resort Release does not maintain an annual budget; rather, it merely looks at its expenses on a month-to-month basis to determine if they are covered by the company's revenues.

39.    Additionally, Resort Release's expert in the District Court litigation calculates that Resort Release's *profits* related to Wyndham timeshare owners alone exceed $4.3 million since 2015 and eclipsed $1.3 million in 2018 alone.  As already noted above, Wyndham timeshare owners account for just fewer than 15% of Resort Release's customer base.

---

[6] The large majority of the clients that have enrolled in the Group Legal Services Plan have not met the eighteen (18) month threshold.

[7] Alarmingly, none of these debts were included in any of the Debtors list of 20 Largest Unsecured Creditors.

Presumably, the profits over the same timeframe would have been more than $28 million. However, based on the Debtors' bankruptcy petitions, none of the Debtors have more than $0-$100,000 in assets and there are allegedly no funds available to pay creditors or refunds to the Debtors' victims.

40.     Given the structure that Resort Release, Redemption FL, and VPL FL put in place in 2018, with their own trusts as the ultimate beneficiaries of the corporate structure, it the majority of the profits from these operations appear to have been siphoned off for the personal benefit, leaving the entities with little to no assets to pay creditors.

## Status of the District Court Litigation

41.     On August 8, 2019, Wyndham filed a Complaint For Damages and Injunctive Relief in the United Stated District Court for the Southern District of Florida under case no. 9:18-cv-81055 (the "District Court Litigation") against the Totten Firm, several of the Debtors and multiple other non-debtor parties.  On October 18, 2018, Wyndham amended its Complaint (the "Amended Complaint") and a copy of the Amended Complaint, without its exhibits is attached hereto as **Exhibit "16."**

42.     In the Amended Complaint, Wyndham seeks, among other things, damages and injunctive relief relating to the Debtors and the other third parties deceptive advertising targeted at Wyndham's customers, trademark infringement, deceptive trade practices, and the tortious interference of contractual relations between Wyndham and its customers.

43.     The District Court case is in the highly advanced pre-trial stages.  The case was filed on August 9, 2018, and the parties are currently scheduled for trial during the trial period beginning July 8, 2019.  A true and correct copy of the Court's Pretrial Scheduling Order is attached as **Exhibit "17."**

44.     The deadline for the parties to complete fact discovery is rapidly approaching and is set to close on April 22, 2019.  The parties have each taken numerous depositions and have each produced tens of thousands of pages of documents.  All parties have retained expert witnesses, who have issued their reports under Rule 26.  Both the Plaintiffs' and the Defendants' expert witnesses are scheduled for deposition the week of April 15, 2019.  Further, the parties are scheduled to attend a court-ordered mediation on May 8, 2019 with mediator Brian Spector.

45.     This case was filed on the heels of Magistrate Reinhart's April 3, 2019 ruling from the bench that compelled the production of thousands of emails and electronic documents which directly support Wyndham's allegations that Resort Release has defrauded is still actively defrauding thousands of timeshare owners with its false advertising.  Notably, Resort Release has produced less than half of the electronic documents required by Magistrate Reinhart.

46.     Furthermore, on April 9, 2019, the same day that Resort Release and the other co-conspirators filed bankruptcy, Judge Middlebrooks denied Resort Release's motions to dismiss Wyndham's claims, and granted Wyndham leave to add to the case the additional Delaware limited liability companies that had assumed the operations of the Florida limited liability companies.

47.     Accordingly, the bankruptcy filing is not designed to effectuate a reorganization of the Debtor's business, but to thwart discovery in the District Court of Resort Release's own fraudulent conduct and delay the impending trial before the District Court.

## The Bankruptcy Filing

48.     With depositions pending in the District Court Litigation, the Debtors filed their bankruptcy cases.  As of the date of this Motion, the Debtors filed skeletal petitions and no first day motions.  Only one Debtor, Redemption Holdings USA, LLC filed its Schedules and

Statement of Financial Affairs.  According to this filing, Redemption Holdings has no assets, no revenue, no executory contracts, and apparently no operations.

**RELIEF REQUESTED AND BASIS FOR RELIEF**

49.     By this Motion, Wyndham respectfully requests that the Court enter an order appointing an interim chapter 11 trustee in the above captioned chapter 11 case (the "Case") and all of the related Debtors' bankruptcy cases for cause pursuant to section 1104(a) of the Bankruptcy Code, or, in the alternative, appointing an examiner pursuant to section 1104(c) of the Bankruptcy Code to investigate the multiple acts of fraud, dishonesty, and other misconduct by current and/or former management of the Debtors, to provide an independent review of the Debtors' accounts, and to ensure that the guaranties made to the public are fulfilled (if possible).

50.     Pursuant to section 1104(a) of the Bankruptcy Code, the Court must appoint a trustee where either cause exists *or* if the appointment is in the best interests of creditors.  Section 1104(a) specifically provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court ***shall order*** the appointment of a trustee –
>
> > (1)  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor  or  the  amount of assets or liabilities of the debtor;  or
> >
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities  of the debtor  or the  amount of assets  or liabilities of the debtor.

11 U.S.C. § 1104(a) (emphasis added).

51.     Courts have found that the appointment of a trustee is essential in a case where

the current management of a debtor is unable to carry out the fiduciary duties of a trustee. *See, e.g., In re v. Savino Oil & Heating Co*., 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee."). Indeed, a debtor's "pre-petition course of conduct, in and of itself, [can] constitute[…] 'cause' for the appointment of a Chapter 11 trustee." *Id*. at 526. Such conduct might include "systematic[ally] syphoning" the debtor's assets "to other companies under common control" on the "eve of bankruptcy." *Sharon Steel*, 871 F.2d at 1226 & 1228.

52.     If ever there were a case where appointment of a trustee was justified, it is this one.  As detailed above, the extensive prepetition fraud, dishonesty, incompetence, and gross mismanagement of the affairs of the Debtor by current management.   11 U.S.C. § 1104(a) (appointment of trustee is mandatory when only one of the aforementioned examples of cause are present).

53.     First, "cause" exists due to the following examples of both fraud ***and*** dishonesty:

- Inducing victims to pay for timeshare exit services that are not actually provided and are already available for free through Wyndham,

- Squandering, or more likely, absconding with, $20,000,000 in profits (including millions of dollars of profits in 2018) and leaving no money to pay creditors, specifically the victims owed money back guarantees;

- Deceptively advertising the Debtors' services while inducing payment from victims not based on a pricing schedule, but based on whatever they can squeeze out of the victims;

- Contracting with the Totten Firm who clearly is not providing the required services to victims;

- Basing a business on deceptive advertising, fraudulent trade practices and the tortious interference with Wyndham's time share contracts with customers; and

- Creating new entities to move operations to while being subject to the District Court Lawsuit.

54.     Second, there are examples of mismanagement:

- Despite significant profits, the Debtors principals admit they have no budget for their operations and exists on a month-to month basis and have not put aside funds to address the pending significant money-back guaranty liabilities;

- The Ponzi Scheme like nature of the Debtors' scheme where the Debtors are dependent on new victims to pay for the old;

- The failure of the Debtors to provide a complete list of their 20 Largest Creditors or in the provided Schedules, despite likely having thousands of creditors; and

- Entering into a contract with the Totten Firm where the Totten Firm is not providing the contracted for services.

55.     As illustrated above, section 1104(a)(1)'s examples of "cause" are present here. However, the Court is not limited to those examples of "cause" provided in section 1104(a)(1), nor are those causes exclusive. *In re Marvel Entm't Grp.*, 140 F.3d 463, 472-73 (3d Cir. 1998).  Here, there are several additional reasons a trustee should be put in place including: 1) the fraudulent nature of the Debtor's business should be evaluated by a third-party to determine if there is any legitimate reason for the Debtors to exist; 2) $20,000,000 of profits have not been accounted for and a trustee needs to be put in place to prevent further losses and to recover the payments made; 3) it is Wyndham's understanding that the Debtor's largest assets are, or will likely be, avoidance claims against insiders and potential recoveries from the Totten Firm – creditors must be assured these claims will be zealously pursued by a trustee; and 4) the public's interest should be served by preventing the Debtors from seeking more victims.

56.     Even if the Court declines to appoint a trustee in this Case, Wyndham respectfully submits that in the alternative, the appointment of an examiner is required.  Section 1104(c)(1) directs the court to order the appointment of an examiner when the following requirements are

met: (a) a party in interest has requested the appointment; (b) the request has been made prior to plan confirmation; (c) a trustee has not yet been appointed, and (d) either (i) the appointment is in the best interest of creditors or (ii) the debtor's fixed, liquidated and unsecured debts other than debts for goods, services, taxes, or insider debts exceed $5 million. 11 U.S.C. § 1104(c). Specifically, section 1104(c) provides:

> (c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court ***shall order*** the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—
>
>> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>>
>> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

57.     All of the section 1104(c) requirements are satisfied in this case. The first three requirements are not in dispute: a party in interest (Wyndham) has requested the appointment, the request has been made prior to plan confirmation, and a trustee has not yet been appointed. 11 U.S.C. § 1104(c). The final requirement is that either the appointment is in the best interest of creditors *or* that the debtor's fixed, liquidated and unsecured debts other than debts for goods, services, taxes, or insider debts exceed $5 million. *Id.* Appointment of an examiner pursuant to section 1104(c)(1) is clearly in the interest of creditors and other interests of the estate. 11 U.S.C. § 1104(c). The appointment of an examiner "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the

management of the affairs of the debtor of or by current or former management of the debtor" is in the best interest of creditors in this Case. 11 U.S.C. § 1104(c)(1). Further, it is anticipated that the Debtor's creditors will have more than $5,000,000 in claims.

58.     As set forth in greater detail above, there is urgent need for an investigation of the Debtor's financial affairs and misconduct, and for an accounting of the funds that it misappropriated from the public. It is imperative that an independent third party be allowed complete access to the Debtor's books and records in order to report to the Court as to the extent of the Debtor's fraud and the location of the over $20,000,000 in profits made in the last four (4) years. Without this information, the Case cannot proceed and reorganization will not be possible.

59.     A proposed Order granting this Motion is attached hereto as **Exhibit "18."**

**WHEREFORE**, for the reasons set forth herein, Wyndham respectfully requests that the Court grant the relief requested herein and such further relief as the Court deems just and necessary.

Respectfully submitted on April 12, 2019.

*/s/ James A. Timko*
PETER H. LEVITT, ESQ.
Florida Bar No. 650978
plevitt@shutts.com
JAMES A. TIMKO, ESQ.
Florida Bar No.: 0088858
jtimko@shutts.com
SHUTTS & BOWEN LLP
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801-5403
Telephone: (407) 423-3200
Facsimile: (407) 425-8316
SHUTTS & BOWEN LLP
200 South Biscayne Blvd., Suite 4100
Miami, FL  33131
Telephone: (305) 358-6300
Facsimile: (305) 381-9982

*Attorneys for Wyndham*

## CERTIFICATE OF GOOD FAITH CONFERENCE

On April 11, 2019, by a telephone call at approximately 1:00 p.m., Wyndham's counsel made a bona fide effort to resolve this matter with counsel for the Debtor.  At this time, the Debtor's counsel has stated that it will not agree to the appointment of a Trustee or an Examiner

*/s/ James A. Timko*
JAMES A. TIMKO, ESQ.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have filed a copy of the foregoing document with this Court's CM/ECF System to be served in accordance therewith and that a copy of the foregoing document was served on April 12, 2019, on the following parties by either Court enabled electronic filing or by depositing a copy of same in the United States Mail, postage pre-paid thereon, to be delivered to the addresses set forth below:

**American Resource Management Group, LLC (FL)**
1401 W. Cypress Creek Rd., Suite 101
Fort Lauderdale, FL 33309
*Debtor*

**Tate M Russack**
7999 North Federal Hwy., Suite 100 A
Boca Raton, FL 33487
*Counsel for Debtor*

**Office of the U.S. Trustee**
51 S.W. 1st Ave., Suite 1204
Miami, FL 33130

*/s/ James A. Timko*
JAMES A. TIMKO, ESQ.

ORLDOCS 16834606 1

22

## DECLARATION OF DENNIS LANGE

1.      My name is Dennis Lange.   I am over eighteen (18) years of age and I am authorized and competent to make the statements contained in this declaration, which statements are made based upon my personal knowledge.

2.      I am a former employee of American Resource Management Group, LLC a/k/a Resort Release ("ARMG").   ARMG, which has also been known as Resort Release, is an entity that advertises to timeshare owners and claims to offer services that will release the timeshare owner from any payment obligations and dispose of their timeshare agreements.   These services were provided relative to timeshare owners with agreements with numerous and varied timeshare developers, including, without limitation, Wyndham, Diamond and Bluegreen.

3.      ARMG is owned by husband and wife, Shyla Cline and Eric Cline, and operated by Eric Cline, Shyla Cline, and Larry Scott Morse. [1]

4.      Redemption and Release, LLC ("Redemption and Release") is owned by Larry Scott Morse.   Redemption and Release is operated by Eric Cline, Shyla Cline, and Larry Scott Morse.

5.      ARMG and Redemption and Release would share and use each other's merchant accounts, switching back and forth depending on volume of transactions being processed through the accounts.

6.      I worked at ARMG and Resort Release from February 2015 until April 2018 as Director of Sales.   In that capacity, I assisted in developing ARMG's and Resort Release's salesforce, business operations, websites, marketing, and law firms.   Overall, I was involved in

---

[1] Mr. Morse goes by various different names in an effort to hide his identity.

Exhibit "1"

every aspect of the business and my chief responsibility was growing and managing the sales force.

7.      Around January or February of 2015, I was contacted by Eric Cline who actively recruited me to work for ARMG and develop and build ARMG's sales floor. (I had known Eric Cline for years previously when he worked for me at Modern Ad Marketing/Modern Ad Media.) In order to develop ARMG's sales floor I was involved in every aspect of the business.

8.      ARMG solicited clients primarily through online advertisements, and secondarily through radio and radio personality endorsements (such as Laura Ingraham).

9.      Initially, ARMG advertised themselves as "Consumer Advocates" as ARMG had no attorney connections at the time and needed to find a way to optically legitimize its services. Eric Cline had originally opened a timeshare exit company in Florida and it was shut down because he was operating illegally for operating without a telemarketing license. Eric Cline was arrested for this activity. This is why ARMG was formed in Rockford, Illinois.

10.     Larry Scott Morse's duties at ARMG included online marketing and search engine optimization ("SEO"). ARMG employed an SEO strategy which Larry Scott Morse referred to as "Confusion Marketing". Larry Scott Morse was intimately involved in the operations of ARMG and Redemption and Release (and all of the other subsidiary and affiliate properties) and was part of all decisions made by the companies. Originally, Larry Scott Morse was the entire "verification" department and did all of the "verification" work, which entailed Larry Scott Morse (who never used his real name on calls with customers) working with customers in order to electronically sign all contracts between customer and ARMG (and/or its affiliated entities). Larry Scott Morse was also originally the entire marketing department.

11.     In the beginning (until they built entire departments around these functions), Eric Cline was the person who 'closed' the majority of the deals and got customers in the door, the majority of the time Larry Scott Morse would call the customer back to ensure all documents were signed correctly, and then Shyla Cline was in charge of trying to dispose of the timeshare interests.

12.     "Confusion Marketing" involved the creation of landing pages and websites that tricked timeshare owners into believing that they had reached the website of ARMG's more well-known competitors. Larry Scott Morse would optimize and promote these websites in order to outrank competitors in Google search results and steer customers to ARMG.

13.     Larry Scott Morse, Eric Cline, and Shyla Cline created additional entities for purposes of "Confusion Marketing", including Resort Exit Team, LLC, and Redemption and Release, LLC. The websites for these entities include:

> http://www.resortexitteam.com;
> http://www.myredemptionservices.com;
> http://www.Redemptionrelease.com; and
> http://www.resortrelease.com.

14.     The www.vacationpropertiesforless.com website was created to attempt to unload inventory that ARMG had taken from consumers but had been unable to get rid of.

15.     The leads generated from these websites were all funneled to ARMG's call center in Fort Lauderdale, Florida. Customers obtained through the marketing efforts of Resort Exit Team, LLC, and Redemption and Release, LLC would be sent to "Fronters" at ARMG who would cold call timeshare owners. A copy of one of the call script utilized by these "Fronters" is attached hereto as **Exhibit "A"**.

16.     Despite the fact that ARMG was operating out of Fort Lauderdale, Florida, ARMG advertised itself on its website, http://www.resortrelease.com, as being located in

Rockford, Illinois. I understood from Shyla Cline, Eric Cline, and Larry Scott Morse that they purposefully did this to mislead timeshare owners into believing that ARMG was a "Midwestern company" so that ARMG would appear more credible and "earn the trust" of customers. Also, the call script used by ARMG Fronters in Fort Lauderdale, Florida indicated that ARMG was in Rockford, Illinois. ARMG sales staff was even provided a fact sheet about Rockford, Illinois that could be referenced during sales calls. A copy of that Rockford, Illinois fact sheet is attached hereto as **Exhibit "B"**. Originally, ARMG had very few people (and zero sales people) in Rockford, IL and everything was done through Fort Lauderdale. Sometimes customers would want to come to the Rockford office to meet with ARMG and we would have to come up with excuses for why that was not possible (it was not possible because nobody was actually in Rockford, the entire sales force was in Fort Lauderdale). We would tell customers that we were in Rockford as part of a 'bait and switch' scam.

17.    The misrepresentations did not end there. I observed ARMG employees, at the direction of the Clines and Morse, call consumers and act like they had been negotiating with attorneys, when, in truth, they had not. In some instances, these employees would make it confusing as to whether they were attorneys or not. Sometimes, customers would be so confused they would call back asking to speak to the attorney they had spoken to (which was actually just the sales person). ARMG would place customers on hold for long periods of time and pretend they were speaking with attorneys, then take the customer off hold to state that the attorney had a question or some questions for the consumers, get the answer(s), put the customer back on hold to pretend to speak to the attorneys, and repeat this pattern multiple times. In reality, ARMG was not speaking to any attorney and was just stringing the customer along to make it seem like ARMG might not take on the customer because the customer's consumer rights hadn't been

violated; in reality, ARMG was going to take any consumer that called them.  This was all part of a script and part of the standard operating practices of ARMG.

18.    While working at ARMG, I observed that ARMG was targeting timeshare owners with two (2) separate schemes depending on the timeshare owner's circumstances.  If the timeshare owner did not have a mortgage and was seeking to be released from maintenance fee obligations, ARMG would offer a "Transfer Service".  If the timeshare owner had a mortgage, they would be offered an "Attorney Solution".

19.    ARMG's "Transfer Service" falsely claimed that ARMG had exclusive relationships with "travel clubs" and "vacation clubs" who would come to ARMG for timeshare inventory. ARMG would explain to the timeshare owner that ARMG had to pay these clubs to "take it off our hands", which was false.  ARMG would issue bogus "inventory control numbers" to the consumers to make it seem to the consumer like something significant was happening, when in fact it was not.  It was part of a script and ARMG's standard operating practice to tell consumers that it was impossible to sell their timeshare and impossible to get a resort to take the timeshare interest back.  ARMG would then tell the consumer that they could work with a very limited number of timeshare developers and that they would take the interest on, would issue the bogus "inventory control number" to the consumer, and tell the customer that the "inventory control number" was only good for a day or two because the "travel clubs" and "vacation clubs" could only take back so many timeshare interest that month and they had almost reached the limit they could take that month.  All of the foregoing was a lie.  All "inventory control numbers" were the same – it was someone's birthday (possibly Eric Cline's birthday but I do remember exactly).  The fake inventory control number was designed to put pressure on the consumer to agree to pay ARMG thousands of dollars and create a false sense of urgency.  Once

the consumer agreed to pay ARMG, Larry Scott Morse would call as the "verification department" and three days later Shyla Cline the customer to congratulate them on being a customer. Shyla Cline waited three days because that was the period of time customers were given to cancel their contract with ARMG was three days.

20.    For a transfer client, ARMG would typically charge the timeshare owner a "Holding Fee" $2,995 but the sales agents could charge as much as they wanted. The sales agent got paid a percentage of the "Holding Fee" so they would try to charge as much as possible. In addition, ARMG would charge a $495 or $595 "Titling Fee" and a "Maintenance Fee" of whatever the maintenance fees were for the year plus additional 'padding' which, when I left, was as high as a 50% markup. There would also be a "Resort Mandated Transfer Fee" of varying amounts. All of the foregoing were averages. All total, the average would be $5,000 to $6,000, or much more, for a transfer.

21.    If the timeshare owner held a mortgage, ARMG would pitch a scheme designed to deceive timeshare owners into believing that they required the "Attorney Solution."

22.    ARMG's "Attorney Solution" was nothing more than bait and switch.

23.    The sales team at ARMG would first solicit and sign up timeshare owners by leading these owners to believe that their consumer rights may have been violated and that they could "cancel" their timeshare ownership without breaching their timeshare agreement based on alleged consumer rights violations.

24.    ARMG backed up this offer with a 100% money-back guarantee.

25.    Eric Cline closed many of these sales himself. Eric's office was right at the sales floor and he was very hands on…sales was his baby.

26.     Once the timeshare owner had paid ARMG, the timeshare owner would then be induced to stop making payments on their timeshare, thereby breaching their timeshare agreement and going into default and ultimately foreclosure.

27.     One way that ARMG would induce timeshare owners to stop making payments was to tell timeshare owners that "the overwhelming majority of our clients do make the decision to stop making their payments" and that "those who stop making payments do get their cancellation quicker than those who do not." A copy of the call script directing ARMG employees to convince timeshare owners to stop making payments is attached hereto as **Exhibit "C"**. The purpose of inducing timeshare owners into stopping payments was to free up cash for the timeshare owner that they could then use to pay ARMG's fees.

28.     ARMG's success in selling "Attorney Solution" to timeshare owners relied upon having a "law firm" to act as a front for the scheme. This was necessary for the scheme to work.

29.     Erica Franqui, the wife of attorney Anthony Franqui, was contacted by Shyla Cline who offered to have ARMG provide the funding for a new law firm that would receive all of ARMG's timeshare owners who held a mortgage.[2]

30.     The Clines then created and fully funded Totten Franqui David & Burk, LLC ("TFDB"), "their firm," and provided TFDB an office in the same building as ARMG.

31.     For timeshare owners with a mortgage, ARMG sales staff referred to themselves as "Intake Managers".

32.     The ARMG sales staff or "Intake Managers" would describe to timeshare owners how they needed to "build a case" based on violations of their "consumer rights" so that the case was strong enough to "take it to our attorneys" and/or "qualify for our legal plan". ARMG

---

[2] As of April 2018, TFDB was still doing all of ARMG's mortgage business.

would coach consumers through how to make claims that their "consumer rights" had been violated.

33.    TFDB and its attorneys were at all times aware of ARMG's sales practices and worked with ARMG on how to sell TFDB's services to timeshare owners.

34.    Erica Franqui, Anthony Franqui, Paul Totten, and the rest of TFDB worked with Eric Cline, Shyla Cline, and Larry Scott Morris to perfect a sales pitch that sold timeshare owners on the promise of legal services through a "Legal Plan." I attended those meetings. Erica Franqui, Anthony Franqui, Paul Totten, and the rest of TFDB would meet regularly with Eric Cline, Shyla Cline, and Larry Scott Morris to discuss business strategy, advertising strategy, and plan and plot how to grow the business of deceiving consumers into believing that ARMG and TFDB had a legitimate method of helping consumers out of their timeshare contracts.

35.    I attended multiple meetings at ARMG offices with Erica Franqui, Anthony Franqui, Paul Totten, Eric Cline, Shyla Cline, and Larry Scott Morris where the creation of TFDB by ARMG was discussed, and where it was planned how to form TFDB, how to capitalize on ARMG's marketing, and for TFDB and ARMG to work 'hand in hand' to conduct business. I was under the impression that this firm (TFDB) was being formed to do legitimate legal work. I was wrong and it is apparent to me now that TFDB was just causing consumers to be foreclosed on in the same way ARMG had always caused to happen. I also met with attorney Christopher Burk at least twice, in the office off of Cypress Creek Boulevard. The meetings with Christopher Burk involved the same subject (forming TFDB, how to capitalize on ARMG's marketing, and how to utilize the two organizations together). All of the attorneys at what is now known as TFDB met every single person on the sales floor who sold the mortgage product (the "Attorney Solution"). This was done to discuss how best to sell the Attorney Solution. The TFDB

attorneys told the sales floor that they were litigators and were going to go after the resort developers.

36.     I later found out that the "Legal Plan" offered by ARMG was nothing more than an illegitimate attempt by ARMG and TFDB to avoid the outward appearance that TFDB was directly sharing legal fees with ARMG. As for the consumers, they were made to believe that the "Legal Plan" was a benefit in the form of unlimited use of TFDB for timeshare cancellation legal services.  Also, this was the only 'benefit' the consumer received from the "Legal Plan"; there was nothing else to the "Legal Plan".  For a while, I was looking to add other components to the "Legal Plan" (like union workers get where you have the plan for multiple different purposes and needs), but we never did.

37.     In reality, the only service being offered through the "Legal Plan" was the fake "guarantee" of timeshare cancellation.[3]

38.     The timeshare owners sent to TFDB by ARMG (which at this time was mainly operating as "Resort Release") were charged a percentage of their remaining mortgage balance, typically 20%.

39.     TFDB was intertwined with ARMG to such an extent that ARMG paid TFDB's overhead, had access to TFDB's customer-relationship management program, and could even listen in on telephone calls between TFDB and timeshare owners.  ARMG would listen in on the calls frequently.

40.     TFDB did not have any clients and was manufactured by Eric Cline, Shyla Cline, and Larry Scott Morris to do ARMG's timeshare mortgage work.  Eric Cline, Shyla Cline, Larry Scott Morris, and ARMG provided TFDB's first office, which was ARMG's original office off

---

[3] During my tenure at ARMG, I am not personally aware of any consumer that was legally exited from a timeshare contract.

of Sunrise Boulevard in Fort Lauderdale. Eventually, Eric Cline, Shyla Cline, Larry Scott Morris, and ARMG moved TFDB's offices to a building next to ARMG's office off of Cypress Creek Parkway because Eric Cline and Larry Scott Morse wanted TFDB closer to ARMG's office.

41.     I also observed that ARMG employees would be sent to work at TFDB. For example, Eric Cline wanted Jacob Larouche (who was an ARMG employee, working as a Verification Officer in the sales department) to go work for TFDB to handle customer service for TFDB (such as making "welcome" phone calls). Jacob's major concern was that he was going to now be paid by TFDB and not ARMG and would not have insurance, so the only way he was going to transfer was if ARMG covered Jacob's insurance. ARMG agreed. I was in the meetings where this occurred and was unhappy to lose Jacob as an employee at ARMG as he was one of my best employees.

42.     To manage customers, ARMG and TFDB had access to the same customer-relationship management software program known as "Consys CRM".

43.     Further, ARMG provided TFDB with a phone system that gave ARMG the ability to monitor TFDB's phone calls with timeshare owners, which ARMG did. ARMG frequently listened in on phone calls.

44.     I personally observed that Eric Cline and Larry Scott Morse would monitor phone calls between TFDB and timeshare owners using the phone system provided by ARMG in order to evaluate TFDB's ability to handle and keep customers so as not to have to give customers their money back. Money never changed hands between customers and TFDB so any demands for refunds were paid by ARMG.

45. Once the sale was complete, these timeshare owners were convinced to stop making payments and go into default. Once in default, ARMG and TFDB could claim that they had successfully cancelled the timeshare when in fact they had only brought about a foreclosure of the timeshare owner's interest, resulting in damage to the owner's credit.

46. In my opinion, if timeshare owners had known that ARMG and TFDB never intended to provide actual legal services and instead had created a scheme to induce timeshare customers to default, thereby resulting in foreclosure and damaged credit, these timeshare owners would never have paid ARMG up to 20% of the balance of their mortgages to sign up for this fraudulent scheme.

47. By April of 2018 my work environment at ARMG had become intolerable. My pay had been significantly reduced for no valid reason, while the Clines, Morse and TFDB were raking in millions. Moreover, I no longer felt comfortable with the manner in which ARMG, its principals, related businesses, including TFDB, and websites were doing business. For example, I had seen situations where elderly persons were cashing in their savings and/or investments to pay for these fake services. In some instances, consumers were paying upwards of $100,000 for purported services, only to end up in foreclosure and, ultimately, with their credit destroyed.

48. After a heated exchange with Eric Cline, Larry Scott Morse, and Shyla Cline, I left my employment with ARMG.

{REMAINDER OF PAGE LEFT INTENTIONALLY BLANK}

PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

FURTHER DECLARANT SAYETH NAUGHT.

Executed: November 16, 2018.

DENNIS LANGE

ORLDOCS 16537287 3

# Frontier Script

Hello, is this _____? Hello _____ my name is _____ and I'm calling on behalf of American Resource Management Group. How are you? Glad to hear it.

The reason for my phone call is that you inquired online looking for some assistance liquidating a _____ resort. I wanted to reach out and explain the service that we provide to timeshare owners and see if we can be of any assistance to you.

We are not a timeshare resale company and we do not offer rental listings. We provide one core service, and that is legally and permanently removing your name from the ownership, freeing you from any and all financial obligations to your resort – maintenance fees, taxes and special assessments. **I have to imagine that is what you are looking for, right?**

Well, what I can do is take down some informatino on your ownership and see if it qualifies for our service – but first – I would like to give you all our contact information. Do you have a pen and paper?

<AGENT NAME>
American Resource Management Group
Rockford, Illinois
888-338-4427
www.ARMGtransfers.com

…………Then fill out worksheet in it's entirety……..

What the next step will be is for me to submit the information you just provided me into your Qualifications Department. We do this to make sure the specifics on your ownership would qualify for our liquidation program, and is something we can acquire into our inventory portfolio.

Would you be available for a consultation with one of our senior representatives today?  <Pick the day and time they are available>

The only thing we ask from you is that you have access to a computer during our consultation because a lot of the information we will go over with you is on our website.

It was a pleasure speaking with you _____, have a GREAT day!

**Exhibit "A"**

# Rockford, Illinois Facts:

2nd Biggest city in Illinois

NIU, Champaign U of I : major universities

Rock Valley College (local College)

Rockford Ice Hogs hockey team

1hr 45min NW from Chicago (Sears Tower now known as the Willis Tower/ John Hancock building/Trump Towers) 3 buildings that make the skyline.

Navy Pier is a well known tourist place downtown Chicago.

Harlem High school: popular high school in rockford

Corn fields everywhere

Rock River for fishing and boating

Office is right off I-90

20min south of the Wisc border

Cubies for baseball, Wrigley Field (rooftop seating is the best in the out field)

Bulls Basketball

Rock cut State Park

Hyway 20

Rockford Library

Lake Michigan

Sock Monkey

**Exhibit "B"**

Question from client; CAN I STOP MAKING PAYMENTS TO MY RESORT?

TAI answer to be used; We cannot legally tell you to, or not to continue making payments to the  resort. What we are allowed to tell you is that the overwhelming majority of our clients do make the decision to stop making their payments.  Additionally, those who stop making payments do get their cancellation quicker than those who do not.

**Exhibit "C"**

## DECLARATION OF KIMBERLEY SKERRITT

1.      My name is Kimberley Skerritt.  I am over eighteen (18) years of age and I am authorized and competent to make the statements contained in this declaration, which statements are made based upon my personal knowledge.

2.      I am a former employee of American Resource Management Group, LLC a/k/a Resort Release ("ARMG").  ARMG, which has also been known as Resort Release, is an entity that advertises to timeshare owners and claims to offer services that will release the timeshare owner from any payment obligations and dispose of their timeshare agreements.

3.      I worked at ARMG and Resort Release from February 2015 until January 2018, first as an executive assistant and ultimately as Financial Operations Manager.  As Financial Operations Manager, I controlled payments, ensured monies were received, ensured contracts were properly executed, conducted audits of accounts receivable, and ensured employees were properly paid.

4.      ARMG is owned by husband and wife, Shyla Cline and Eric Cline, and operated by Eric Cline, Shyla Cline, and Larry Scott Morse. [1]

5.      Redemption and Release, LLC ("Redemption and Release") is owned by Larry Scott Morse.  Redemption and Release is operated by Larry Scott Morse.

6.      ARMG and Redemption and Release work together.  The Clines and Morse, and ARMG and Redemption and Release, worked as 60/40 partners.   The Clines and ARMG received 60% of the profits and Morse and Redemption and Release received 40% of the profits.

7.      When I joined ARMG, Shyla Cline ran the administrative team, Eric Cline ran the sales team, and Larry Scott Morse was running the marketing team of the combined companies.  Morse told me that consumers would call in because they wanted to get out of their timeshares

---

[1] Mr. Morse goes by various different names in an effort to hide his identity.

Exhibit "2"

and other companies claimed they did the same thing but they were not legitimate, and that ARMG and Redemption and Release were legitimate.

8.    However, I learned that what ARMG and Redemption and Release were doing was not what was being advertised to consumers.  If a consumer owned a timeshare and did not have a mortgage, the consumer was charged thousands of dollars and told that the timeshare would be disposed of, and that the timeshare would not be resold.  However, many of the timeshares were simply resold, primarily through eBay.  As consumers would find out that ARMG, Redemption and Release, the Clines, and Morse were simply reselling their timeshares, and that the timeshare interest had remained titled in the name of the consumer the entire time, they would receive complaints.  Vacation Properties for Less was created to hide this activity.  I helped create Vacation Properties for Less by completing necessary paperwork, obtaining required licensure, and setting up payroll, amongst other activities.  Vacation Properties for Less was formed in secret and for the sole purpose of obscuring ARMG's and Redemption and Release's true business activities because ARMG and Redemption and Release (and the Clines and Morse) told consumers that they did not resell the timeshare interests – in fact, this promise was part of the pitch made to consumers.

9.    Payments were processed through merchant accounts.  Many merchant accounts were used.  CMG, Meritus, and NMI were (or still are) used by ARMG.  Redemption and Release had a separate Meritus account, they also use or used Power Pay and Pay Pal (which was used for the eBay sales).  Aratix was used by both ARMG and Redemption and Release.

10.    For consumers without mortgages or loans, payments were processed directly by ARMG and/or Redemption and Release.

11.     For consumers with mortgages or loans on their timeshare interests, they were sent to lawyers.  Originally those lawyers were Castle Law.  Castle Law was supposed to process the payment from the consumer directly and pay a 'cut' or portion of it back to ARMG, Redemption & Release, the Clines, and Morse.  However, Castle Law rarely, if ever, made any of the required payments.

12.     Because of non-payment from Castle Law, the business was transferred to U.S. Consumer Attorneys ("USCA").

13.     USCA is run by a man named Robert "Bob" Sussman.

14.     USCA would process payments directly from consumers.  If a consumer was paying more than $6,000, ARMG, Redemption and Release, the Clines, and Morse would receive a payment of 68% of the total sales price.  If the consumer was paying less than $6,000, USCA would keep $1,600, and the remaining portion would be paid to ARMG, Redemption and Release, the Clines, and Morse.  Payments were originally made by USCA directly to Morse's bank account at PNC Bank.  Morse would then reconcile the account by stating what had been paid to him and paying the Clines 60% of what Morse had received.  One of my jobs was to streamline and 'professionalize' this process to ensure all payments were being made.  I would review lists of files provided by USCA and Bob Sussman and confirm whether the payments had been received by Morse.

15.     In reviewing the list of payments collected by USCA, I recall seeing a company named 1 Planet Media as a company that had processed payments on behalf of USCA.  I worked with a woman who I believed to be named Laura Parma who was the individual that would normally send me the list of payments. Parma utilized a 1 Planet Media email account.

16.     Eventually, the Clines and Morse decided they wanted to have their own law firm that they would have more control over and created the law firm known as Totten Franqui Davis and Burk ("TFDB"). The Clines and Morse paid for the formation of TFDB. I recall meeting Erica Franqui when she was meeting with Shyla Cline at the ARMG office to discuss how the current business was operating. ARMG and Redemption & Release provided TFDB office space and gave TFDB access to their CRM system.

17.     ARMG, Redemption & Release, the Clines, and Morse interviewed other groups of attorneys before deciding to form TFDB. There may have been about three other sets of attorneys interviewed.

18.     ARMG transferred multiple employees to TFDB, I believe the exact number was three (it might have been more) and that one of those employees was Catherine. All of the employees transferred from ARMG to TFDB were being paid by ARMG and I was the one who processed payroll to pay these employees. To the best of my knowledge, when I left ARMG there were only the three transferred employees at TFDB.

19.     I received multiple refund requests while working for ARMG and Redemption & Release. In the beginning, most of the refund requests were generally made because either the consumer was spending a lot of money and having second thoughts or because of poor customer support and service. Towards the end of my time the complaints were shifting towards consumers complaining that ARMG/Redemption and Release is a scam. I had multiple consumers tell me that they had not received what they had been promised.

20.     Larry Scott Morse handled all demands for refunds and made the decisions on whether to make refunds.

21.    ARMG/Redemption and Release was grossing around $40million per year.   On transfers (those consumers without mortgages/loans) ARMG/Redemption and Release would process payments of between $200,000 and $500,000 per week while consumers were being charged around $5,000 per timeshare.   On mortgage/loan cases, an additional $200,000 per week was being processed while consumers were being charged on average between $6,000 and $15,000 per timeshare.

22.    I sat in on many meetings with the Clines and Morse where business was discussed.   During at least one of those meetings I remember them discussing Patriot Law, Jordan Salkin, and the Timeshare Freedom Group.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

FURTHER DECLARANT SAYETH NAUGHT.

Executed: November 27, 2018.

KIMBERLEY SKERRITT

ORLDOCS 16551173 1

## DECLARATION OF BROOKS NUNEZ

1.  My name is Brooks Nunez.  I am over eighteen (18) years of age and I am authorized and competent to make the statements contained in this declaration, which statements are made based upon my personal knowledge.

2.  I am a former employee of American Resource Management Group, LLC a/k/a Resort Release ("ARMG").  ARMG, which has also been known as Resort Release, is an entity that advertises to timeshare owners and claims to offer services that will release the timeshare owner from any payment obligations and dispose of their timeshare agreements.  These services were provided relative to timeshare owners with agreements with numerous and varied timeshare developers, including, without limitation, Wyndham, Diamond, and Bluegreen.

3.  I worked at ARMG and Resort Release from January 2015 until June of 2018 as a sales manager/closer.  As a sales manager/closer I would work on phone call scripts, rebuttals (which are scripts used by salespeople to respond to complaints made by consumers on the phone), compile reports, and help oversee the sales people.  I reported to Dennis Lange and reported to him on a daily basis.

4.  ARMG is owned by husband and wife, Shyla Cline and Eric Cline, and operated by Eric Cline, Shyla Cline, and Larry Scott Morse. [1]

5.  Redemption and Release, LLC ("Redemption and Release") is owned by Larry Scott Morse.  Redemption and Release is operated by Eric Cline, Shyla Cline, and Larry Scott Morse.

6.  ARMG operates a call center in Fort Lauderdale, Florida.  ARMG states that this call center is in Rockford, Illinois, but that is false.  I was personally located in Fort Lauderdale, Florida with the call center staff.

---

[1] Mr. Morse goes by various different names in an effort to hide his identity.

7.     While working at ARMG, ARMG operated two (2) separate schemes depending on the timeshare owner's circumstances.  If the timeshare owner did not have a mortgage and was seeking to be released from maintenance fee obligations, ARMG would offer a "Transfer Service".  If the timeshare owner had a mortgage, they would be offered an "Attorney Solution".

8.     ARMG's "Transfer Service" falsely claimed that ARMG had exclusive relationships with "travel clubs" and "vacation clubs" who would come to ARMG for timeshare inventory. ARMG would explain to the timeshare owner that ARMG had to pay these clubs to "take it off our hands", which was false.  ARMG would issue bogus "inventory control numbers" to the consumers to make it seem to the consumer like something significant was happening, when in fact it was not.  It was part of a script and ARMG's standard operating practice to tell consumers that it was impossible to sell their timeshare and impossible to get a resort to take the timeshare interest back.  ARMG would then tell the consumer that they could work with a very limited number of timeshare developers and that they would take the interest on, would issue the bogus "inventory control number" to the consumer, and tell the customer that the "inventory control number" was only good for a day or two because the "travel clubs" and "vacation clubs" could only take back so many timeshare interest that month and they had almost reached the limit they could take that month.  All of the foregoing was a lie.  All "inventory control numbers" were the same – it was someone's birthday (possibly Eric Cline's birthday but I do remember exactly).  The fake inventory control number was designed to put pressure on the consumer to agree to pay ARMG thousands of dollars and create a false sense of urgency.  Once the consumer agreed to pay ARMG, Larry Scott Morse would call as the "verification department" and three days later Shyla Cline the customer to congratulate them on being a customer.  Shyla Cline waited three days (and no payments would be processed for three days)

because that was the period of time customers were given to cancel their contract with ARMG was three days. Now, there are teams of people who handle the verification and welcome calls.

9.      If the timeshare owner held a mortgage, ARMG would pitch a scheme designed to deceive timeshare owners into believing that they required the "Attorney Solution."

10.      I observed ARMG employees, at the direction of the Clines and Morse, during calls with consumers act like they had been negotiating with attorneys, when, in truth, they had not. In some instances, these employees would make it confusing as to whether they were attorneys or not. Sometimes, customers would be so confused they would call back asking to speak to the attorney they had spoken to (which was actually just the sales person). ARMG would place customers on hold for long periods of time and pretend they were speaking with attorneys, then take the customer off hold to state that the attorney had a question or some questions for the consumers, get the answer(s), put the customer back on hold to pretend to speak to the attorneys, and repeat this pattern multiple times. In reality, ARMG was not speaking to any attorney and was just stringing the customer along to make it seem like ARMG might not take on the customer because the customer's consumer rights hadn't been violated – for example, the sales person might go outside and smoke a cigarette. In reality, ARMG was going to take any consumer that called them. This was all part of a script and part of the standard operating practices of ARMG. The goal was to make the consumer feel like their consumer rights had been violated (even when they had clearly not been violated) and get the consumer to say so. There was never any case evaluation performed by a lawyer.

11.      In reality, there was no plan or process. The attorneys used would simply send form letters to resorts and, if the resort failed or refused to negotiate, the attorneys would either allow the resort to foreclose on the consumer or offer a deed-in-lieu of foreclosure. Either way,

all, or nearly all, of the ARMG customers who used the "Attorney Solution" would wind up with damaged or ruined credit.

12.     Initially, the consumers who were put in the "Attorney Solution" were sent to Castle Law Group.  After Castle Law Group failed to pay ARMG monies owed to ARMG, ARMG began working with US Consumer Attorneys, P.A. ("USCA").  The person who ran USCA is Robert "Bob" Sussman.  I have met Bob Sussman a couple times.  One time he came into the ARMG office and started handing cash (a few hundred dollars) to sales agents for doing a good job.

13.     I have never heard of or met anyone by the name of Henry Portner.

14.     Eventually, problems arose between ARMG and USCA.  There were two main problems.  The first was that consumers who called ARMG actually paid USCA, and USCA was supposed to pay to ARMG a 'cut' or portion of that money.  USCA began failing to pay all amounts allegedly due and owing, just as Castle Law had.  The second problem was that USCA's customer service was very poor and was causing a lot of consumer complaints to be made, which had to be handled by ARMG.  This created a problem for ARMG as they were having to handle customer complaints.

15.     As the problems with USCA got worse, the Clines, Morse, and ARMG began looking for a replacement for USCA.

16.     The Clines created and fully funded Totten Franqui David & Burk, LLC ("TFDB"), "their firm," and provided TFDB an office in the same building as ARMG.  I heard Eric Cline state multiple times that he, his wife, Morse, and ARMG had formed TFDB, that it was "their" firm, and that they had financed the formation of TFDB.  At this point, ARMG ceased working with USCA.

17.     TFDB was given an office in ARMG's old office space.  Eventually, TFDB was moved to an office next o ARMG's new offices off of Cypress Creek Boulevard in Fort Lauderdale, Florida.

18.     I personally observed that Eric Cline and Larry Scott Morse would monitor phone calls between TFDB and timeshare owners using the phone system provided by ARMG in order to evaluate TFDB's ability to handle and keep customers so as not to have to give customers their money back.  Money never changed hands between customers and TFDB so any demands for refunds were paid by ARMG.  I personally heard Eric Cline yelling because he was upset that the TFDB lawyers were going to potentially lose a client.

19.     All calls between ARMG and consumers are recorded.  I believe the recordings are kept for 90 days.  I believe ARMG uses an IP based phone system.

20.     Sales practices did not change substantively.  Went from speaking with the "legal team" to speaking with the "legal plan administrator".  There was no legal plan administrator.  TFDB was aware of this fact.  Other than this, the call scripts and sales practices did not change in any meaningful way once TFDB was formed.

21.     At one point, Eric Cline came in to the office and bragged that he had "forced" the Totten Franqui Davis & Burk attorneys to accept clients from an additional 15 states.  I do not know why, but TFDB refuses to take customers who are residents of Florida (as well as some other states).

22.     I also observed that ARMG employees would be sent to work at TFDB.  For example, Eric Cline wanted Jacob Larouche (who was an ARMG employee, working as a Verification Officer in the sales department) to go work for TFDB to handle customer service for TFDB (such as making "welcome" phone calls).  Other employees were also shared by, or sent

from, ARMG and TFDB.  My understanding is that some of these employees were directed to review lawsuits filed by Finn Law in order to identify potential strategies to utilize.  In other words, the TFDB lawyers did not know how they were going to handle cases.

23.    I am unaware of any instance where a TFDB lawyer actually met with or spoke to a consumer.  In every case, the consumer was told they had a viable case, and was signed to a contract with ARMG, before ever speaking to any lawyer at TFDB (or any other firm).

24.    Eventually, ARGM, the Clines, and Morse began speaking with Bob Sussman again to send work back to USCA.  Bob Sussman told ARMG, the Clines, and Morse that Dennis Lange had contacted him (Bob Sussman) about forming his own timeshare exit company. I had been in contact with Dennis Lange about joining his new timeshare exit company.  The same day that ARMG began sending work back to USCA I was fired.

PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

FURTHER DECLARANT SAYETH NAUGHT.

Executed: November 26, 2018.

BROOKS NUNEZ

ORLDOCS 16551153 1

- 6 -

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF FLORIDA

 3                 WEST PALM BEACH DIVISION

 4                  9:180CV-81055-DMM

 5            **Excerpts of this transcript have been

 6              declared attorneys' eyes only and

 7            have been sealed under separate cover**

 8    WYNDHAM VACATION OWNERSHIP, INC., a
      Delaware corporation, WYNDHAM VACATION
 9    RESORTS, INC., a Delaware corporation,
      WYNDHAM RESORT DEVELOPMENT CORPORATION,
10    an Oregon Corporation, and SHELL VACATIONS,
      LLC, an Arizona limited liability company,
11
          Plaintiffs,
12
          vs.
13
      TOTTEN, FRANQUI, DAVIS & BURK, LLC, a
14    Florida limited liability company; TOTTEN,
      FRANQUI, DAVIS & BURK, PLLC, a North
15    Carolina professional limited liability company;
      AMERICAN RESOURCE MANAGEMENT GROUP, LLC d/b/a
16    resortrelease.com d/b/a
      Americanresourcemanagementgroup.com, a Florida
17    limited liability company; VACATION PROPERTIES
      FOR LESS, LLC, a Florida limited liability
18    company; REDEMPTION AND RELEASE, LLC, a Florida
      limited liability company; RESORT EXIT TEAM, LLC
19    d/b/a resortexitteam.com, a Florida limited liability
      company; HELPING TIMESHARE OWNERS, INC. f/k/a HELPING
20    TIMESHARE OWNERS, LLC d/b/a canceltimesharecontract.
      com d/b/a Help4TSO, a Florida corporation; JOHN
21    DOE #2 d/b/a Timeshare Freedom Group d/b/a
      timesharefreedomgroup.com; ERIC S. CLINE a/k/a
22    STEPHEN E. CLINE, an individual; SHYLA CLINE, an
      individual; SCOTT MORSE a/k/a LARRY SCOTT MORSE,
23    an individual; WILLIAM HOWELL, JR. a/k/a William
      W. Howell, Jr. a/k/a Bob Howell a/k/a Bill Howell,
24    an individual; and JORDAN SALKIN, an individual,

25        Defendants.
```



**Orange Legal**
**800-275-7991**

```
1    ********************************************************

2    VIDEOTAPED DEPOSITION OF:  ERIC CLINE

3    DATE TAKEN:                March 25, 2019

4    TIME:                      10:00 a.m. to 5:54 p.m.

5    PLACE:                     200 East Broward Boulevard
                                Suite 2100
6                               Fort Lauderdale, Florida

7    TAKEN BEFORE:              JERI DRUM, COURT REPORTER
                                AND NOTARY PUBLIC
8    ********************************************************

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1        A    It was because the home solicitation, sir,

 2   yes.

 3        Q    And then you left.  And is that when you moved

 4   to Rockford, Illinois?

 5        A    Is that when we moved to Rockford, Illinois?

 6   That is when we moved to Rockford, Illinois, yes, sir.

 7        Q    And when you moved to Rockford, Illinois, did

 8   you start another business there?

 9        A    Yes.

10        Q    And what was the business you started there?

11        A    American Resource Management Group.

12        Q    It is the same ARMG that we're talking about

13   in this case, correct?

14             MR. WATERWAY:  Object to the form.

15             THE WITNESS:  Well, there is two different

16        ARMGs.

17        Q    (By Mr. Bennington)  Well, let's talk about

18   them.  What is the first one and when did it change or

19   when did there become a second one?

20        A    Okay.  So we had -- the first one we would

21   have incorporated, I believe, January of 2012.

22        Q    And that was the -- the January 22, 2012, does

23   that sound right?

24        A    I thought it was the '12 but I wasn't sure of

25   the exact date so I didn't say it.
```

```
 1        Q     But 2012 or January of '12?

 2        A     January of 2012 in Illinois.

 3        Q     And that would be a short time after you were

 4   arrested for the Skyline operating -- the home

 5   solicitation, as you put it, correct?

 6        A     I don't recall.  I don't know what you mean by

 7   a short period of time.

 8        Q     Okay.  Did you plead guilty to any charges

 9   involving the Skyline situation?

10        A     I don't recall what I pled, to be honest with

11   you.

12        Q     Were you fined or sentenced?

13        A     I was not sentenced to anything.  To the best

14   of my knowledge, it was dropped to a misdemeanor.

15        Q     Okay.  Did you pay a fine, if you recall?

16        A     Yes, sir.

17        Q     All right.  And then what did you do?  What

18   did you do next?  What business did you endeavor on

19   after that?

20        A     Well, me and my family moved back to my

21   hometown and my wife and I started American Resource

22   Management Group.

23        Q     And what was the purpose of American Resource

24   Management Group?

25        A     Assisting timeshare owners with resolutions.
```



```
 1        Q    And what does that mean, resolutions?

 2        A    If a consumer is looking for help out of an

 3   ownership, we will assess their ownership, their

 4   situation and circumstances.  And if there is help

 5   available that we believe we can offer them, we would

 6   enroll them into our Resort Release's services.

 7        Q    All right.  Before we get into that, did ARMG

 8   advertise a process by which they -- to offer the

 9   service of canceling a timeshare, owner's timeshare

10   contract?

11             MR. WATERWAY:  Object to the form.  Time

12        period?

13        Q    (By Mr. Bennington)  At the time that you

14   started the company.  I'm talking the beginning of the

15   company when you started ARMG, did you commence

16   advertising, for starters?

17        A    No.

18        Q    At any point did you advertise for the

19   cancelation of a timeshare owner's interest in a

20   contract; did you promote that?

21        A    From conception to today?

22        Q    Correct.

23        A    ARMG did advertise.

24        Q    Okay.  And what did you advertise?  What was

25   your advertisements, in essence?
```



 1      A    ARMG advertised that we could help people out

 2  of -- or we could help people with timeshare problems.

 3      Q    Okay.  You were going to say help them --

 4  well, strike that.

 5           What does help them with timeshare problems

 6  mean?

 7      A    If someone, like, for instance, we get every

 8  single day people calling us up saying they can't --

 9  they can't use their ownership.  They were, quote,

10  unquote, bullied into a timeshare.  Didn't understand.

11  They were given a credit card to put down on the down

12  payment, PayPal account, exorbitant interest rates.

13           They were promised they could go to New York

14  every single year to see their son and that's the only

15  reason they bought it and the first time they go to book

16  a vacation realize they are not even allowed to go to

17  New York.

18           An elderly couple that is 80 years old and

19  has, unfortunately, spent over $450,000 on a timeshare

20  and later on the husband writing a suicide letter and

21  committing suicide based off of just a timeshare

22  developer and what they have done to their family.

23  That's what we help with.

24      Q    Okay.  Let's go back.  How do you help them

25  specifically?  Do you help them cancel the timeshare?

 1   Do you help them sell -- what do you do?

 2        A    Great question.  So we -- what American

 3   Resource Management Group does or Resort Release?

 4        Q    What is Resort Release?

 5        A    We -- it is a DBA --

 6        Q    Okay.

 7        A    -- that we have done or that the company did.

 8   It was just consumers understood it more.

 9        Q    Okay.  So Resort Release is the same -- when

10   we speak of Resort Release and ARMG, one and the same?

11        A    One and the same.

12        Q    So go ahead.  You were telling me what it is

13   you do to help all these people that you just listed --

14        A    Yes, sir.

15        Q    -- that had issues.  What is the services that

16   you provide in terms of canceling or exit; what do you

17   do?

18        A    Great question.  So there is two different

19   programs that Resort Release offers.  One is a transfer

20   of ownership and that is for paid-in-full timeshares.

21        Q    Okay.

22        A    There is a couple different ways and means

23   that we go about that.  For a consumer that has a

24   paid-in-full timeshare, they are current with their

25   fees, we -- on some of the resorts we have had a

1       Q     (By Mr. Bennington)  But this is someone that

2    has a mortgage, right?

3       A     Someone that has a mortgage.

4       Q     Right.  Why would you -- they are not lawyers,

5    right?

6       A     They are not but to our understanding they

7    deal with people that can help facilitate getting them

8    out.

9       Q     Do you think that is important to know who the

10   lawyer would be that could help them to get out?

11      A     We're just sending a lead over.

12      Q     And do you charge for that?

13      A     They -- we don't -- they send us -- One Planet

14   Media pays us.  And it is not even Resort Release that

15   they pay.  It is -- I believe they pay Redemption and

16   Release.

17      Q     And what is Redemption and Release?

18      A     It is another entity that Scott had when we

19   first started out being two separate companies.

20      Q     Why would you need two separate companies to

21   do the same job?

22      A     Well, you asked what Resort Release was.

23      Q     Correct.

24      A     We didn't need two separate companies.  But

25   when we started, we had two separate companies.

```
 1        A    Great question.  So I had gotten a taste of

 2   the South Florida sun and went back up north.  And I

 3   remember the exact date that I decided I wanted to come

 4   home.  I was trying to shovel my car out of the

 5   driveway.  And you know when the snow turns to ice and

 6   you can't quite get it off the driveway, well, I had

 7   taken my shovel and I set it on the side of the house

 8   and I came in and I said, honey, I don't want to shovel

 9   driveways anymore.

10           So I don't know the exact date.  But it was in

11   the middle -- it was in the winter months and I just

12   told her I'm done dealing with the snow.

13        Q    Why was there a need to create a separate

14   Florida ARMG?

15        A    I don't know if there was a need but we didn't

16   know any better at the time, sir.  And we thought that

17   was the right thing to do.

18        Q    Who made that decision to create separate

19   entities?

20        A    I don't know if one individual made that

21   decision, sir.

22        Q    Did the Florida and Illinois ARMG entities

23   operate differently or provide any different services?

24        A    To the best of my knowledge, no.

25        Q    So can you describe any differences that there
```

# RESORT RR RELEASE

(888)758-0993

▸ Services        ▸ Testimonials        ▸ Fees        ▸ FAQ's        ▸ Who We Are

    

GET A FREE QUOTE



## 5 Timeshare Release Questions

### 1. Who does Resort Release provide timeshare transfer services for?

The ResortRelease.com timeshare transfer program is for timeshare owners who:

- Are unable to use their timeshare.
- Who are concerned about their inability to sell their timeshare through a listing company.
- [...] expected increasing Maintenance Fees and Special Assessments Fees.
- [...] nes inheriting their timeshare and all the fees that go along with it.

**Kathy from San Francisco, CA**
Enrolled in Cancellation Services
1 minute ago  ★ SES-1308233

📞 Call Us Now 888-758-0993

- Are unable to use their timeshare.
- Who are concerned about their inability to sell their timeshare through a listing company.
- Have been overwhelmed by unexpected increasing Maintenance Fees and Special Assessments Fees.
- Are worried about their loved ones inheriting their timeshare and all the fees that go along with it.
- Have become increasingly frustrated with Exchange Companies.
- Are looking for more affordable vacation options.
- Are widowed, divorced, or simply can no longer travel with their loved ones
- Don't use their timeshare as much as they had originally intended.
- No longer able to travel.

## 2. What does Resort Release do?

We are a timeshare release company that helps remove timeshare owners from their unwanted timeshare properties. We guarantee to get you out of your timeshare contract. Period.

## 3. Do I qualify for your service?

If your timeshare is paid off in full and your Maintenance Fees and Special Assessments are current, then yes, you likely qualify for our timeshare release service. If your unit meets our combined criteria (i.e. qualifies), we will review our simple process with you to ensure it is the best option to suit your needs. If your resort does not qualify for our service, our consultants will provide you with the direction and advice you may find difficult to uncover on your own, free of charge. Contact us today!

## 4. Do you charge an upfront fee for your services?

Simply put, yes. The fees associated with our services are collected upfront, but only after you have thoroughly reviewed our Transfer Agreement and you understand how our guaranteed process works. Feel free to contact us to learn more.

## 5. Is ResortRelease.com a legitimate solution to removing my family from our timeshare contract?

We are proud to say that we are one of the only A+ rated, BBB accredited timeshare release companies in the industry. We have already helped thousands of people legally and permanently get out of their timeshare. We always put our clients first and all of our services are guaranteed.

## Learn More



Kathy from San Francisco, CA
Enrolled in Cancellation Services
1 minute ago ⭐ SES-1308233

build a great company, you have to also build a great community. As a platinum member of our proud sponsor of many local community building events, we work hard to give back to the city

📞 Call Us Now 888-758-0993

GET A FREE QUOTE

## Learn More

At Resort Release we believe to build a great company, you have to also build a great community. As a platinum member of our local Chamber of Commerce and proud sponsor of many local community building events, we work hard to give back to the city that has given us so much. We welcome you to request more information on our services and talk to one of our friendly team members.

**SIGN UP FOR A FREE CONSULTATION TODAY**

GET A FREE QUOTE

 1

 2

 3

### FREE CONSULTATION

Our top advisors provide a free in-depth review of your timeshare purchase. If accepted as a client, we will guarantee the outcome.

### LEGAL CANCELLATION

Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.

### GUARANTEED RESULTS

We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.

    

**Mary Lin Metcalf**

I was very pleased with the whole experience. Everything was clearly explained and I was kept informed at each step in the process. Everyone I came in contact with was professional and knowledgeable. It was such a pleasure to go through this as securely as I did. I am now timeshare FREE all thanks to RESORT RELEASE!

### GUARANTEE POLICY

### CONTACT US

### NAV LINKS


**Kathy from San Francisco, CA**
Enrolled in Cancellation Services
1 minute ago    ⭐ SES-1308233

 **Resort Release**
6785 Weaver Road #1b

> Home

**Call Us Now 888-758-0993**

Document title: FAQ&#39;s | Resort Release
Capture URL: https://www.resortrelease.com/faqs
Capture timestamp (UTC): Tue, 07 Aug 2018 16:01:35 GMT

## FREE CONSULTATION

Our top advisors provide a free in-depth review of your timeshare purchase. If accepted as a client, we will guarantee the outcome.

## LEGAL CANCELLATION

Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.

## GUARANTEED RESULTS

We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.

    

GET A FREE QUOTE

**Mary Lin Metcalf**

I was very pleased with the whole experience. Everything was clearly explained and I was kept informed at each step in the process. Everyone I came in contact with was professional and knowledgeable. It was such a pleasure to go through this as securely as I did. I am now timeshare FREE all thanks to RESORT RELEASE!

## GUARANTEE POLICY

Legally and permanently getting out of your timeshare has never been this easy. At Resort Release the client always comes first.

 



Resort Release is not a law firm, and the employees of Resort Release are not attorneys.

Terms and Privacy

## CONTACT US

📍 **Resort Release**
6785 Weaver Road #1b
Rockford, IL 61114

📍 **Resort Release**
1401 W Cypress Creek Road
Suite 101
Fort Lauderdale, FL 33309

📞 **Phone Number:**
888-758-0993
888-269-1598

📠 **Fax Number:**
815-708-8359

## NAV LINKS

➤ Home

➤ About

➤ Contact

➤ Careers

➤ Consultation

➤ Timeshare Consumer Rights

➤ *Client Survey*

**Kathy from San Francisco, CA**
Enrolled in Cancellation Services
1 minute ago   ⭐ SES-1308233

📞 Call Us Now 888-758-0993

Document title: FAQ&#39;s | Resort Release
Capture URL: https://www.resortrelease.com/faqs
Capture timestamp (UTC): Tue, 07 Aug 2018 16:01:35 GMT



PAGEVAULT
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Timeshare Cancellation Services |
| Capture URL: | https://www.resortrelease.com/services |
| Captured site IP: | 70.35.205.143 |
| Page loaded at (UTC): | Fri, 12 Oct 2018 16:59:39 GMT |
| Capture timestamp (UTC): | Fri, 12 Oct 2018 17:00:29 GMT |
| Capture tool: | v6.8.1 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Chrome/62.0.3202.9 |
| Operating system: | Microsoft Windows NT 6.2.9200.0 (6.2.9200.0) |
| PDF length: | 5 |
| Capture ID: | 7849c01d-6e84-4af6-a4ce-74a931e7d798 |
| User: | sb-dgeary |

# RESORT R RELEASE

(888)758-0993

▸ Services          ▸ Testimonials          ▸ Fees          ▸ FAQ's          ▸ Who We Are

6 YEARS IN BUSINESS           BBB ACCREDITED BUSINESS           ROCKFORD Chamber of Commerce

## Timeshare Causing Stress?

❌ Frustrated With Rising Fees?

❌ Don't Use It Anymore?

❌ Don't Want Your Kids To Inherit It?

❌ Can't Keep Up With Payments?

## We Offer The Solution

✅ No More Fees

✅ Never Pay Another Bill

✅ Cancel Your Contract

✅ Gain Back Financial Freedom

## We Provide Two Guaranteed Services



### Timeshare Transfer

If your timeshare is paid in full we can help you exit your timeshare with ease.



### Timeshare Cancellation

Still owe a mortgage on your timeshare? We have solutions to get you out of your mortgage payments

**— Sign up for a FREE Consultation**

🖊 Sign up for a FREE consultation to speak with a Client Advisor who specializes in your particular timeshare ownership.

**— Sign up for a FREE Consultation**

🖊 Sign up for a FREE Consultation today

- One of our Intake Managers will speak with you about what options may be available to you to terminate your timeshare ownership.

TEXAS   Daniel Ponton from Rowlett, TX
Enrolled in Cancellation Services
[since ago]   ● SES-1308233

...eshare does not
...rtgage and therefore

📞 CALL US NOW 888-758-0993

specializes in your particular timeshare ownership.

- Your paid in full timeshare does not have an existing mortgage and therefore can likely be handled through our transfer service.
- Our detailed consultation will review your individual resorts exit policies and outline the steps to successfully end your timeshare ownership.
- Unfortunately, many resorts today have placed significant obstacles in front of those wanting to get rid of their timeshare.
- Our team of expert advisors will give you directions to navigate through the complexities of your resorts exit policies.

## Transfer Away Your Fees, For Life

⇄   Once you register for our resort release program you will receive a welcome packet via 1st class mail. This packet will provide you all of the information that is needed to get the transfer process started. The transfer of ownership is a simple process, done by assigning you a dedicated Case Manager who keeps you informed every step of the way.

## Guaranteed Timeshare Freedom

⚑   We are so confident in our services that we give you three separate 100% guarantees. Over the past 6 years we have helped over 12,600 desperate families transfer out of their timeshare ... re not timeshare free ... vice, we will refund ... Contract vs today

- One of our Intake Managers will speak with you about what options may be available to you to terminate your timeshare ownership.
- If you qualify for this attorney backed service, the attorneys will work with you and pursue a strategy to attempt to terminate your timeshare contract.
- This service has strict qualification criteria.

## The Attorneys Go To Work

⚖   Once you are accepted into the timeshare mortgage and ownership cancellation program you will be sent a welcome packet introducing the team of skilled attorneys that will be working towards the termination of your contract. Resorts should fear attorneys who are well versed in the types of fraud and deception many timeshare owners have claimed to experience. The attorney service represents these qualified clients seeking to terminate their timeshare contract.

## Guaranteed Contract Termination

⚑   Your attorneys will diligently, competently, and effectively represent you in seeking the termination of your timeshare contract.
We understand how difficult and constraining timeshare contracts can be for timeshare owners. Resort Release is here to help.

**Daniel Ponton from Rowlett, TX**
Enrolled in Cancellation Services
TEXAS    ● SES-1308233

📞 CALL US NOW 888-758-0993

Document title: Timeshare Cancellation Services
Capture URL: https://www.resortrelease.com/services
Capture timestamp (UTC): Fri, 12 Oct 2018 17:00:29 GMT

have helped over 12,600 desperate families transfer out of their timeshare properties. If you are not timeshare free at the end of our service, we will refund 100% of your money. Contact us today to join the thousands of others that are currently experiencing timeshare freedom.

for timeshare owners. Resort Release is here to help.

**○ START YOUR FREE CONSULTATION TODAY!**



## 1 FREE CONSULTATION

Our top advisors provide a free in-depth review of your timeshare purchase. If accepted as a client, we will guarantee the outcome.



## 2 LEGAL CANCELLATION

Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.



## 3 GUARANTEED RESULTS

We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.

    

### George Picket

NO more maintenance fees!! Your process is very easy to follow and you delivered on every promise that was made. Competitive pricing, strong guarantees, and credible references. From the start, your directions were clear and easy to follow. The constant updates assured me that my case was continually being worked on until that magic day we were RELEASED from the timeshare!

TEXAS  Daniel Ponton from Rowlett, TX
Enrolled in Cancellation Services
1 minute ago  ● SES-1308233

**☎ CALL US NOW 888-758-0993**

Document title: Timeshare Cancellation Services
Capture URL: https://www.resortrelease.com/services
Capture timestamp (UTC): Fri, 12 Oct 2018 17:00:29 GMT

    

### George Picket

NO more maintenance fees!! Your process is very easy to follow and you delivered on every promise that was made. Competitive pricing, strong guarantees, and credible references. From the start, your directions were clear and easy to follow. The constant updates assured me that my case was continually being worked on until that magic day we were RELEASED from the timeshare!

## GUARANTEE POLICY

Legally and permanently getting out of your timeshare has never been this easy. At Resort Release the client always comes first.

 



Resort Release is not a law firm, and the employees of Resort Release are not attorneys.
Terms and Privacy

*Pending your qualification into our Timeshare Transfer Services.

Daniel Ponton from Rowlett, TX
Enrolled in Cancellation Services
SES-1308233

## CONTACT US

📍 **Resort Release**
6785 Weaver Road #1b
Rockford, IL 61114

📍 **Resort Release**
1401 W Cypress Creek Road
Suite 101
Fort Lauderdale, FL 33309

📞 **Phone Number:**
888-758-0993

📠 **Fax Number:**
815-708-8359

## NAV LINKS

> Home
> About
> Contact
> Careers
> Consultation
> Timeshare Consumer Rights
> "Client Survey"

📞 CALL US NOW 888-758-0993

PAGEV■ULT®
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Timeshare Cancellation Services |
| Capture URL: | https://www.resortrelease.com/services/ |
| Captured site IP: | 70.35.205.143 |
| Page loaded at (UTC): | Wed, 03 Oct 2018 18:47:15 GMT |
| Capture timestamp (UTC): | Wed, 03 Oct 2018 18:47:31 GMT |
| Capture tool: | v6.8.1 |
| Collection server IP: | 52.7.109.102 |
| Browser engine: | Chrome/62.0.3202.9 |
| Operating system: | Microsoft Windows NT 6.2.9200.0 (6.2.9200.0) |
| PDF length: | 4 |
| Capture ID: | 61a5c93f-50f9-48e0-90e7-e250681d6051 |
| User: | sb-dgeary |

Exhibit "8"

PDF REFERENCE #:        mpaaMqWEUM3xXyNPAFazRD

 **\*We Pay Your 2019 Maintenance Fees\*** Limited Time Promotion - Expires 09/22/18 - Transfer Service Only 

# RESORT ⟨R⟩ RELEASE

(888)758-0993

▸ Services    ▸ Testimonials    ▸ Fees    ▸ FAQ's    ▸ Who We Are

**GET A FREE QUOTE**

 6+ YEARS IN BUSINESS     BBB ACCREDITED BUSINESS     Leading Business Growth ROCKFORD Chamber of Commerce

## Timeshare Causing Stress?

❌ Frustrated With Rising Fees?

❌ Don't Use It Anymore?

❌ Don't Want Your Kids To Inherit It?

❌ Can't Keep Up With Payments?

## We Offer The Solution

✅ No More Fees

✅ Never Pay Another Bill

✅ Cancel Your Contract

✅ Gain Back Financial Freedom

# We Provide Two Guaranteed Services

 RESORT RELEASE.com

## Timeshare Transfer

If your timeshare is paid in full we can help you exit your timeshare with ease.

 RESORT RELEASE.com

## Timeshare Cancellation

Still owe a mortgage on your timeshare? We have solutions to get you out of your mortgage payments

**—**   Sign up for a FREE Consultation

✎ Sign up for a FREE consultation to speak with a Client Advisor who specializes in your particular timeshare

**—**   Sign up for a FREE Consultation

✎ Sign up for a FREE Consultation today

- One of our Intake Managers will speak with you about what options

NEVADA
**Robert Mitchell from Las Vegas, NV**
Enrolled in Cancellation Services
1 minute ago   ⭐ SES-1308220

📞 CALL US NOW 888-758-0993

Document title: Timeshare Cancellation Services
Capture URL: https://www.resortrelease.com/services/
Capture timestamp (UTC): Wed, 03 Oct 2018 18:47:31 GMT

Page 1 of 3

speak with a Client Advisor who specializes in your particular timeshare ownership.

- Your paid in full timeshare does not have an existing mortgage and therefore can likely be handled through our transfer service.
- Our detailed consultation will review your individual resorts exit policies and outline the steps to successfully end your timeshare ownership.
- Unfortunately, many resorts today have placed significant obstacles in front of those wanting to get rid of their timeshare.
- Our team of expert advisors will give you directions to navigate through the complexities of your resorts exit policies.

- One of our Intake Managers will speak with you about what options may be available to you to terminate your timeshare ownership.
- If you qualify for this attorney backed service, the attorneys will work with you and pursue a strategy to attempt to terminate your timeshare contract.
- This service has strict qualification criteria.

**+ The Attorneys Go To Work**

**+ Guaranteed Contract Termination**

**+ Transfer Away Your Fees, For Life**

**+ Guaranteed Timeshare Freedom**

**GET A FREE QUOTE**

⌄ START YOUR FREE CONSULTATION TODAY!

## 1  FREE CONSULTATION

Our top advisors provide a free in-depth review of your timeshare purchase. If accepted as a client, we will guarantee the outcome.

## 2  LEGAL CANCELLATION

Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent.

## 3  GUARANTEED RESULTS

We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.



Robert Mitchell from Las Vegas, NV
Enrolled in Cancellation Services
1 minute ago    ★ SES-1308220

   

📞 CALL US NOW 888-758-0993

purchase. If accepted as a client, we will guarantee the outcome.

binding and courthouse recorded results, your timeshare transfer is permanent.

if we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund.

GET A FREE QUOTE







### John Tillery

We tried your competitors and only lost more money! We don't know of any other company who can say they have any success helping people like us get out of the endless money pit of a timeshare. From the bottom of our hearts, thank you for giving us our freedom back.

## GUARANTEE POLICY

Legally and permanently getting out of your timeshare has never been this easy. At Resort Release the client always comes first.






Resort Release is not a law firm, and the employees of Resort Release are not attorneys.

Terms and Privacy

## CONTACT US

📍 **Resort Release**
6785 Weaver Road #1b
Rockford, IL 61114

📍 **Resort Release**
1401 W Cypress Creek Road
Suite 101
Fort Lauderdale, FL 33309

📞 **Phone Number:**
888-758-0993

📠 **Fax Number:**
815-708-8359

## NAV LINKS

> Home

> About

> Contact

> Careers

> Consultation

> Timeshare Consumer Rights

> *Client Survey*

Robert Mitchell from Las Vegas, NV
Enrolled in Cancellation Services
1 minute ago   ⭐ SES-1308220





📞 CALL US NOW 888-758-0993

PAGEVAULT®
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Transfer - Mortgage Presentation |
| Capture URL: | https://owner.resortrelease.com/transfer/#7 |
| Captured site IP: | 70.35.205.143 |
| Page loaded at (UTC): | Mon, 12 Nov 2018 18:52:08 GMT |
| Capture timestamp (UTC): | Mon, 12 Nov 2018 18:52:31 GMT |
| Capture tool: | v6.8.1 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Chrome/62.0.3202.9 |
| Operating system: | Microsoft Windows NT 6.2.9200.0 (6.2.9200.0) |
| PDF length: | 4 |
| Capture ID: | 065d8cd3-5181-4a3c-842e-05b21a20114c |
| User: | sb-dgeary |

PDF REFERENCE #:        pEkcMvmnf2QwZSoeS73fjS

RESORT **ЯiЯ** RELEASE

  

●●●

## 7

# Legislation Passed To Make Timeshare Ownership More Difficult.



Diamond Resorts U.S. Collection Members Association

Diamond Resorts U.S. Collection Members Association
Assessment Fee Department
PO Box 8526
Coral Springs, FL 33075-8526

2018 Assessment Fee
Account#: ▮▮▮▮

| Description | Debit | Credit | Amount |
|---|---|---|---|
| Beginning Balance | .00 | .00 | 185.45 |
| ARDA-ROC Voluntary Contribution | 5.00 | .00 | 5.00 |
| 2016-U.S. Base Standard Assessment | 225.00 | .00 | 225.00 |
| 2016-U.S. Point Standard Assessment | 2580.26 | .00 | 2580.26 |
| 2016-THE Club® Base Collection Assessment | 175.00 | .00 | 175.00 |
| 2016-THE Club® Point Collection Assessment | 85.00 | .00 | 85.00 |

Save your association credit card fees,
pay by check (US funds only)

**Amount Due**   **$3255.71**

## (Actual Client's Maintenance Fees)



## Failed Vermont Bill

**Vermont S. 50** by Senator Mark MacDonald (D-Williamstown) amends the conveyancing statute to allow timeshare owners to gift both timeshare estates and timeshare licenses back to their association (and the association must accept the gift) if the following conditions are met: 1) the owners send a notice of the gift to their association in advance, 2) the timeshare is free of encumbrances, and 3) the owners pay the costs of conveyance, including costs for preparing and recording documents.

## Why Did It Fail?

--ARDA demanded it was inappropriate to alter a real estate contract and effectively stopped the bill.
--Resort lobbyists do not want you to stop making your maintenance fee payments

Document title: Transfer - Mortgage Presentation
Capture URL: https://owner.resortrelease.com/transfer/#7
Capture timestamp (UTC): Mon, 12 Nov 2018 18:52:31 GMT

## Failed Vermont Bill

Vermont S. 50 by Senator Mark MacDonald (D-Williamstown) amends the conveyancing statute to allow timeshare owners to gift both timeshare estates and timeshare licenses back to their association (and the association must accept the gift) if the following conditions are met: 1) the owners send a notice of the gift to their association in advance, 2) the timeshare is free of encumbrances, and 3) the owners pay the costs of conveyance, including costs for preparing and recording documents.

## Why Did It Fail?

--ARDA demanded it was inappropriate to alter a real estate contract and effectively stopped the bill.
--Resort lobbyists do not want you to stop making your maintenance fee payments









**PREV**

**NEXT**

Resort Release is not a law firm, and the employees of Resort Release are not attorneys.

Terms and Privacy

### Nav Links

- User Login
- Home
- Client Survey



© 2018 ResortRelease

PAGE **V**∧ULT®
WEBPAGE CAPTURES FOR LEGAL USE

| | |
|---|---|
| Document title: | Transfer - Mortgage Presentation |
| Capture URL: | https://owner.resortrelease.com/transfer/#2 |
| Captured site IP: | 70.35.205.143 |
| Page loaded at (UTC): | Mon, 12 Nov 2018 18:49:28 GMT |
| Capture timestamp (UTC): | Mon, 12 Nov 2018 18:49:51 GMT |
| Capture tool: | v6.8.1 |
| Collection server IP: | 54.174.78.137 |
| Browser engine: | Chrome/62.0.3202.9 |
| Operating system: | Microsoft Windows NT 6.2.9200.0 (6.2.9200.0) |
| PDF length: | 4 |
| Capture ID: | 395cb186-1ec2-4d06-b251-e8a645736197 |
| User: | sb-dgeary |

PDF REFERENCE #:        Hr1ASjZXwTVb7EyEH7g25

  

**RESORT ⚡ RELEASE**

---

## 2

# Timeshare Industry Analysis

It's time to face the truth about timeshare rentals and resales. Almost all timeshare owners were sold their timeshares with the promise of a return on the original investment. Most timeshare owners were told that their timeshares were "a piece of real estate that will increase in value over time." The impression given is that you can purchase your timeshare "today", use it for 10-15 years and then sell it for a minimum of what you paid on the original day of purchase. For almost all timeshare owners, this turned out to be a lie. There is NO secondary timeshare market and this has left millions of timeshare owners desperate to find a way out of their timeshare and its ever rising fees.

## 2A   SellMyTimeshareNow.Com



---

Document title: Transfer - Mortgage Presentation
Capture URL: https://owner.resortrelease.com/transfer/#2
Capture timestamp (UTC): Mon, 12 Nov 2018 18:49:51 GMT



1904 Fort Macon Road, Atlantic Beach, North Carolina, United States.
2nd Story Unit With Partial Beach View! Ideal Area Close To Many Water Based Activities! Buyer May Receive A Title Fee Credit, Inquire For Details!

**Week(s):** 36          **Sleeps:** 4

**Unit Size:** 1 Bedroom          **Ad Number:** 2110317

Have a question?
Call Our Buyer Hotline:
1-855-299-3829

Alpenland Sporthotel - St. Johann-im-Pongau
Hans-Kappacher-Str. 7-9 St., St. Johann im Pongau, Austria

**2B**    EBay





TIMESHARES

PREV          NEXT

Resort Release is not a law firm, and the employees of Resort Release are not attorneys.

Nav Links

• User Login





Resort Release is not a law firm, and the employees of Resort Release are not attorneys.

Terms and Privacy

**Nav Links**

- User Login
- Home
- Client Survey

BBB. ACCREDITED BUSINESS

© 2018 ResortRelease



Document title:              Home - Redemption and Release

Capture URL:                 https://www.redemptionandrelease.com/

Captured site IP:            70.35.205.165

Page loaded at (UTC):        Thu, 09 Aug 2018 01:01:54 GMT

Capture timestamp (UTC):     Thu, 09 Aug 2018 01:02:10 GMT

Capture tool:                v6.8.1

Collection server IP:        54.175.14.236

Browser engine:              Chrome/62.0.3202.9

Operating system:            Microsoft Windows NT 6.2.9200.0 (6.2.9200.0)

PDF length:                  5

Capture ID:                  f423e343-5e16-4b1a-933e-792b01c8fe8a

User:                        sb-mwilson


PDF REFERENCE #:        pJkxT9i7wgrrzjozemNMRP

WYN_TOTTEN_036449

TIMESHARE REDEMPTION
**REDEMPTION & RELEASE**

📞 **888-743-9051**

| How It Works | Free Help Articles | Testimonials | FAQ's | Our Guarantees | Learn More | Contact Us |



Our timeshare specialists will help you...
Avoid Paying High Maintenance Fees

GET A FREE QUOTE

ℹ️

# We Provide the Keys to Timeshare Freedom



## STOP all annual fees.

You will no longer be obligated to pay any annual maintenance fees associated with timeshare ownership. In just 3 easy steps, you will be free of ever-increasing timeshare fees and special assessments...legally AND permanently!

Learn More



## REGAIN travel freedom.

You will no longer be tethered to a timeshare that dictates where, when & how you vacation. No more points, exchange companies, or unavailability issues. We DO NOT force you to join a travel club to get rid of your timeshare.

Learn More



## TERMINATE perpetuity.

Unlike other inherited real estate, there's no inherent value in timeshare ownership, only financial obligations. We remove "perpetuity of ownership," so your children WILL NOT be forced to take over your timeshare headaches.

Learn More

# What Our Clients Say



*Everything was just as promised and right on time. The staff was always*



# What Our Clients Say

GET A FREE QUOTE

"

*Everything was just as promised and right on time. The staff was always friendly, patient and helpful. Collectively, the experience was far better than expected. We feel great about being rid of this timeshare. Great job!*

- James Snyder, Former Timeshare Owner



## Our Timeshare Services



**Timeshare Consultation**

Free consultation with timeshare cancellation experts.



**Ownership Evaluation**

Advice and guidance on best timeshare termination options for *you*.



**Consumer Advocacy**

Communication & intervention with resorts on your behalf.





**Timeshare Redemption**

100% Guaranteed legal & permanent transfer of ownership out of your name.



**Document Management**

Document processing by our Licensed, Bonded & Insured Title Office.



**Timeshare Freedom**

Final relief of all timeshare obligations with termination of ownership.

## About Redemption & Release, LLC

Redemption and Release, LLC is NOT a timeshare rental or resale company. We only offer one core service for our valued clients, successful Timeshare Redemption.

The vacation asset liquidation service we provide ensures our clients with a quick, inexpensive and definitive relief from the financial headaches associated with ownership. If you've tried and failed to get out of your timeshare contract

WYN_TOTTEN_036451

Redemption and Release, LLC is NOT a timeshare rental or resale company. We only offer one core service for our valued clients, successful Timeshare Redemption.

The vacation asset liquidation service we provide ensures our clients with a quick, inexpensive and definitive relief from the financial headaches associated with ownership. If you've tried and failed to get out of your timeshare contract obligations through attempts to sell your timeshare, cancel a timeshare contract, or donate a timeshare, now is the time to find out how to legally redeem your timeshare. Redeeming your timeshare is as simple as contacting us via our web form to request a FREE no-obligation property analysis or simply calling our toll free number at 888-743-9051 to get an instant quote.

You can finally have the peace of mind you have been searching for by leaving behind the burdens of timeshare ownership and enrolling in our simple and inexpensive Timeshare Redemption program.

GET A FREE QUOTE

## Need Your Contract Cancelled Now?

Full Name

Email Address

Phone Number

Resort Name

Comments

**GET ME OUT OF MY TIMESHARE - NOW!**

By clicking submit you are agreeing to our Terms and Conditions.

### FREE Timeshare Redemption Consultation

**ACCREDITED BUSINESS**
**100% SATISFACTION GUARANTEE**



**EV SSL Certificate**





**WE DON'T JUST CANCEL YOUR TIMESHARE**
**– WE REDEEM IT.**

It's a simple and inexpensive process, and the best way to get rid of a timeshare. Redemption and Release, LLC is the nations premiere Timeshare Redemption company because we offer a no-haggle, low cost, and twice guaranteed timeshare exit solution. We provide an inexpensive way to get out of a timeshare.

Redemption and Release, LLC is NOT a timeshare rental or resale company.
We only offer one core service for our valued clients, successful Timeshare Redemption .

Document title: Home - Redemption and Release
Capture URL: https://www.redemptionandrelease.com/
Capture timestamp (UTC): Thu, 09 Aug 2018 01:02:10 GMT

Page 3 of 4

WYN_TOTTEN_036452

valued clients, successful Timeshare Redemption.

The vacation asset liquidation service we provide ensures our clients with a quick, inexpensive and definitive relief from the financial headaches associated with ownership. If you've tried and failed to get out of your timeshare contract obligations through attempts to sell your timeshare, cancel a timeshare contract, or donate a timeshare, now is the time to find out how to legally redeem your timeshare. Redeeming your timeshare is as simple as contacting us via our web form to request a FREE no-obligation property analysis or simply calling our toll free number at 888-743-9051 to get an instant quote.

You can finally have the peace of mind you have been searching for by leaving behind the burdens of timeshare ownership and enrolling in our simple and inexpensive Timeshare Redemption program.

GET A FREE QUOTE

## *Need Your Contract Cancelled Now?*

Full Name

Email Address

Phone Number

Resort Name

Comments

GET ME OUT OF MY TIMESHARE - NOW!

By clicking submit you are agreeing to our Terms and Conditions.

## FREE Timeshare Redemption Consultation

### ACCREDITED BUSINESS
### 100% SATISFACTION GUARANTEE



**EV SSL Certificate**





### WE DON'T JUST CANCEL YOUR TIMESHARE
### – *WE REDEEM IT.*

It's a simple and inexpensive process, and the best way to get rid of a timeshare. Redemption and Release, LLC is the nations premiere Timeshare Redemption company because we offer a no-haggle, low cost, and twice guaranteed timeshare exit solution.We provide an inexpensive way to get out of a timeshare.

Redemption and Release, LLC is NOT a timeshare rental or resale company.
We only offer one core service for our valued clients, successful Timeshare Redemption .

© Copyright 2011 - 2018 | Terms of Service | Privacy Policy

Document title: Home - Redemption and Release
Capture URL: https://www.redemptionandrelease.com/
Capture timestamp (UTC): Thu, 09 Aug 2018 01:02:10 GMT

Page 4 of 4

WYN_TOTTEN_036453

**2018 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L13000131381

**Entity Name:** AMERICAN RESOURCE MANAGEMENT GROUP LLC

**FILED**

**Apr 09, 2018**
**Secretary of State**
**CC2668362407**

**Current Principal Place of Business:**

1401 W. CYPRESS CREEK RD
SUITE 101
FORT LAUDERDALE, FL 33309

**Current Mailing Address:**

1401 W. CYPRESS CREEK RD.
SUITE 101
FORT LAUDERDALE, FL 33309 US

**FEI Number:** 46-4051532                             **Certificate of Status Desired:** Yes

**Name and Address of Current Registered Agent:**

INCORP SERVICES , INC
17888 67TH COURT NORTH
LOXAHATCHEE, FL 33470 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

| SIGNATURE: | INCORP SERVICES, INC | 04/09/2018 |
|---|---|---|
| | Electronic Signature of Registered Agent | Date |

**Authorized Person(s) Detail :**

| Title | MGRM | | Title | MGRM |
|---|---|---|---|---|
| Name | CLINE, ERIC | | Name | CLINE, SHYLA |
| Address | 1401 W. CYPRESS CREEK RD. SUITE 101 | | Address | 1401 W. CYPRESS CREEK RD SUITE 101 |
| City-State-Zip: | FORT LAUDERDALE FL 33309 | | City-State-Zip: | FORT LAUDERDALE FL 33309 |

Exhibit "12"

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

| SIGNATURE: SHYLA CLINE | CEO | 04/09/2018 |
|---|---|---|
| Electronic Signature of Signing Authorized Person(s) Detail | | Date |

**2018  FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L11000137579

**Entity Name:** REDEMPTION AND RELEASE, LLC

**FILED**

**Aug 13, 2018**
**Secretary of State**
**CC6318401936**

**Current Principal  Place of Business:**

1401 W. CYPRESS CREEK RD
 SUITE 101
FORT LAUDERDALE,  FL  33309

**Current Mailing Address:**

1401 W. CYPRESS CREEK RD
 SUITE 101
FORT LAUDERDALE,  FL  33309  US

**FEI Number: 45-3992101**                                        Certificate of Status Desired:  No

**Name and Address of Current Registered Agent:**

REGISTERED AGENTS INC.
3030 N. ROCKY POINT DRIVE
 STE 150A
TAMPA, FL  33607  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:  BILL HAVRE                                                             08/13/2018
                         Electronic Signature of Registered Agent                                         Date

**Authorized Person(s) Detail :**

Title              MGR

Name          MORSE, LARRY S

Address       1401 W. CYPRESS CREEK RD
                     SUITE 101

City-State-Zip:   FORT LAUDERDALE  FL  33309

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: LARRY MORSE                                    OWNER                        08/13/2018
                     Electronic Signature of Signing Authorized Person(s) Detail                                         Date

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO: 9:18-cv-81055-DMM

WYNDHAM VACATION OWNERSHIP, INC.;
WYNDHAM VACATION RESORTS, INC.;
WYNDHAM RESORT DEVELOPMENT
CORPORATION; and SHELL VACATIONS,
LLC,

      Plaintiffs,

v.

TOTTEN FRANQUI DAVIS & BURK, LLC;
TOTTEN FRANQUI DAVIS & BURK, PLLC;
AMERICAN RESOURCE MANAGEMENT
GROUP, LLC; VACATION PROPERTIES
FOR LESS, LLC; REDEMPTION AND
RELEASE, LLC; RESORT EXIT TEAM, LLC;
HELPING TIMESHARE OWNERS, INC.;
JOHN DOE #2; ERIC S. CLINE; SHYLA
CLINE; SCOTT MORSE; WILLIAM
HOWELL JR.; and JORDAN SALKIN,

      Defendants.

_____/

## DEFENDANTS' RULE 26 EXPERT DISCLOSURE

Defendants, American Resource Management Group, LLC, Redemption and Release, LLC, Vacation Properties for Less, LLC, Resort Exit Team, LLC, Eric Cline, Shyla Cline and Scott Morse (collectively, "Defendants"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 26(a)(2), and this Court's Scheduling Order [DE 86], hereby serve this Expert Disclosure, along with the Expert Report of Scott M. Bouchner, attached hereto as Exhibit "A." and assert that the data and information therein is Confidential pursuant to the Stipulated Protective Order entered in the case per [DE 124]. Accordingly, Defendants disclose:

A.   **SCOTT M. BOUCHNER, CMA, CVA, CFE, CIRA**
     **Berkowitz, Pollack and Brant, Advisors, Accountants,**
     **LLP**

*(1)   A complete statement of all opinions the witness will express and the basis and reasons for them.*

> Please see "Expert Report of Scott M. Bouchner," attached hereto as Exhibit "A."

*(2)   The fact or data considered by the witness in forming them.*

> Please see "Expert Report of Scott M. Bouchner," attached hereto as Exhibit "A," Section IV, "Documents Considered."

*(3)   Any exhibits that will be used to summarize or support the opinions.*

> Please see "Expert Report of Scott M. Bouchner," attached hereto as Exhibit "A."

*(4)   The witnesses qualifications, including a list of all publications authored in the previous ten (10) years.*

> Please see "Expert Report of Scott M. Bouchner," attached hereto as Exhibit "A."  See also Mr. Bouchner's Report, section III, "Qualifications."

> A list of Mr. Bouchner's publications are included within his CV under heading "Publications."

*(5)   A list of all other cases in which, during the previous four (4) years, the witness testified as an expert either at trial or by deposition.*

> Please see "Expert Report of Scott M. Bouchner," attached hereto as Exhibit "A." *See* Mr. Bouchner's CV under heading "List of Cases Testified."

Dated: March 22, 2019                     Respectfully submitted,

                                          **BERGER SINGERMAN LLP**
                                          350 East Las Olas Blvd, Suite 1000
                                          Fort Lauderdale, FL  33301
                                          Telephone:   (954) 525-9900
                                          Facsimile:   (954) 523-2872

                                          */s/ Gavin C. Gaukroger*
                                          P. Benjamin Zuckerman

2

Florida Bar No. 187143
Email: bzuckerman@bergersingerman.com
Gavin C. Gaukroger
Florida Bar No. 76489
E-mail: ggaukroger@bergersingerman.com
Matthew S. Nelles
Florida Bar No. 009245
E-mail: mnelles@bergersingerman.com
Kenneth W. Waterway
Florida Bar No. 994235
E-mail: kwaterway@bergersingerman.com
Marianne Curtis
Florida Bar No. 92729
Email: mcurtis@bergersingerman.com
Email: DRT@bergersingerman.com
*Attorneys* for *Defendants American Resource Management Group LLC, Vacation Properties for Less, LLC, Resort Exit Team, LLC, Redemption and Release, LLC, Eric Cline, Shyla Cline, and Scott Morse*

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 22, 2019 a true and correct copy of the foregoing was served via electronic mail upon counsel of record as set forth on the Service List below.

**A.** **Via Electronic Mail:**

**SHUTTS & BOWEN LLP**
ALFRED J. BENNINGTON, JR., ESQ.
GLENNYS ORTEGA RUBIN, ESQ.
RAYMOND F. TREADWELL, ESQ.
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255
Email:bbennington@shutts.com
Email:grubin@shutts.com
Email: rtreadwell@shutts.com

and

**SHUTTS & BOWEN LLP**
DANIEL J. BARSKY, ESQ.
FRANK A. ZACHERL, ESQ.
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile: (561) 822-5527
Email: dbarsky@shutts.com
Email: fzacherl@shutts.com

*Attorneys for Plaintiffs*

**MCINTOSH SAWRAN & CARTAYA, P.A.**
DOUGLAS M. MCINTOSH, ESQ.
CARMEN Y. CARTAYA, ESQ.
1776 East Sunrise Blvd.
Fort Lauderdale, FL 33304
Telephone: 954-765-1001
Facsimile: 954-765-1005
Email: CCartaya@mscesq.com
Email: DMcIntosh@mscesq.com
Email: dmmpleadings@mscesq.com
Email: cycpleadings@mscesq.com

*Attorneys for Defendants Totten Franqui Davis & Burk, LLC, and Totten Franqui Davis & Burk, PLLC*

**DAVID ANTHONY WILSON, ESQ.**
201 S.W. 2nd Street, #101
Ocala, Florida 34771
Telephone: (352) 629-4466
Facsimile: (352) 732-6469
Email: david@dwilsonlaw.com

*Attorneys for Defendants Helping Timeshare Owners, Inc. and William W. Howell, Jr.*

**B.** **Via United States Mail:**

**JORDAN SALKIN**
c/o Theo Lacy Facility [Booking No. 3100098]
501 City Drive South
Orange, CA 92868

*Pro Se Defendant*

By: */s/ Gavin C. Gaukroger*
Gavin C. Gaukroger

8997524-1

4

# EXHIBIT A

*Wyndham Vacation Ownership, Inc., et al. vs. Totten Franqui Davis & Burk, LLC, et. al.*
Case No. 9:18-cv-81055-DMM

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  9:18-CV-81055-MIDDLEBROOKS/BRANNON

WYNDHAM VACATION OWNERSHIP, INC.;
WYNDHAM VACATION RESORTS, INC.;
WYNDHAM RESORT DEVELOPMENT
CORPORATION; and SHELL VACATIONS, LLC

Plaintiffs,

vs.

TOTTEN FRANQUI DAVIS & BURK, LLC;
TOTTEN FRANQUI DAVIS & BURK, PLLC;
AMERICAN RESOURCE MANAGEMENT GROUP, LLC;
VACATION PROPERTIES FOR LESS, LLC;
REDEMPTION AND RELEASE, LLC; RESORT EXIT TEAM, LLC;
HELPING TIMESHARE OWNERS, INC; JOHN DOE #2;
ERIC S. CLINE; SHYLA CLINE; SCOTT MORSE;
WILLIAM HOWELL JR. and JORDAN SALKIN

Defendants

EXPERT REPORT OF SCOTT M. BOUCHNER

Prepared by:

Scott M. Bouchner, CMA, CVA, CFE, CIRA

Berkowitz Pollack Brant

Advisors and Accountants, LLP

March 22, 2019

## I.    BACKGROUND[1]

Using online advertising, radio and direct mail, American Resource Management Group, LLC[2] d/b/a Resort Release ("ARMG") and Redemption and Release, LLC[3] ("RNR") advertises to timeshare, or vacation ownership interest ("VOI"), owners looking to sell or exit from their VOIs. VOI owners who own their units free and clear without a mortgage can enroll with RNR or ARMG to access their transfer services in which the companies coordinate the sale or transfer of the VOI to another party who is willing to take on the rights and obligations of ownership. Those VOI owners with an outstanding mortgage enroll through ARMG with The Resort Release Group Legal Services Plan ("Group Legal Plan") to access cancellation services, which require the retention of legal counsel to assist VOI owners cancel their VOI agreements and terminate any related obligations. Members of the Group Legal Plan, among other benefits, gain access to limited legal services. In order to coordinate the delivery of these legal services ("Group Legal Services"), ARMG acts as the Sponsor of the Group Legal Plan.

On August 10, 2017, Totten Franqui Davis & Burk, LLC ("TFDB") entered into a Retainer Agreement with ARMG and agreed to provide, manage and effectuate the legal services under the Group Legal Plan for all members. From its inception through the present, all VOI owners enrolling in the Group Legal Plan were directed to the Plan by ARMG and entered into a Master Agreement with ARMG as the Sponsor of the plan.

Under the Retainer Agreement, for a fixed monthly fee paid by ARMG, TFDB agreed to provide legal services to all plan members who resided in states in which TFDB was able to take on members. For the collective group of states Arizona, California, Illinois, Missouri, New York, North Carolina, Pennsylvania and Texas, the Retainer Agreement provided that ARMG would pay TFDB a fixed monthly fee of $45,000 ("Group 1 States"). For all other states other than Florida, ARMG would pay TFDB an additional $55,000 ("Group 2 States"). For the state of Florida, if and when the Group Legal Plan was approved and TFDB could take residents of Florida, ARMG would pay TFDB an additional $50,000. Beginning in August 2017, TFDB only took on members in Group 1 states, and it added Group 2 states in February 2018. It has not and does not currently take on any members in the state of Florida.  All Florida residents with mortgages are not enrolled in the Group Legal Plan and are directed to a marketing company, which is not owned or controlled by ARMG,

---

[1] The source of the information contained in this background section was the First Amended Complaint, the Retainer Agreement between TFDB and ARMG, the Group Legal Plan and the Wolf Report (as defined herein).  This information has been presented as background information and is not intended to constitute expert opinions.

[2] In October 2018, American Resource Management Group, LLC was reorganized to become ARMG Holdings, LLC.

[3] In October 2018, Redemption and Release, LLC was reorganized to become Redemption Holdings USA, LLC.

TFDB or any of their principals.  From August 2017 through December 2018, TFDB received fees totaling $1.505 million in connection with the work it performed on behalf of members of the Group Legal Plan.[4]

Wyndham Vacation Ownership, Inc., Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation and Shell Vacations, LLC ("Wyndham" or "Plaintiffs") filed their First Amended Complaint on October 18, 2018[5] against Totten Franqui Davis & Burk, LLC and Totten Franqui Davis & Burk, PLLC (the "TFDB Defendants") and American Resource Management Group, LLC, Vacation Properties For Less, LLC, Redemption And Release, LLC, Resort Exit Team, LLC, Eric S. Cline, Shyla Cline and  Scott Morse, (collectively, the "ARMG Defendants"), as well as additional defendants Helping Timeshare Owners, Inc., John Doe #2, William Howell Jr. and Jordan Salkin.

Wyndham has asserted, among other things, that all of the Defendants have made false or misleading statements of fact in their commercial advertisements which mislead consumers in violation of the Lanham Act, 15 U.S.C. § 1125(a)(l).  Wyndham further alleges that TFDB has contributed and continues to contribute to the purportedly false advertising by knowingly inducing or causing the conduct, or materially participating in it.  Wyndham has also asserted tortious interference, Florida Deceptive and Unfair Trade Practice Act ("FDUTPA"), and related claims against TFDB and ARMG. For  these counts, the Plaintiffs are seeking i) actual damages sustained as a result of the alleged false advertising, tortious interference, FDUPTA and related claims, ii) TFDB's and ARMG's respective profits resulting from the alleged false advertising to Wyndham VOI owners, and iii) costs of the action.

On March 1, 2019, Steven A. Wolf, CPA, CFE, ABV/CFF, ASA issued an Expert Report (the "Wolf Report"), which claimed mortgage related damages of $5,947,233, comprised of past due mortgage principal, past due mortgage interest, past due late fees and remaining principal balances for 155 mortgage for which VOI owners stopped making payments on their mortgages.  These damages were segregated into two groups: a) 37 mortgages for which the VOI owners purportedly stopped making their mortgage payments on or after Wyndham received a Letter of Representation ("LOR") from TFDB (with total claimed damages of $1,654,373) and b) 118 mortgages for which the VOI owners purportedly stopped making their mortgage payments prior to Wyndham receiving a Letter of Representation ("LOR") from TFDB (with total claimed damages of $4,292,850).[6]

---

[4] The parties modified fees payable under the Retainer Agreement, resulting in TFDB being paid $45,000 per month from August 2017 through January 2018, $105,000 from February 2018 through September 2018, $125,000 per month for October 2018 and November 2018 and $135,000 in December 2018.

[5] The original Complaint for Damages and Injunctive Relief was filed by Wyndham on August 8, 2018. A Motion for Leave to File Second Amended Complaint was filed January 7, 2019, but has not been acted upon.

[6] Mr. Wolf also calculated pre-judgment interest of $22,930 on the past due mortgage amounts through February 28, 2019.

## II.   SCOPE OF ASSIGNMENT

BPB was retained by the law firm of McIntosh Sawran & Cartaya, P.A. in connection with its representation of the TFDB Defendants and Berger Singerman LLP in connection with its representation of the ARMG Defendants.  Specifically, I was asked to review pertinent documents, including the financial records of TFDB and ARMG and data extracted from TFDB's and ARMG's Customer Relationship Management (CRM) systems, and to calculate the profits, if any, earned by TFDB and ARMG in connection with services provided by these Defendants on behalf of consumers that had purchased Wyndham VOI properties, should the Plaintiffs prevail on their liability claims.

I am not qualified to offer -- and do not offer -- any opinion as to the legal viability of Plaintiffs' claims against TFDB. Instead, I assume solely for the purposes of this report that Plaintiffs will prevail in their liability claims of Contributory False Advertising in Violation of the Lanham Act against TFDB and ARMG, and are awarded, among other things, the disgorgement of both TFDB's and ARMG's respective profits resulting from the alleged false advertising to Wyndham Owners.  I was also retained as a rebuttal expert to review the expert report and assess the methodologies, assumptions and opinions of Steven A. Wolf, as presented in the Wolf Report.

## III.   QUALIFICATIONS

I am a Director of Forensic and Business Valuation Services at the accounting firm of Berkowitz Pollack Brant ("BPB").  BPB was established in 1980 and today has over 200 employees with offices in Miami, Fort Lauderdale, Boca Raton and West Palm Beach, Florida and New York, New York.  I am a Certified Management Accountant (CMA), as designated by the Institute of Management Accountants, a Certified Valuation Analyst (CVA), as designated by the National Association of Certified Valuation Analysts, a Certified Fraud Examiner (CFE), as designated by the Association of Certified Fraud Examiners, and a Certified Insolvency & Restructuring Advisor (CIRA), as designated by the Association of Insolvency & Restructuring Advisors.

I have authored and/or contributed to the following publications, among others, concerning damages and  lost profits analysis:  *Calculating Lost Profits – Business Valuation and Forensic & Litigation Services Practice Aid 06-4* (American Institute of Certified Public Accountants), *Discount Rates, Risk and Uncertainty in Economic Damages Calculations* (American Institute of Certified Public Accountants), *Attaining Reasonable Certainty in Economic Damages Calculations* (American Institute of Certified Public Accountants),  *Attaining Reasonable Certainty in Economic Damages Calculations – Revenues, Costs and Best Evidence* and *Lost Profits Damages: Principals, Methods and Applications – Mitigation of Damages in the Lost Profits calculation (Chapter 12)*.   A list of publications and articles I authored and my testimony experience are included on my Curricula Vitae.

## IV.   DOCUMENTS CONSIDERED

In forming the opinions expressed herein, I reviewed and relied upon the following information:

-   Second Amended Complaint for Damages and Injunctive Relief.

-   Responses by the ARMG Defendants to the Plaintiffs first requests for production.

-   Responses by the Wyndham Plaintiffs to the ARMG Defendants' first requests for production.

-   Answers by the ARMG Defendants to the Plaintiffs first interrogatories

-   Answers by the Wyndham Plaintiffs to the ARMG Defendants' first interrogatories.

-   Responses by the ARMG Defendants to the Plaintiffs first requests for admissions.

-   Plaintiffs' Amended Expert Witness Designation and Disclosure.

-   Preliminary Expert Reports issued on February 8, 2019 by Plaintiffs' experts, including Steven A. Wolf, Warren W. Lindsey and K. Gus Dimitrelos.

-   Expert Report of Steven A. Wolf issued on March 1, 2019.

-   QuickBooks files for TFDB from the law firm's inception on August 7, 2017 through December 31, 2018.

-   Data extracted from TFDB's CRM System, which identifies:

    A)    Property Identification Numbers (PID) for all VOI owners

    B)    The sale date in which VOI owners associated with each PID became customers of the ARMG / RNR Defendants

    C)    The date that TFDB sent out a welcome letter to the VOI owner associated with each PID, evidencing an attorney client relationship

    D)    A designation of Wyndham / Non-Wyndham for each PID[7]

    E)    The status of each client / PID

          i.       Welcome letter sent to client

          ii.      Documents being processed

          iii.     Incomplete documents provided by client

          iv.     Demand letter sent to developer

          v.      Received response from developer

          vi.     Pre-litigation / dispute activities

          vii.    In dispute (i.e. arbitration / litigation)

          viii.   Resolution of matter (i.e. deed-in-lieu / foreclosure / settlement)

          ix.     "Mission Complete" letter sent to client

          x.      Relationship cancelled

---

[7] Client names of those Non-Wyndham VOI owners have been redacted.

- Payroll data for TFDB

- The Resort Release Group Legal Services Plan

- Retainer Agreement By And Between Resort Release and Totten Franqui Davis & Burk, LLC dated August 10, 2017

- Data exported from the QuickBooks files of the ARMG Defendants for the period of January 1, 2015 through December 31, 2018

- Data extracted from ARMG's CRM System[8], which identifies:

    a)    The Deal Type (i.e. Transfer or Exit)

    b)    Property Identification Numbers (PID)

    c)    The Payment Type (i.e. Deal, Cancel or Refund)

    d)    The Payment Status (i.e. Bounce, Chargeback, Cancel, Hold, Paid, Paid In Full, Pro Bono or Unpaid)

    e)    The name(s) of the VOI owner customers[9]

    f)    The Charge Source (i.e. ARMG, Redemption and Release [RNR] or Lead Gen)

    g)    A designation of Wyndham / Non-Wyndham for each PID

    h)    The sale date in which VOI owners associated with each PID became customers of the ARMG / RNR Defendants

    i)    The Due Date in which payments to the ARMG Defendants were due from their customers

    j)    The Process Date in which payments to the ARMG Defendants were processed

    k)    The Card Type, which identified the type of credit card (or check) used by customers to pay the ARMG Defendants

    l)    The Merchant used to process the credit card payment

    m)    The amount of fees paid to the ARMG Defendants by its customers

- Payroll data for the ARMG Defendants

- Wyndham Destinations, Inc. Public Filings

- Deposition of Ramona Harrington – March 11, 2019

- Discussions with Management from TFDB and ARMG

---

[8] The ARMG CRM system was used beginning in June 2016.  Prior to June 2016, ARMG Defendants tracked its customers using spreadsheets that did not maintain the same level of detail as did the CRM system.

[9] Client names of those Non-Wyndham VOI owners have been redacted.

## V.   **EXPERT OPINIONS**

As discussed in greater detail in Section VI – Basis for Opinion, below, my expert opinions are as follows:

A)   In the approximately 17 months since its inception in August 2017 through December 2018, TFDB has not yet achieved profitability, generating firm-wide losses of $4,823 associated with all VOI owner clients it has represented or continues to represent over this period. These losses do not take into consideration any future obligations that TFDB may have in connection with its continued representation of its VOI clients. As such, any legal services performed specifically on behalf of the Wyndham VOI owners who retained TFDB have not generated any profits.

B)   From January 1, 2015 through December 31, 2018, profits / (losses) earned by the ARMG Defendants pertaining specifically to Wyndham VOI owners are as follows:

|  | **2015** | **2016** | **2017** | **2018** | **Total** |
|---|---|---|---|---|---|
| Wyndham Related Revenues | $808,395 | $1,917,949 | $3,242,949 | $3,843,742 | $9,813,137 |
| Direct Product Expenses | -48,541 | -41,800 | -63,184 | -129,951 | -283,477 |
| Indirect Product Expenses | -274,661 | -746,271 | -1,308,585 | -2,063,908 | -4,393,424 |
| Overhead Allocation | -95,446 | -152,142 | -235,410 | -319,321 | -802,310 |
| Wyndham Related Profit | $389,748 | $976,838 | $1,638,778 | $1,330,562 | $4,333,926 |
| Contingent Guarantee Exposure | - | - | -434,788 | -2,936,128 | -3,360,916 |
| **Wyndham Related Profit / (Loss) Net of Guarantee Exposure** | **$389,748** | **$976,838** | **$1,201,990** | **-$1,595,565** | **$973,011** |
| Transfer Profits | $138,820 | $207,596 | $304,883 | -$478,050 | $173,249 |
| Exit Profits |  |  | -200,211 | -1,488,823 | -1,689,034 |
| Non-Client Profits | 250,928 | 769,241 | 1,097,318 | 371,308 | 2,488,796 |
| **Wyndham Related Profit / (Loss) Net of Guarantee Exposure** | **$389,748** | **$976,838** | **$1,201,990** | **-$1,595,565** | **$973,011** |

C)   The calculation of damages prepared by Steven A. Wolf are fundamentally flawed and cannot be reasonably relied upon given that Mr. Wolf has:

a.   inappropriately included in his damage calculation those Wyndham VOI owners that had stopped making mortgage payments on their VOIs prior to entering into any agreement with the TFDB or ARMG Defendants;

b.    failed to perform any analysis or establish any causal link between the VOI owners' decisions to stop making mortgage payments on their VOIs and the actions of the TFDB and ARMG Defendants (other than relying on the date of the TFDB prepared Letter of Representation);

c.    erroneously included the late mortgage principal, interest and fees, and the outstanding mortgage balances for all delinquent VOI Wyndham owners, even though the majority of the mortgages are not owned by the Wyndham Plaintiffs, and are, instead, sold within 30 to 90 days after their origination to bankruptcy-remote special purpose entities that are legally separate from Wyndham without any recourse to Wyndham;

d.    failed to consider any opportunity for Plaintiffs to mitigate the purported damages by erroneously including all past due mortgage payments, as well as the entirety of the outstanding mortgage balance, as a measure of damage[10], even if the mortgage payments have only been delinquent for several months, and

e.    erroneously failed to offset any of his claimed damages even though Wyndham is able to recover the underlying VOI inventory and resell it at its full current value.

---

[10] This assumption would require that a VOI owner's decision to forego making one or more mortgage payments would shift any mortgage obligation for such debts entirely from the VOI owner to TFDB and/or ARMG.

## VI.   BASIS FOR OPINION

### A)   TFDB DISORGEMENT OF PROFITS

In order to determine the profits earned by TFDB in connection with the servicing of Wyndham related VOI owners, I obtained copies of TFDB's QuickBooks files, which contained all financial activity for the law firm, from its inception in August 2017 through December 2018.  As reflected on Exhibit 1, TFDB received 17 monthly retainer payments from ARMG totaling $1,505,000 to provide legal services to all members of the Group Legal Plan, which included services provided to the Wyndham VOI owners.

These retainer payments were not specifically based upon the number of timeshare owners that joined the Group Legal Plan in any month, the number of timeshare owners that continued to participate in the Group Legal Plan or the specific results of the work done by TFDB for any specific timeshare owner, including owners of the Wyndham VOI units.  TFDB received fees of $45,000 per month from August 2017 through January 2018, $105,000 per month in February through September 2018, $125,000 in October 2018 and $135,000 per month in November and December 2018.

For the approximately five-month period ending December 31, 2017, TFDB received total fees from ARMG of $225,000 and incurred expenses of $182,383, which are identified by category on Exhibit 1, leaving an excess of cash receipts over cash disbursements[11] of $42,617.  Payroll related expenses of $174,000 accounted for the vast majority (i.e., 95.8%) of the expenses incurred and, in 2017, consisted of payments made to TFDB's five partners, Paul G. Totten, Anthony G. Franqui, Erica L. Franqui, Garry T. Davis and Christopher D. Burk and an administrative assistant.

For the full year ending December 31, 2018, TFDB received total fees from ARMG of $1,280,000 and incurred expenses of $1,327,439, resulting in cash-basis losses of at least $47,439[12]. As in 2017,

---

[11] TFDB's books and records are maintained on a cash-basis.

[12] As the books and records are maintained on a cash-basis, outstanding actual and/or contingent liabilities are not included in the losses reflected in this report.

payroll related expenses of $1,280,000 accounted for the majority (i.e. 96.4%) of the total expenses incurred. For the seventeen-month period from August 2017 through December 31, 2018, TFDB had total losses of at least -$4,823.

As TFDB took on additional timeshare related matters, the firm had to hire additional employees. By the end of 2018, in addition to its five partners, there were eleven other employees on the firm's payroll.  TFDB's five partners each received a salary of $78,000 per year on an annualized basis from the firm's inception through February 2018, at which point, given the additional caseload, salary increased to $120,000 in February 2018 and then to $144,000 per year from March through December 2018 to service and oversee the more 2,000 case files.

Despite that no amounts paid by ARMG to TFDB can be traced or specifically matched to an individual timeshare owner or property, for purposes of this litigation, I have apportioned the losses that can be attributed to the aggregate pool of Wyndham VOIs based upon the total number of Wyndham properties for which TFDB provided Group Legal Services as a percentage of total timeshare properties serviced in the Group Legal Plan.  Over the seventeen-month period, TFDB provided Group Legal Services to owners of 2,417 timeshare properties, of which Wyndham accounted for 471, or 19.49%, of the total.

Given the time that a property owner may require legal services can vary considerably, from less than one month to well over a year, I have also considered the amount of total time that TFDB provided such services to each timeshare property owner.  For example, a timeshare owner that became a Group Legal Plan client in January 2018 whose issues had not been fully resolved by December 2018 would have received 12 months of legal services for that property in 2018, whereas a timeshare owner that became a client in December 2018 would only have received one month of legal services. Over the seventeen-month period, TFDB provided 14,865 property-months of service, of which Wyndham accounted for 2,914 property-months, or 19.60% of this total, approximately the same as the 19.49% of Wyndham properties relative to the number of total properties.  As such, the total losses that I have

apportioned to Wyndham for purposes of this litigation ranges from -$940 to -$945, as reflected on the bottom of Exhibit 1.

This however, does not take into consideration any continuing obligations that TFDB may have to its Group Legal Plan clients, which will continue through the final resolution of the timeshare property (regardless of the outcome of this lawsuit) or until the timeshare client chooses to withdraw from the Group Legal Plan. These continuing obligations represent liabilities to TFDB for which the corresponding expenses have not been accrued in TFDB's financial statements.  Had such liabilities been recorded by TFDB, losses for all timeshare properties, including Wyndham, would increase above the -$4,823 and Wyndham losses would increase above the -$945 reflected on Exhibit 1. Consequently, because over the approximately seventeen-month period from TFDB's inception in August 2017 through December 2018, all funds received by the firm were used to pay expenses, which primarily consisted of reasonable compensation paid to its attorneys and other employees, there have been no profits to disgorge.

B) **ARMG DEFENDANTS DISGORGEMENT OF PROFITS**

In order to determine the profits earned by ARMG in connection with the servicing of Wyndham related VOI owners, I obtained copies of ARMG's QuickBooks files, which contained financial activity for ARMG-FL, ARMG-IL, ARMG-DE, RNR, VPL-FL and VPL-DE from January 2015 (or from each company's inception if operations began after January 2015) through December 2018.[13] Additionally, I obtained data extracted from ARMG's customer relationship management ("CRM") system.

Because the QuickBooks do not provide detail of the underlying source of revenues, I relied upon the CRM to determine whether fees were derived from Wyndham or Non-Wyndham clients. Revenues included in the QuickBooks are recorded on a gross basis with the corresponding merchant fees recorded separately as an expense, whereas revenues in the CRM are reflected net of corresponding merchant fees. After subtracting merchant fees from the corresponding gross revenue, net revenue included in the QuickBooks are approximately 0.6% greater than that identified in the CRM over the 2015 through 2018 period analyzed. Because revenues are greater in the QuickBooks files, the CRM data allows for a delineation between Wyndham and Non-Wyndham and the QuickBooks files may include additional adjustments for subsequent financial activity not included in the CRM, I calculated Wyndham revenues by applying the percentage of Wyndham revenues to total revenues, as reflected in the CRM, to the total revenues recorded in the QuickBooks:

| | No Sale Date | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|
| Non-Wyndham | (284,329) | 5,359,267 | 8,562,427 | 18,789,663 | 23,368,156 | 55,795,185 |
| Wyndham | (500) | 796,138 | 1,548,815 | 3,183,650 | 3,967,066 | 9,495,169 |
| **Total** | **$(284,829)** | **$6,155,405** | **$10,111,243** | **$21,973,313** | **$27,335,222** | **$65,290,354** |
| | | | | | | |
| **Wyndham Revenue as a Percentage of All Revenue** | | **12.93%** | **15.32%** | **14.49%** | **14.51%** | |

---

[13] Financial activity for ARMG-FL, ARMG-IL, ARMG-DE, RNR, VPL-FL and VPL-DE were combined into a single transactional database, with the elimination of all intercompany activities to avoid duplication. For example, if RNR reimbursed ARMG-FL for certain incurred expenses, the payments made by RNR to ARMG-FL and the income received by ARMG-FL from RNR were eliminated so that only revenues received by the ARMG entities from third parties and expenses paid by the ARMG entities to third parties were included in my analysis.

Over the four-year period, Wyndham revenues reflected in the CRM accounted for approximately $9.50 million of the $65.29 million, or 14.5%, in revenues generated by the ARMG defendants. As reflected in Exhibit 2, the above percentages were applied to revenues recorded in the QuickBooks files, resulting in approximately $9.81 million attributed to Wyndham VOIs.

I then classified and grouped expenses recorded in QuickBooks into the following three categories; Direct Product Expenses, Indirect Product Expenses and Overhead Allocation.

- Direct Product Expenses consist of those expense items that relate directly to the generation of revenue from VOI owners and for which I was able to identify whether the expense related to a Wyndham vs a Non-Wyndham owner. Examples of Direct Product Expenses include transfer costs (i.e. transfer, title and recording fees), maintenance fees, merchant fees recording fees and other miscellaneous expenses that could be matched to a specific timeshare property.

- Indirect Product Expenses consist primarily of those expenses that are not directly attributable to any specific owner but are necessary to the creation of revenue and would be considered variable in nature. Examples of Indirect Product Expenses include payroll costs and employee benefits, marketing costs and payments made to TFDB for Group Legal Plan Services. Also included as Indirect Product Expenses are those expenses that would otherwise be classified as Direct Product Expenses for which there was insufficient information to identify and match the expense to a specific Wyndham or a Non-Wyndham owner.

- Overhead Allocation includes those expenses required to maintain the corporate offices and would generally be considered less variable in nature. Examples of such expenses would be office expenses, professional fees, rent, computer related costs, depreciation, insurance, travel and meal costs, utilities, interest and other miscellaneous expenses.

Direct Product Expenses related to Wyndham owners identified in each year were deducted directly against the respective Wyndham related revenue in that year, as reflected in Exhibit 2 and summarized in the following table:

| | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|
| Wyndham Related Revenues | $808,395 | $1,917,949 | $3,242,949 | $3,843,742 | $9,813,137 |
| Direct Product Expenses | -48,541 | -41,800 | -63,184 | -129,951 | -283,477 |
| **Wyndham Related Revenue Less Direct Product Expenses** | **$759,854** | **$1,875,251** | **$3,180,764** | **$3,713,7791** | **$9,529,660** |

Indirect Product Expenses and Overhead Allocation, excluding amounts relating to the legal plan, were apportioned based upon the Wyndham Client Revenue as a Percentage of All Revenue for each respective year.  Because the legal plan expenses relate specifically to Group Legal Plan clients represented by TFDB and the retainer received by TFDB was not tied to any specific clients, I allocated legal plan expenses based on the number of Wyndham Exit Clients as a Percentage of All Exit clients based upon the 19.60% apportionment discussed in Section IV-A (TFDB Disgorgement of Profits) above, which was applied to the legal plan expenses in both the Indirect Product Expenses and Overhead Allocation classifications. The resulting Wyndham apportioned expenses were then deducted against Wyndham related revenue in that year, as reflected in Exhibit 2 and summarized in the following table.

| | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|
| **Wyndham Related Revenue Less Direct Product Expenses** | **$759,854** | **$1,875,251** | **$3,180,764** | **$3,713,7791** | **$9,529,660** |
| Indirect Product Expenses | -274,661 | -746,271 | -1,308,585 | -2,063,908 | -4,393,424 |
| Overhead Allocation | -95,446 | -152,142 | -235,410 | -319,321 | -802,310 |
| **Wyndham Related Profit Before Guarantee Exposure** | **$389,748** | **$976,838** | **$1,638,778** | **$1,330,562** | **$4,333,926** |

To the extent that Plaintiffs prevail in this litigation and are able to prevent Defendants from representing Wyndham clients, a money-back guarantee offered by the ARMG Defendants to each of

its customers would likely trigger an actual expense that would further reduce Wyndham related profits, as reflected on Exhibit 2 and summarized in the following table:

|  | **2015** | **2016** | **2017** | **2018** | **Total** |
|---|---|---|---|---|---|
| Wyndham Related Revenue | $808,395 | $1,917,949 | $3,242,949 | $3,843,742 | $9,813,137 |
| Direct Product Expenses | -48,541 | -41,800 | -63,184 | -129,951 | -283,477 |
| Indirect Product Expenses | -274,661 | -746,271 | -1,308,585 | -2,063,908 | -4,393,424 |
| Overhead Allocation | -95,446 | -152,142 | -235,410 | -319,321 | -802,310 |
| Wyndham Related Profit | $389,748 | $976,838 | $1,638,778 | $1,330,562 | $4,333,926 |
| Contingent Guarantee Exposure | - | - | -434,788 | -2,936,128 | -3,360,916 |
| **Wyndham Related Profit / (Loss) Net of Guarantee Exposure** | **$389,748** | **$976,838** | **$1,201,990** | **-$1,595,565** | **$973,011** |

I have further broken down the collective Wyndham Related Profit / (Loss) Net of Guarantee Exposure by the type of service provided to VOI owners, as reflected in greater detail on Exhibit 2 and summarized in the following table:

|  | **2015** | **2016** | **2017** | **2018** | **Total** |
|---|---|---|---|---|---|
| Transfer | $138,820 | $207,596 | $304,883 | -$478,050 | $173,249 |
| Exit |  |  | -200,211 | -1,488,823 | -1,689,034 |
| Non-Client | 250,928 | 769,241 | 1,097,318 | 371,308 | 2,488,796 |
| **Wyndham Related Profit / (Loss) Net of Guarantee Exposure** | **$389,748** | **$976,838** | **$1,201,990** | **-$1,595,565** | **$973,011** |

Transfer services pertain to those VOI owners who own their VOIs outright without any underlying mortgage and have retained ARMG to transfer their property to another owner. Exit services pertain to those VOI owners who have an outstanding mortgage on their VOIs and, therefore, contract with ARMG (through the Group Legal Plan) and TFDB to exit from their VOIs. Non-Client services pertain to VOI owners who have been directed to a marketing company, which is not owned or controlled by ARMG, TFDB or any of their principals, for which ARMG receives a fee.

Revenues have been allocated based upon the Wyndham related revenues that are attributable to each service type as a percentage of total Wyndham related revenues, as reflected in ARMG's CRM. To calculate profits,

as reflected in greater detail on Exhibit 2, revenues for each service type were first reduced by those expenses that could be matched to a specific service type.  All remaining unallocated expenses were allocated to the three service types based upon the revenues attributed to each service type as a percentage of total Wyndham related revenues.

### C)  FLAWED AFFIRMATIVE DAMAGES IN WOLF REPORT

The damages calculations prepared by Steven A. Wolf cannot be reasonably relied upon as they are predicated on fundamentally flawed assumptions, are not based on sufficient relevant data and sufficient relevant forensic procedures, which he failed to perform.

### A.  Wolf damages erroneously included Wyndham VOI owners that were delinquent on mortgage payments prior to entering into any agreement with Defendants

The Wolf Report identifies 155 "Affected Accounts" that form the basis for Mr. Wolf's damage calculations.  On Page 2 of the Wolf Report, he states:

> *I was asked to segregate the population of Wyndham's timeshare accounts that are or were represented by Defendants (the "**Affected Account(s)**") into the following Groups: (1) accounts that became past due on or after the Defendants letter of representation ("LOR") date (2) accounts that became past due at some point before the LOR date*

On page 9 of his report, Mr. Wolf goes on to state,

> *To assign the remaining 155 Affected Accounts to Groups, I first had to identify the due date of first payment missed for a given account, and then compare that date to the LOR date for each account owner.*

Other than he was asked to by counsel, Mr. Wolf does not explain anywhere in his report why he is segregating the "Affected Accounts" into two groups.  More importantly, to the extent that a VOI owner made the decision to stop making payments on their mortgage prior to entering into an agreement with any of the Defendants, the Wolf Report fails to provide any explanation as to how such a decision could constitute a damage that could be attributed to the Defendants.   Of the $5,947,223 in damages claimed by Mr. Wolf (excluding pre-judgment interest), $4,297,850, or 72.2% pertain to an account that he classified as having become past due at some point before the LOR date.[14]

### B.  Wolf failed to perform any analysis that establishes a causal link between VOI owners' delinquent mortgage payments and the actions of Defendants

Similarly, in addition to attributing damages pertaining to accounts that became past due at some point before the LOR date entirely to Defendants, Mr. Wolf implicitly assumed that <u>any</u> decision to withhold mortgage payments must have been caused by the actions of the Defendants.

---

[14] In addition, included among the 155 "Affected Accounts" are VOIs for which TFDB has reached some settlement or resolution with Plaintiffs.

Of the 155 "Affected Accounts" identified by Mr. Wolf, 118, or 76.1%, had already become delinquent prior to Plaintiff's receipt of the LOR, which indicates that many VOI owners made this decision without any direction or influence by the Defendants.  Even if a VOI owner opted to withhold mortgage payments after a LOR was received by Wyndham, however, I am not aware of any evidence that definitively links mortgage delinquencies to the Defendants' actions. Pursuant to the deposition of Ramona Harrington, Wyndham's corporate representative, it was apparent that Plaintiffs do not have direct knowledge of VOI owners withholding mortgage payments as a result of the Defendants' actions.

Page 22

17 Q. So let me ask you the first question then. Who
18 was advised by ARMG to stop making payments on a
19 timeshare contract?
20 A. We have a list of owners that are represented,
21 you know, by ARMG, and they stopped making payments
22 relatively soon after ARMG's involvement with the
23 account.
24 Q. Who are those people?
25 A. We provided the list of owners.

Page 23

1 Q. So every one of those people on the list were
2 advised by ARMG to stop making payments on their
3 timeshares?
4 A. I think the majority of them were.
5 Q. How did you come to make the conclusion that the
6 majority of these folks were told to stop making
7 payments on their timeshare by ARMG?
8 A. We looked at the rate of delinquency after ARMG
9 became involved with the account, versus the rate of
10  delinquency for owners who are not represented by ARMG....

Page 24

4 Q. ...With respect to the individuals that you
5 said the majority of who were instructed to stop making
6 payments on their timeshares, who among them was told by
7 the ARMG defendants to stop making payments on their
8 timeshares?
9 A. My understanding is that American Resource
10 Management Group, ARMG, refers their clients to Totten,
11 Franqui, and the owners who are represented by Totten,
12 Franqui become delinquent and default at a higher rate
13 than the owners not represented by them. . . .

Page 25

10  . . . Q. Who among those individuals were instructed by my
11 clients, the ARMG defendants, to stop making payments on
12 their timeshares?
13 MR. ZACHERL: I object to the form.
14 THE WITNESS: I don't know which ones were
15 instructed by them. What I do know is that
16 after they do business with your client they
17 have a higher propensity to go delinquent.

As reflected in the above excerpts from her deposition, Ms. Harrington has expressed Wyndham's assumption that because VOI owners that have contracted with Defendants and have higher delinquency rates than other VOI owners (of which neither is discussed in the Wolf Report), that somehow proves that Defendants caused the delinquencies. This assumption, however, fails to consider that VOI owners who have made the decision to allow their mortgages to become delinquent are also more likely to look for ways of relieving themselves of the financial obligations of VOI ownership.

Mr. Wolf's damages necessarily assumes, without any evidence, analysis or sufficient relevant data that there is a causal relationship between a VOI owner choosing to retain the Defendants and their decision to withhold making mortgage payments. This assumption, however, is in direct contradiction with information received from TFDB that VOI owners enrolled in the Group Legal Plan were never advised to stop making any payments.

A VOI owner's decision to withhold mortgage payments is entirely consistent with an owner's decision to retain professional assistance in order to transfer their ownership to another party or exit from their timeshare obligation, as both decisions reflect a desire by the owner to alter their financial circumstances. In the absence of any evidence, it is not reasonable to conclude that simply because a VOI owner enters into an agreement with companies such as ARMG or TFDB and also begins withholding mortgage payments and/or fees, that it was the decision to retain professionals that caused the delinquent payments. Correlation (i.e. events that coincide with one another) is not causation, and there is nothing in the Wolf Report that establishes or even alludes to such causation. As such, attributing every delinquent payment entirely to Defendants is both speculative and not supported by the data.

C. **Wolf erroneously failed to consider Plaintiffs' ability to mitigate damages by including all past due mortgage payments as well as the entire outstanding mortgage balances**

On pages 10 and 11 of the Wolf Report, Mr. Wolf states:

> *For the 155 Affected Accounts, I quantify and present the following amounts as of February 18, 2019:*
>
> - *Past due mortgage principal*
> - *Past due mortgage interest*
> - *Past due mortgage related other fees*
> - ***Remaining Principal*** **(emphasis added)**

Other than being requested to do so by counsel, the Wolf Report does not include any explanation as to why the remaining principal balance is included as an element of damages:

> *I was asked to quantify the past due mortgage principal, interest, and other fee amounts owed by the owners ("Owners") of the Affected Accounts (collectively "Past Due Amounts"), and the remaining mortgage principal balance (the "Remaining Principal")* (Page 2)

Of the $5,947,223 in damages calculated by Mr. Wolf (excluding pre-judgment interest), $5,020,177[15], or 84.4% or the amounts claimed, is comprised of the aggregate remaining principal balance on mortgages with delinquent payments. By doing so, Mr. Wolf has implicitly shifted all legal responsibility for repayment of the mortgage from the VOI owner to the Defendants. He further assumes that, to the extent that a VOI owner has been delinquent on any mortgage payments, the only possible outcome is a full default on the outstanding mortgage. Moreover, he fails to consider Plaintiff's ability to mitigate any losses that may be incurred by pursuing what Wyndham believes are its rights under the timeshare contracts.

Mr. Wolf has not offered any logical basis to include the aggregate outstanding principal balance on all delinquent mortgages in his damages calculation. In its representation of VOI owners under the Group Legal Plan, TFDB has pursued what it believes to be available legal remedies that would enable owners to be relieved of any legal obligation to make payments on the outstanding mortgages. If TFDB's efforts to prosecute these cases are successful, there would be no basis for a claim for damages.

To the extent that TFDB's efforts are unsuccessful, it is my understanding that the legal and financial obligation would remain with the VOI owner, which is consistent with Plaintiff's First Amended Complaint (i.e. *"Wyndham has valid and binding contracts...with individuals who purchased timeshare interests from Wyndham... which control the benefits and obligations of timeshare ownership")[16]*. In such instances, Plaintiffs would not suffered damages in the form of lost mortgage principal, as these amounts would still be owed by the VOI owners.

Moreover, only a very small fraction of the VOIs represented by TFDB in the Group Legal Plan have actually been resolved – either through settlement, foreclosure or dispute resolution. As discussed previously, I have reviewed data extracted from TFDB's CRM, which provides a status of each matter, and includes the following classifications:

---

[15] Of this amount, $3,542,902 relates to VOI owners who stopped making payments prior to Wyndham's receipt of the LOR and $1,477,275 relates to VOI owners who stopped making payments after Wyndham's receipt of the LOR.
[16] First Amended Complaint – paragraph 2

     i.        Welcome letter sent to client

     ii.       Documents being processed

     iii.      Incomplete documents provided by client

     iv.      Demand letter sent to developer

     v.       Received response from developer

     vi.      Pre-litigation / dispute activities

     vii.     In dispute (i.e. arbitration / litigation)

     viii.    Resolution of matter (i.e. deed-in-lieu / foreclosure / settlement)

     ix.      "Mission Complete" letter sent to client

     x.       Relationship cancelled

The overwhelming majority of the Wyndham VOIs have not progressed beyond a demand letter being sent to Wyndham. Of the 471 Wyndham related VOIs identified in TFDB's CRM, only 14 have reached the "Mission Complete" stage. As such, to include the full acceleration of the entire aggregate principal balance of all delinquent mortgages as an element of damage is highly speculative and cannot be reasonably relied upon.

**D.**    **Wolf damages erroneously included late mortgage payments and outstanding mortgage balances on debt that was sold without recourse to legally separate special purpose entities (SPEs)**

As reflected on page 5 of the Wolf Report,

> *The Company's sales of VOI's are either cash sales or developer-financed sales. Developer financed sales are typically collateralized by the underlying VOI. The Company pools qualifying vacation ownership contract receivables and sells them to bankruptcy-remote entities. Vacation ownership contract receivables qualify for securitization based primarily on the credit strength of the VOI purchaser to whom financing has been extended. Vacation ownership contract receivables are securitized through bankruptcy-remote SPE's that are consolidated within the Company's financial statements.*

Mr. Wolf appears to suggest without explanation that, merely because these bankruptcy-remote SPE's are consolidated within Wyndham's financial statements, any losses suffered by these entities would somehow constitute losses / damages to the Plaintiffs in this case. This is contrary to the description of the relationship between Wyndham and the SPEs presented in the Wyndham Destinations, Inc. 2018 Form 10-K, which makes reference to $2.357 billion of **Non-recourse** Vacation Ownership Debt[17]:

---

[17] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Pages 71 and 102

> *Represents non-recourse debt that is securitized through bankruptcy-remote special purpose entities ("SPEs"), the creditors of which have no recourse to the Company for principal and interest. These outstanding borrowings (which legally are not liabilities of the Company) are collateralized by $3.03 billion and $2.68 billion of underlying gross vacation ownership contract receivables and related assets (which legally are not assets of the Company) as of December 31, 2018 and 2017, respectively.[18]*

The Form 10-K goes on to state:

> *The activities of these SPEs are limited to (i) purchasing vacation ownership contract receivables from the Company's vacation ownership subsidiaries, (ii) issuing debt securities and/or borrowing under a conduit facility to fund such purchases and (iii) entering into derivatives to hedge interest rate exposure. The bankruptcy remote SPEs are legally separate from the Company. The receivables held by the bankruptcy-remote SPEs are not available to creditors of the Company and legally are not assets of the Company. Additionally, the non-recourse debt that is securitized through the SPEs is legally not a liability of the Company and thus, the creditors of these SPEs have no recourse to the Company for principal and interest.[19]*

As reflected on the following table appearing on page 107 of Wyndham Destination, Inc.'s 2018 Form 10-K, there were $3.029 billion of SPE assets, which included $2.883 billion of gross securitized contract receivables, and total SPE liabilities of $2.360 billion, which represented $669 million of SPE assets in excess of SPE liabilities, providing a large cushion in the event of any loan defaults.

|  | December 31, 2018 | December 31, 2017 |
|---|---|---|
| Securitized contract receivables, gross [(a)] | $        2,883 | $        2,553 |
| Securitized restricted cash [(b)] | 120 | 106 |
| Interest receivables on securitized contract receivables [(c)] | 23 | 22 |
| Other assets [(d)] | 3 | 4 |
| Total SPE assets | 3,029 | 2,685 |
| Non-recourse term notes [(e)(f)] | 1,839 | 1,219 |
| Non-recourse conduit facilities [(e)] | 518 | 879 |
| Other liabilities [(g)] | 3 | 2 |
| Total SPE liabilities | 2,360 | 2,100 |
| SPE assets in excess of SPE liabilities | $          669 | $          585 |

On August 29, 2002, Wyndham Consumer Finance, Inc. entered into a Master Loan Purchase Agreement to sell vacation ownership contract receivables to Sierra Deposit Company, LLC, an

---

[18] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Page 103

[19] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Page 107

agreement that was amended and restated as of October 30, 2007.  In this agreement, it was made clear that

> *It is the express and specific intent of the parties that the transfer of the Additional Loans and the other Transferred Assets relating thereto from the Seller to the Purchaser as provided is and shall be construed for all purposes as a true and absolute sale of such Additional Loans and Transferred Assets, shall be absolute and irrevocable and provide the Purchaser with the full benefits of ownership of the Additional Loans and related Transferred Assets and will be treated as such for all federal income tax reporting and all other purposes.*

The vast majority of all vacation ownership contract receivables were securitized and irrevocably sold without recourse to bankruptcy remote SPEs.  As of December 31, 2018, Wyndham Destination, Inc.'s Form 10-K reports that there were $2.883 billion of securitized contract receivables and $888 million non-securitized contract receivables, which indicates that approximately 76.5% of its notes have been irrevocably sold to legally separate parties without any recourse to Wyndham.[20]

The Wolf Report, however, contains no analysis that identifies and distinguishes between the "Affected Accounts" that have been securitized from those that have not.  To the extent that Mr. Wolf has calculated and included any losses that have been incurred by a legally separate and distinct third party, his damages are overstated.

**E.  Wolf erroneously failed to offset his claimed damages despite that Wyndham is able to recover the underlying VOI inventory and resell it at its full current value**

On page 12 of the Wolf Report, Mr. Wolf states

> At the time of this report, none of the Affected Accounts VOI's were recovered and placed back into Wyndham's inventory. Therefore, Wyndham has received no economic benefit associated with the 155 past due accounts.  However, I have considered if a potential economic benefit may exist in the event the Affected Accounts VOI's are returned to Wyndham's inventory for later resale.

I agree with Mr. Wolf that it would be inconsistent to include as a measure of damages the delinquent mortgage principal, interest and fees on all "Affected Accounts", as well as the aggregate remaining principal on these accounts, without offsetting these purported damages by

---

[20] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Pages 107-108

the economic value of any VOIs recovered as a result of a default by the VOI owner.  As included in the 2018 Wyndham Destinations, Inc. Form 10-K:

> *Inventory Sourcing*
>
> *Consumer loan defaults. As discussed in the "Purchaser Financing" section, we offer financing to purchasers of VOIs. In the event of a default, we are able to recover the inventory and resell it at full current value. We are responsible for the payment of maintenance fees to the property owners' associations until the product is sold. As of December 31, 2017, inventory on the Consolidated Balance Sheet included estimated recoveries of loan defaults in the amount of $286 million.[21]*

Inventory held by Wyndham, including estimated VOI recoveries, was summarized in the Form 10-K as follows[22]:

| | 2018 | | 2017 | |
|---|---|---|---|---|
| Land held for VOI development | $ | 4 | $ | 4 |
| VOI construction in process | | 45 | | 25 |
| Inventory sold subject to repurchase | | 33 | | 43 |
| Completed VOI inventory | | 797 | | 841 |
| Estimated VOI recoveries | | 286 | | 279 |
| Exchange & Rentals vacation credits and other | | 59 | | 57 |
| Total inventory | $ | 1,224 | $ | 1,249 |

Despite statements in Wyndham's public filings that it has sourced and is holding an estimated $286 million of inventory from VOI recoveries obtained through consumer loan defaults, Mr. Wolf has completely ignored the existence of this value and has, in fact, argued on page 12 that it has no value:

> *While it may appear that a recovery of a timeshare account owner's deeded interval or points may provide an economic benefit, since Wyndham can eventually attempt to resell or rent the deeded interval placed back into its inventory, the economic reality is different. This is due to the large amount of existing inventory it already holds for sale, in addition to the unrecovered upfront costs incurred by Wyndham to initially develop, build, market, sell and administer the timeshare account.*

This statement, however, completely ignores the inherent value of the recovered VOIs recognized and acknowledged to exist by Wyndham in each of its annual audited financial filings.  Mr. Wolf, instead, appears to be making a FIFO (first-in first-out) inventory accounting argument, that because Wyndham has other inventory to sell, he can simply ignore the value of the recovered VOIs.  He also argues that because there are costs associated with holding inventory (i.e. maintenance fees) and costs associated with marketing and selling VOIs, "VOIs do not appear to provide a meaningful economic benefit to Wyndham

---

[21] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Page12

[22] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Page 99

since the profit is back-end loaded in the transaction, but instead may result in unrecovered transaction costs and impose additional expense."[23]

This flawed argument, of course, undercuts Wyndham's entire business model, which Wyndham describes as follows:

> *We operate the world's largest vacation ownership business. We develop and acquire vacation ownership resorts, market and sell VOIs, provide consumer financing for the majority of the sales and provide property management services to property owners' associations. As of December 31, 2018, we had 224 vacation ownership resorts in the U.S., Canada, Mexico, Caribbean and South Pacific that represent more than 25,000 individual vacation ownership units and approximately 880,000 owners of VOIs.... Our vacation ownership business derives a majority of its revenues from timeshare sales, with the remainder of revenues coming from consumer financing and property management.* [24]

The false arguments made by Mr. Wolf to avoid including any offset to his purported damages would be applicable to other inventory held, marketed and sold by Wyndham.

Wyndham's Vacation Ownership constitutes a business segment that continues to grow in terms of both revenues and profits.   In 2018, Wyndham had gross VOI sales of $2.271 billion, a 6.2% increase over the $2.138 billion it generated in 2017.   Approximately 45% of Wyndham's net revenues ($1,769 net VOI sales out of $3,931 total net sales)[25] originated from the sale of VOIs. Moreover, Wyndham reported $731 million of adjusted EBITDA (Earnings Before Interest Taxes Depreciation and Amortization) to its Vacation Ownership segment.[26]

Nonetheless, Mr. Wolf chooses to include in his damages calculation delinquent mortgage payments and aggregate outstanding principal balances that were irrevocably sold without recourse to non-Plaintiff entities, while, at the same time, completely ignoring any value that would be received by Plaintiffs as a result of VOI recoveries, resulting in a further overstatement in calculated damages that cannot be reasonably attributed to the Defendants.

I understand that discovery is ongoing. As such, I reserve the right to update this report and the opinions contained herein if additional information becomes available for my review.

---

[23] Wolf Report, page 16

[24] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Pages 8-9

[25] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Page 43

[26] Wyndham Destinations, Inc. Form 10-K for the fiscal year ended December 31, 2018, Page 46

## VII.   <u>EXPERT COMPENSATION</u>

I am being compensated at my standard rate of $505 per hour, while other members of our firm who worked on this engagement are compensated at $85 to $480 per hour.  Neither my compensation nor the compensation of the other BPB personnel who worked on this assignment is contingent on the outcome of this litigation.

Scott M. Bouchner, CMA, CVA, CFE, CIRA
Berkowitz Pollack Brant Accountants and Advisors LLP
200 South Biscayne Boulevard, Sixth Floor
Miami, Florida 33131

**Exhibit 1**

**Totten Franqui Davis & Burk, LLC**
**Profit and Loss Statement from Inception (August 2017) through December 31, 2018**
**and**
**Apportionment of Profits / (Losses) to Wyndham Properties**

| | | | 2017 | 2018 | TOTAL |
|---|---|---|---|---|---|
| **Income** | | | | | |
| Group Legal Services Plan - Retainer | | | | | |
| | | 08/10/17 | $45,000 | | $45,000 |
| | | 09/18/17 | 45,000 | | 45,000 |
| | | 10/13/17 | 45,000 | | 45,000 |
| | | 11/14/17 | 45,000 | | 45,000 |
| | | 12/15/17 | 45,000 | | 45,000 |
| | | 01/16/18 | | 45,000 | 45,000 |
| | | 02/15/18 | | 105,000 | 105,000 |
| | | 03/14/18 | | 105,000 | 105,000 |
| | | 04/17/18 | | 105,000 | 105,000 |
| | | 05/16/18 | | 105,000 | 105,000 |
| | | 06/19/18 | | 105,000 | 105,000 |
| | | 07/17/18 | | 105,000 | 105,000 |
| | | 08/16/18 | | 105,000 | 105,000 |
| | | 09/19/18 | | 105,000 | 105,000 |
| | | 10/15/18 | | 125,000 | 125,000 |
| | | 11/15/18 | | 135,000 | 135,000 |
| | | 12/14/18 | | 135,000 | 135,000 |
| **Total Income** | | | $225,000 | $1,280,000 | $1,505,000 |
| **Expense** | | | | | |
| Payroll Expenses | | | $174,800 | $1,173,992 | $1,348,792 |
| Independent Contractors | | | 0 | 76,092 | 76,092 |
| Professional Fees | | | 1,827 | 66,209 | 68,036 |
| Rent Expense | | | 0 | 56,238 | 56,238 |
| Insurance Expense | | | | | |
| Health Insurance | | | 0 | 17,582 | 17,582 |
| Professional Liability | | | 2,582 | 10,993 | 13,575 |
| Worker's Compensation | | | 114 | 820 | 934 |
| Insurance Expense - Other | | | 0 | 1,998 | 1,998 |
| Total Insurance Expense | | | 2,696 | 31,393 | 34,089 |
| Advanced Client Costs | | | 396 | 31,740 | 32,136 |
| Miscellaneous Expense | | | 0 | 10,053 | 10,053 |
| Reimbursement of Employee Paid Expenses | | | 0 | 4,500 | 4,500 |
| Meals and Entertainment | | | 204 | 3,945 | 4,149 |
| Computer and Internet Expenses | | | 0 | 2,997 | 2,997 |
| Business Licenses and Permits | | | 2,160 | 754 | 2,914 |
| Office Supplies | | | 861 | 1,693 | 2,554 |
| Utilities | | | 0 | 1,490 | 1,490 |
| Travel Expense | | | 0 | 618 | 618 |
| Bank Service Charges | | | 14 | 82 | 96 |
| Reimbursement of Loss Items | | | 0 | 50 | 50 |
| Research | | | 0 | 15 | 15 |
| Reimbursement of Group Plan Legal Costs and Advanced Client Expenses | | | (575) | (134,421) | (134,996) |
| **Total Expenses (Net of Reimbursements)** | | | $182,383 | $1,327,439 | $1,509,823 |
| **Net Income / (Loss)** | | | **$42,617** | **($47,439)** | **($4,823)** |
| Wyndham Timeshare Properties through 12/31/18 | 471 | 19.49% | **$8,305** | **($9,244)** | **($940)** |
| Non-Wyndham Timeshare Properties through 12/31/18 | 1,946 | 80.51% | | | |
| Total Timeshare Owners | 2,417 | 100.00% | | | |
| or | | | | | |
| Wyndham Timeshare Properties through 12/31/18 (in months) [1] | 2,914 | 19.60% | **$8,354** | **($9,300)** | **($945)** |
| Non-Wyndham Timeshare Properties through 12/31/18 (in months) | 11,951 | 80.40% | | | |
| Total Timeshare Owners (in months) | 14,865 | 100.00% | | | |

[1] Timeshare properties in months is equal to the number of months that each timeshare property has been active, from the date of acquisition by TFDB through either the date of completion / cancellation or through December 31, 2018 for active files.

Exhibit 2                                    Calculation of Wyndham Profits

| | 2015 | 2016 | 2017 | 2018 | TOTAL |
|---|---|---|---|---|---|
| **Wyndham Client Revenue as a Percentage of All Revenue** | 12.93% | 15.32% | 14.49% | 14.51% | |
| **Wyndham Exit Clients as a Percentage of All Exit Clients** | | | | | 19.60% [A] |
| **Wyndham Related Revenues** | $808,395 | $1,917,051 | $3,243,549 | $3,843,742 | $9,813,137 |
| **Direct Product Expenses** | | | | | |
| Transfer Cost | 26,772 | 13,735 | 50,167 | 78,914 | 169,588 |
| Maintenance Fees | 21,769 | 28,065 | 11,768 | 43,243 | 104,844 |
| Client Incentive | - | - | 550 | 6,670 | 7,220 |
| Marketing - Direct | - | - | 700 | 400 | 1,100 |
| Legal Plan - Direct | - | - | - | 724 | 724 |
| | 48,541 | 41,800 | 63,184 | 129,951 | 283,477 |
| **Wyndham Related Revenue Less Direct Product Expenses** | 759,854 | 1,875,251 | 3,180,764 | 3,713,791 | 9,529,660 |
| **Indirect Product Expenses** | | | | | |
| Payroll | 153,085 | 467,158 | 713,371 | 968,810 | 2,302,423 [B] |
| Marketing | 95,490 | 200,184 | 405,283 | 646,317 | 1,347,273 [B] |
| Merchant Fees | 20,179 | 40,447 | 85,488 | 106,349 | 252,462 [B] |
| Inventory Costs | 2,402 | 28,160 | 37,162 | 27,837 | 95,561 [B] |
| Transfer Cost | 3,506 | 8,973 | 11,664 | 17,892 | 42,035 [B] |
| Employee Benefits | - | 1,349 | 11,405 | 19,262 | 32,016 [B] |
| Legal Plan | - | - | 44,213 | 277,441 | 321,654 [C] |
| | 274,661 | 746,271 | 1,308,585 | 2,063,908 | 4,393,424 |
| **Wyndham Related Revenue Less All Product Expenses** | 485,193 | 1,128,980 | 1,872,180 | 1,649,883 | 5,136,236 |
| **Overhead Allocation** | | | | | |
| Legal Plan | - | - | 17,331 | 23,572 | 40,903 [C] |
| Other | 95,446 | 152,142 | 218,070 | 295,748 | 761,407 [B] |
| | 95,446 | 152,142 | 235,401 | 319,321 | 802,310 |
| **Wyndham Related Profit** | 389,748 | 976,838 | 1,636,778 | 1,330,562 | 4,333,926 |
| Contingent Guarantee Exposure - Exit Clients | | | (416,920) | (2,241,964) | (2,658,884) [D] |
| Contingent Guarantee Exposure - Transfer Clients | | | (17,868) | (684,164) | (702,032) [D] |
| **Wyndham Related Profit / (Loss) Net of Guarantee Exposure** $ | 389,748 | $ 976,838 | $ 1,201,990 | $ (1,595,565) | $ 973,011 |

**Notes:**

*A -Based on Totten Franqui Davis & Burk, LLC ("TFDB") Client List*

*B - Allocated based upon Wyndham Client Revenue as a Percentage of all Revenue*

*C - Allocated based upon Wyndham Exit Clients as a Percentage of all Exit Clients*

*D - Includes all Open Contracts Subject to Guarantee*

| | 2015 | 2016 | 2017 | 2018 | TOTAL |
|---|---|---|---|---|---|
| *Transfer Revenue %* | 43.51% | 27.14% | 24.02% | 21.09% | 24.94% |
| *Exit Revenue %* | | | 15.37% | 58.37% | 29.54% |
| *Non-Client Revenue %* | 56.49% | 72.86% | 60.61% | 20.55% | 45.52% |
| | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| **Transfer Revenues** | $351,730 | $520,274 | $779,052 | $810,475 | $2,461,532 |
| Direct Costs | 48,541 | 41,800 | 63,184 | 129,227 | 282,752 |
| Indirect Costs | 122,841 | 229,588 | 340,746 | 412,774 | 1,105,949 |
| Overhead Allocation | 41,528 | 41,290 | 52,371 | 62,360 | 197,549 |
| Contingent Guarantee Exposure | 0 | 0 | 17,868 | 684,164 | 702,032 |
| **Transfer Profits** | 138,820 | 207,596 | 304,883 | (478,050) | 173,249 |
| **Exit Revenues** | | | $498,603 | $2,243,555 | $2,742,158 |
| Direct Costs | | | 0 | 724 | 724 |
| Indirect Costs | | | 231,045 | 1,293,492 | 1,524,538 |
| Overhead Allocation | | | 50,849 | 196,198 | 247,047 |
| Contingent Guarantee Exposure | | | 416,920 | 2,241,964 | 2,658,884 |
| **Exit Profits** | | | (200,211) | (1,488,823) | (1,689,034) |
| **Non-Client Revenues** | $456,665 | $1,396,776 | $1,966,294 | $789,712 | $4,609,447 |
| Direct Costs | 0 | 0 | 0 | 0 | 0 |
| Indirect Costs | 151,819 | 516,683 | 736,794 | 357,641 | 1,762,937 |
| Overhead Allocation | 53,918 | 110,852 | 132,182 | 60,763 | 357,714 |
| Contingent Guarantee Exposure | 0 | 0 | 0 | 0 | 0 |
| **Non-Client Profits** | 250,928 | 769,241 | 1,097,318 | 371,308 | 2,488,796 |
| **Total Profits** | $389,748 | $976,838 | $1,201,990 | -$1,595,565 | $973,011 |



www.bpbcpa.com

 

800.999.1CPA(1272)

## CURRICULUM VITAE

SCOTT M. BOUCHNER

### Business Background

**Berkowitz Pollack Brant,** Miami and Ft. Lauderdale, FL                          1999 to Present
- Partner and Director of Forensic Accounting and Business Valuation Services

**PricewaterhouseCoopers LLP,** New York, NY and Miami, FL                1990 – 1995, 1997-1999
- Manager - Financial Advisory Services Group

**KPMG Peat Marwick LLP**, New York, NY                                              1995-1996
- Manager - Corporate Transactions Group

**First American Bankshares**, Washington DC                                            1987-1988
- Credit Analyst

### Practice areas include:
- Bankruptcy, insolvency and receivership services
- Litigation support services and expert witness testimony
- Forensic accounting investigations involving allegations of fraud / mismanagement
- Business valuations
- Due-diligence investigations in connection with merger and acquisition transactions
- Preparation of pro-forma financial information and financial forecasts
- Strategic / financial consulting and business advisory services

### Qualifications

Certified Management Accountant (CMA)
Institute of Management Accountants (1996)

Certified Valuation Analyst (CVA)
National Association of Certified Valuation Analysts (2001)

Certified Fraud Examiner (CFE)
National Association of Certified Fraud Examiners (2007)

Certified Insolvency and Restructuring Advisor (CIRA)
The Association of Insolvency and Restructuring Advisors (2012)
- Awarded the Zolfo Cooper Silver Medal Award - 2nd highest cumulative national exam score

Honored in South Florida Legal Guide's Top CPAs and Financial Professionals in Litigation Support (2005 through 2017)

AIPCA Forensic and Litigation Services Damages Task Force (2011 - 2018)

CFF Exam Development Task Force (2012 - 2014)

Awarded AICPA's Forensic & Litigation Services Volunteer of the Year (2016)

**Educational Background**

Columbia Business School -- Masters of Business Administration, 1990, Degree in Finance / Marketing

The George Washington University -- Bachelors of Arts, 1987, Degree in English Literature

**Publications and Instruction**

**Publications:**

- <u>Attaining Reasonable Certainty in Economic Damages Calculations – Revenues, Costs and Best Evidence</u>, (Co-authored), Forensic & Valuation Services Practice Aid, *Association of International Certified Professional Accountants*, 2018

   <u>Lost Profits Damages: Principles, Methods, and Applications</u>, *Chapter 12 "Mitigation of Damages in the Lost Profits Calculation",* Valuation Products and Services, LLC, Ventnor City, New Jersey, 2017

- <u>Attaining Reasonable Certainty in Economic Damages Calculations</u>, (Co-authored), Forensic & Valuation Services Practice Aid, The American Institute of Certified Public Accountants, 2015

- <u>Calculating Lost Profits – Business Valuation and Forensic & Litigation Services Practice Aid 06-4,</u> (Co-authored), The American Institute of Certified Public Accountants, 2006

- <u>Certified in Financial Forensics Examination</u>, *The American Institute of Certified Public Accountants,* 2010 – Selected to participate on committee to develop test questions used on examination to award Certified in Financial Forensics (CFF) credential.

- <u>Discount Rates, Risk, and Uncertainty in Economic Damages Calculations</u>, (Co-authored), *The American Institute of Certified Public Accountants,* 2012

**Instruction:**

- "Economic Damages Case Law Update", The American Institute of Certified Public Accountants - 2017

- "Attacking the Plaintiff's Damage Calculation", The American Institute of Certified Public Accountants – 2017

- "Attaining Reasonable Certainty in Economic Damages Calculations", The American Institute of Certified Public Accountants - 2015

- "Causation and the Damages Expert in Florida", Florida Institute of Certified Public Accountants – 2014

- "Reasonable Certainty Round 2: An Inside Look at the Findings of the Damages Task Force" – American Institute of Certified Public Accountants – 2013

- "Attaining Reasonable Certainty in Damage Calculations" - American Institute of Certified Public Accountants – 2012

- "Discount Rates, Risk, and Uncertainty in Economic Damages Calculations" – American Institute of Certified Public Accountants - Webinar – 2012

- "Madoff, Peters and Rothstein: Fraud and Ponzi Schemes in South Florida" – Turnaround Management Association – 2010

- "Understanding, Developing & Managing Forensic Engagements" – American Institute of Certified Public Accountants – Forensic and Valuation Section - 2010

- "Understanding Discount Rates and the Time Value of Money in Calculating Economic Damages", Florida Institute of Certified Public Accountants – 2010

- Lost Profits in the Florida Courts" – Dade County Bar Association - 2009, Florida Institute of Certified Public Accountants – 2009

**List of Cases Testified**

Bay Parc Plaza Apartments, L.P., et al. v. Airbnb, Inc. and Airbnb Payments, Inc.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving damages pertaining to illegal short-term rental activity
Testified in deposition for Plaintiff in 2018

Sheridan Healthcorp, Inc. v. Aetna Health Inc., Aetna Life Insurance Co., et al.
Seventeenth Judicial Circuit – Broward County, Florida
Testimony involving valuation of medical claims
Testified in deposition for Plaintiff in 2018

Tapestry Senior Housing Management, et al v. Herbert J. Sims & Co., Inc.
American Arbitration Association
Testimony involving economic damages arising from professional negligence
Testified in deposition and arbitration for Defendant in 2018

Ronald N. Dubner v. The Estate of Bradley A. Dubner, et al
Fifteenth Judicial Circuit – Palm Beach County, Florida
Testimony involving valuation issues
Testified in deposition for Defendant in 2018

Daniel S. Newman, as Receiver for Founding Partners, et al v. Ernst & Young, LLP and Mayer Brown, LLP
Seventeenth Judicial Circuit – Broward County, Florida
Testimony involving receivership accounting
Testified as 30(b)(6) witness for Berkowitz Pollack Brant Advisors and Accountants, LLP in 2018

AH Biscayne Investor, LLC v. 1st Sun Properties, LLC
U.S. District Court Southern District of Florida Miami Division
Testimony involving calculation of lost profits
Testified in deposition for Plaintiff in 2017

BMO Harris Bank, N.A. v. Richert Funds, LLC, Dwight Richert and Bart Garbrecht
United States District Court for the Northern District of Georgia
Testimony involving accounting investigation pertaining to alleged fraud
Testified in deposition for Defendant in 2017

GOLTV, Inc, et al. v. Fox Sports Latin America, Ltd., et al.
United States District Court Southern District of Florida
Testified as Rule 30(b)(6) witness T&T Sports Marketing Ltd. in 2017

W. Riley Allen, Esq. vs. Dudley Q. Sharp, Jr., Esq. and Burr & Forman, LLP
Ninth Judicial Circuit – Orange County, Florida
Testimony involving damages suffered in connection with professional malpractice
Testified in deposition for Defendants in 2016

Hawaiian Airlines, Inc. v. AAR Aircraft Services, Inc. and Mankiewicz Coatings, LLC
United States District Court for the Southern District of Florida
Testimony involving damages suffered in connection with product liability
Testified in deposition for Plaintiff in 2016

In re: Miguel Angel Villaverde, Debtor
United States Bankruptcy Court for the Southern District of Florida, Miami Division
Testimony involving feasibility of Chapter 13 bankruptcy plan of reorganization
Testified in trial for creditor in 2014

Galen Francis, et al v. Metal Roofing Systems by Brian Embick Roofing, Inc., et al
Fifteenth Judicial Circuit – Palm Beach County, Florida
Testimony involving personal injury claims
Testified in deposition for Plaintiff in 2014

USA v. Steinger et al
Criminal Trial – United States District Court for the Southern District of Florida
Testimony Involving Forensic Accounting
Testified in trial for prosecution in 2013

Lawrence Weinstein, MD v. Tenet Florida Physician Services
Arbitration
Testimony involving lost earnings
Testified in deposition and arbitration for Defendant in 2013

Robert Chinick, et al. v. Armor Screen Corporation, et al.
Minority Shareholder Dispute
Court appointed neutral appraiser in 2012

Leon A. Bynoe, M.D. v. Jeffrey N. Weiss, M.D.
American Arbitration Association
Testimony involving buyout of minority shareholder
Testified in deposition as neutral expert in 2011

Lisy Corp. v. Alberico Echemendia, et al
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving post-acquisition dispute
Testified in deposition for Plaintiff in 2011

In Re: The Marriage of: Judith Berens and Fred Berens
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testified in deposition for Respondent / Former Husband in 2010

Malamud v. Aristed Group, LLC
Seventeenth Judicial Circuit – Broward County, Florida
Testimony involving lost earnings in connection with personal injury claim
Testified in deposition for Plaintiff in 2008

In Re: United States Sugar Corporation Litigation
United States District Court for the Southern District Of Florida
Testimony involving proceeds due ESOP participants in class action litigation
Testified in deposition for Plaintiff in 2009

Roberto Martinez, as Court-Appointed Receiver of Mutual Benefits Corp, et al v. Spear Safer CPAs
United States District Court for the Southern District Of Florida
Testimony involving damages suffered in connection with professional malpractice
Testified in deposition for Plaintiff in 2007

Henry Torres and Hilda Torres v. Empire Seafood Corp and Performance Food Group Co.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving post-acquisition dispute
Testified in deposition for Defendant / Counter-Plaintiff in 2007 and Trial in 2009

Topp, Inc. v. Uniden America Corporation
United States District Court for the Southern District Of Florida
Testimony involving lost net investment resulting from alleged fraud.
Testified in deposition for Plaintiff in 2006 and in Jury Trial in 2008

Florida Tire Recycling, Inc. v. Lexington Insurance Company and Webster, Inc.
Nineteenth Judicial Circuit – St. Lucie County, Florida
Testimony involving property and casualty insurance claim
Testified in deposition for Defendant in 2006

Dulce N. Rispoli v. Herbert A. Stiefel
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving valuation in closely held business
Trial testimony and deposition for Husband in 2006

Grupo Televisa, S.A. et al v. Telemundo Communications Group, Inc. et al
United States District Court for the Southern District Of Florida
Testimony involving lost profits resulting from alleged tortuous interference.
Testified in deposition for Defendant in 2005 and 2007

Bank of New York v. Bernard Jaffe, Jr.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving alleged fraudulent transfers of funds.
Testified in deposition for third party defendant in 2004

In Re: Estate of Manny Bankhalter
Eleventh Judicial Circuit – Miami-Dade County, Florida – Probate Division
Testimony involving the evaluation of two competing offers for the sale of estate assets
Testified in court hearing in 2003

Andrew Chauser & Katherine Sayet v. Sayet Assoc. Pathologist Reference Laboratory, Inc.
Eleventh Judicial Circuit – Miami-Dade County, Florida
Testimony involving reasonableness of compensation in dissident shareholder action
Testified in deposition for Defendant in 2002

Johnston Tombigbee Furniture Manufacturing Company v. Akzo Noble Coatings, Inc.
United States District Court for the Northern District Of Mississippi Eastern Division
Testimony involving lost profits resulting from product liability
Testified in deposition for the Plaintiff in 2002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION
Case No.: 9:18-cv-81055-MIDDLEBROOKS/BRANNON

| | |
|---|---|
| WYNDHAM VACATION OWNERSHIP, INC., a Delaware corporation; WYNDHAM VACATION RESORTS, INC.; a Delaware corporation, WYNDHAM RESORT DEVELOPMENT CORPORATION, an Oregon Corporation; and SHELL VACATIONS, LLC, an Arizona limited liability company,<br><br>      Plaintiffs,<br><br>v.<br><br>TOTTEN FRANQUI DAVIS & BURK, LLC, a Florida limited liability company; TOTTEN FRANQUI DAVIS & BURK, PLLC, a North Carolina professional limited liability company; AMERICAN RESOURCE MANAGEMENT GROUP, LLC d/b/a resortrelease.com d/b/a americanresourcemanagementgroup.com, a Florida limited liability company; VACATION PROPERTIES FOR LESS, LLC, a Florida limited liability company; REDEMPTION AND RELEASE, LLC, a Florida limited liability company; RESORT EXIT TEAM, LLC d/b/a resortexitteam.com, a Florida limited liability company; HELPING TIMESHARE OWNERS, INC. f/k/a HELPING TIMESHARE OWNERS LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO a Florida corporation; JOHN DOE #2 d/b/a Timeshare Freedom Group d/b/a timesharefreedomgroup.com; ERIC S. CLINE a/k/a STEPHEN E. CLINE, an individual; SHYLA CLINE, an individual; SCOTT MORSE a/k/a LARRY SCOTT MORSE, an individual; WILLIAM HOWELL JR., a/k/a William W. Howell, Jr. a/k/a Bill Howell, an individual; and JORDAN SALKIN, an individual,<br><br>      Defendants. | **FIRST AMENDED COMPLAINT**<br>**FOR DAMAGES AND**<br>**INJUNCTIVE RELIEF** |

**<u>FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>**

Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts, Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); and Shell Vacations, LLC ("SV") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of Civil Procedure, hereby sue Defendants Totten Franqui Davis & Burk, LLC ("TFDB Law FL"); Totten Franqui Davis & Burk PLLC ("TFDB Law NC")(TFDB Law FL and TFDB Law NC, together, "Totten"); American Resource Management Group, LLC d/b/a resortrelease.com d/b/a americanresourcemanagementgroup.com ("Resort Release"); Vacation Properties for Less, LLC ("Vacation Properties"); Redemption and Release, LLC ("Redemption"); Resort Exit Team, LLC d/b/a resortexitteam.com ("Resort Exit"); Helping Timeshare Owners, Inc. f/k/a Helping Timeshare Owners LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO ("Help4TSO"); John Doe #2 d/b/a Timeshare Freedom Group d/b/a timesharefreedomgroup.com ("Timeshare Freedom"); Eric S. Cline a/k/a Stephen E. Cline ("Eric Cline"); Shyla Cline; Scott Morse a/k/a Larry Scott Morse ("Morse"); William Howell Jr. a/k/a William W. Howell Jr. a/k/a Bob Howell a/k/a Bill Howell ("Howell"); and Jordan Salkin ("Salkin")(collectively, the "Defendants"), and state:

A.  **<u>INTRODUCTION</u>**

1.  This action is based on the simple premise that it is inherently false and misleading for a non-party to a contract to advertise and sell any ability to cancel or release a party to that contract of or from the obligations of that contract.

2.  Wyndham has valid and binding contracts (the "Timeshare Contracts") with individuals who purchased timeshare interests from Wyndham (the "Wyndham Owners") which control the benefits and obligations of timeshare ownership.

- 2 -

3.      Defendants are not parties to the Timeshare Contracts.  Yet, despite this, they falsely advertise a "cancellation," "exit," or "transfer" service that purports to "legally" release or "exit" Wyndham Owners from the obligations of their Timeshare Contracts.  The following is a representative advertisement by Defendant Resort Release for illustrative purposes:



4.      Defendants even guarantee results – that is, Defendants guarantee that Wyndham Owners will be legally and permanently exited from their Timeshare Contracts if they use Defendants' services.

5.      Because a guarantee of this nature would violate the Florida Bar Rules of Professional Conduct if advertised directly by the law firm Defendant Totten,[1] the non-lawyer Defendants publish these advertisements and then refer any "clients" to Totten for purported legal representation.

6.      Through these false and misleading advertisements, Defendants deceive hundreds of Wyndham Owners into retaining Defendants, including the attorneys at Totten, at substantial cost, to implement Defendants' purported "cancellation" or "transfer" services related to their Timeshare Contracts.

---

[1] Rule 4-7.13(b), Florida Rules of Professional Conduct, states, "Deceptive or inherently misleading advertisements include, but are not limited to advertisements that contain: (1) statements or information that can reasonably be interpreted by a prospective client as a prediction or guaranty of success or specific results; . . . ."

7.    Unfortunately for these Wyndham Owners, the "services" Defendants sell typically results in an outcome very different than what Defendants promise.

8.    Upon being retained, Defendants instruct, deceive, induce, or persuade Wyndham Owners to stop fulfilling their contractual obligations under the Timeshare Contracts, as a means of facilitating the "exit", "cancellation", or "transfer."    In fact, many of Defendants' advertisements promise that very ability to cease making payments on the Timeshare Contracts. For example, the following is an advertisement by Defendant Resort Release:



9.    Defendants do not disclose to the Wyndham Owners the consequences of ceasing payments, or that their "cancellation" and "exit" will actually result in an unlawful breach of the

Timeshare Contracts due to non-payment, leading to a non-judicial foreclosure of their timeshare interests.

10.     Nevertheless, after the Timeshare Contracts are foreclosed, Defendants then misrepresent to these former Wyndham Owners that they were successful in "cancelling" or "exiting" their Timeshare Contracts.

11.     Alternatively, Defendants may negotiate a surrender or deed-in-lieu on behalf of Wyndham Owners, while failing to inform the Wyndham Owners that doing so also has substantial negative impacts on the credit and finances of Wyndham Owners.

12.     Cancellation or rescission of a contract is very different in nature than a breach and termination.  But Defendants advertise the former only to mislead Wyndham Owners into the latter.

13.     What is worse, each Wyndham Owner pays Defendants thousands of dollars to essentially breach a Timeshare Contract that the Wyndham Owner could have breached on his or her own, for free.  Defendants' "cancellation" services are therefore illusory, and the Wyndham Owners often do not realize the scam until after the damage is done when their credit rating is badly hurt due to the default and/or foreclosure.

14.     Under the Florida Statutes, the "cancellation" of a Timeshare Contract is a specific, non-waivable rescission right held by Wyndham Owners that can be exercised within a certain time period following the execution of a Timeshare Contract.  *See* Fla. Stat. § 721.10.  It is not a service that can be advertised, sold, or provided in commerce.

15.     For these reasons, and the others set forth herienbelow, Defendants mislead Wyndham Owners into purchasing illusory "cancellation" or "transfer" services and thereby cause and induce the breaches of hundreds of Timeshare Contracts.

16.     Wyndham has no other option but to actively and aggressively seek damages and injunctive relief to prevent Defendants from inflicting further damage to Wyndham's business and, most importantly, to its relationships with Wyndham Owners.

**B.     OVERVIEW OF THE COMPLAINT**

17.     In pursuing its legal and equitable remedies here, Wyndham is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Wyndham is also protecting Wyndham Owners from further harm, and timeshare owners at large, who have been scammed and negatively impacted by Defendants' wrongful conduct.

18.     This Amended Complaint requests damages and injunctive relief for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1), intentional interference with contractual relations, civil conspiracy to commit tortious interference, violations of the Florida Deceptive and Unfair Trade Practices Act, and violations of the Florida Vacation Plan and Timesharing Act, Fla. Stat. § 721.17.

**C.     PARTIES, JURISDICTION, AND VENUE**

**i.     The Plaintiffs**

19.     Plaintiff Wyndham Vacation Ownership, Inc. ("WVO") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

20.     Plaintiff Wyndham Vacation Resorts, Inc. ("WVR") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

21.     Plaintiff Wyndham Resort Development Corporation ("WRDC") is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

22.     Plaintiff Shell Vacations LLC ("SV") is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

ii.     **The Defendants**

23.     Defendant Totten Franqui Davis & Burk, LLC ("TFDB Law FL") is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business located at 1451 West Cypress Creek Road, Suite 211, Fort Lauderdale, Florida 33309.  TFDB Law FL is ostensibly a law firm with five principals:

a.   Paul G. Totten, Esq., admitted to practice in the State of Florida;

b.   Anthony G. Franqui, Esq., admitted to practice in the states of Florida and Texas;

c.   Garry T. Davis, Esq., admitted to practice in the states of Florida, Ohio, North Carolina, and Missouri;

d.   Christopher D. Burk, Esq., admitted to practice in the states of Nevada, California, and Arizona; and

e.   Erica L. Franqui, Esq., admitted to practice in the State of Florida.

24.     Defendant Totten Franqui Davis & Burk, PLLC ("TFDB Law NC") is a professional liability company organized and existing under the laws of the State of North Carolina with a principal place of business located at 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304.  TFDB Law NC is ostensibly a law firm with the same five principals as TFDB Law FL, and may, in fact, just be a foreign registration of TFDB Law FL.

However, TFDB Law NC claims a different principal address and registered address than those claimed by TFDB Law FL. Because it is impossible for a company to have two separate registered agent offices in a single state, TFDB Law FL and TFDB Law NC appear to be different legal entities.

25.     American Resource Management Group, LLC, which also does business as Resort Release ("Resort Release") is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309. Resort Release also maintains a physical address at 6785 Weaver Road, Suite 1B, Rockford, Illinois 61114. Resort Release does business through at least two websites: www.resortrelease.com and www.americanresourcemanagementgroup.com. There are two managers of Resort Release: Defendants Eric Cline and Shyla Cline.

26.     Defendant Vacation Properties for Less, LLC ("Vacation Properties") is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business allegedly located at 1451 West Cypress Creek Road, Suite 316, Fort Lauderdale, Florida 33309. Vacation Properties has two managers: Defendants Scott Morse and Eric Cline; Vacation Properties also has one authorized member, non-party Robbert Gaarlandt. Morse serves as the Registered Agent for Vacation Properties and lists the Registered Agent Address as 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304, an address he shares with Mr. Gaarlandt.

27.     Defendant Redemption and Release, LLC ("Redemption") is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business located at 1401 West Cypress Creek Road, Suite 101, Fort Lauderdale, Florida 33309.

Redemption has a single manager: Defendant Larry Morse. Until recently, however, Redemption listed its principal place of business as 2455 East Sunrise Boulevard, Suite 415, Fort Lauderdale, Florida 33304.

28. Defendant Resort Exit Team, LLC ("Resort Exit") is a limited liability company organized and existing under the laws of the State of Florida with a principal place of business ostensibly located at 1007 North Federal Highway, Suite 367, Fort Lauderdale, Florida 33304. However, that address, which is also used as the address for the registered agent, is a UPS Store. The actual principal address for Resort Exit is 6785 Weaver Road, Suite 1B, Rockford, Illinois 61114. Resort Exit has two managers: Defendants Morse and Eric Cline.

29. Defendant Helping Timeshare Owners, Inc. f/k/a Helping Timeshare Owners LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO is a corporation organized and existing under the laws of the State of Florida with a principal place of business located at 7800 Southland Boulevard, Suite 200, Orlando, Florida 32809.

30. Defendant John Doe #2 d/b/a Timeshare Freedom Group d/b/a timesharefreedomgroup.com is the owner and operator of the website located at the domain <timesharefreedomgroup.com>. Timeshare Freedom Group purports to have a principal address located at 23046 Avenida De La Carlota, Suite 600, Laguna Hills, California 92653, as well as other locations in California, Virginia, and Arizona. However, the California, Virginia, and Arizona Secretaries of State do not have records for a 'Timeshare Freedom Group' business, thus the actual corporate identity of this Defendant remains unknown at this time. The domain name <timesharefreedomgroup.com> is registered behind a privacy shield; therefore, the true identity of the owner of said domain name cannot be determined without the use of the Court's subpoena power.

- 9 -

31. Defendant Eric Cline is an individual and resident of the State of Florida, owning property located at 2506 Barcelona Drive, Fort Lauderdale, Florida 33301, and is otherwise *sui juris*.

32. Defendant Shyla Cline is an individual and resident of the State of Florida, is married to Eric Cline, and owns property located at 2506 Barcelona Drive, Fort Lauderdale, Florida 33301, and is otherwise *sui juris*.

33. Defendant Scott Morse a/k/a Larry Scott Morse is an individual and resident of the State of Florida, owning property subject to the Florida Homestead Exemption located at 930 NE 16th Avenue, Fort Lauderdale, Florida 33304, and is otherwise *sui juris*.

34. Defendant William Howell Jr. is an individual and resident of the State of Florida who resides in the Orlando, Florida area and is otherwise *sui juris*.

35. Defendant Jordan Salkin is an individual and resident of the State of California who resides in Irvine, California, and is otherwise *sui juris*.

### iii. **Subject Matter Jurisdiction**

36. This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338. This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### iv. **Personal Jurisdiction**

37. This Court has personal jurisdiction over the Defendants for the following reasons:

a.      over Totten, Resort Release, Vacation Properties, Redemption, Resort Exit, and Help4TSO as they are all organized and existing under the laws of the State of Florida with registered offices in the State of Florida;

b.      over Eric Cline, Shyla Cline, Morse, and Howell as they are all residents of the State of Florida, own real property in the State of Florida, and conduct business in the State of Florida;

c.      over John Doe #2 as it is an active, not passive, operation that does business over the Internet by entering into contracts with residents of the State of Florida and/or soliciting residents of the State of Florida and/or otherwise providing their purported services to Wyndham Owners vacationing in the State of Florida through its website, which involves the repeated transmission of computer files over the Internet and allows Florida residents and Florida visitors to exchange their contact information with a host computer; the Court's exercise of personal jurisdiction over John Doe #2 will not violate traditional notions of fair play and substantial justice; and

d.      over Salkin because he is or was the registrant of the domain name through which John Doe #2 operates and is therefore subject to personal jurisdiction in this Court for the same reasons as John Doe #2.

**v.      <u>Venue</u>**

38.      Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, the vast majority of the Defendants are located in this District, and Defendants' conduct giving rise to the claims set forth herein occurred in this District

### vi.   <u>Conditions Precedent, Attorneys' Fees</u>

39.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

40.     Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 15 U.S.C. § 1117, Fla. Stat. § 501.2105, and Fla. Stat. § 721.17(3)(g).

### D.   <u>BACKGROUND ON THE TIMESHARE INDUSTRY</u>

41.     Timeshare properties revolutionized the vacation and travel industry and have been a popular option for families for decades. Prior to the inception of the timeshare industry in the United States, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

42.     The birth of the innovative timeshare concept in the 1970s changed the vacation landscape. Now, developers, like Wyndham, can divide a single vacation unit between 52 owners, with each owner purchasing a fractional interest of the whole for a specified share of the total price, i.e. deeded ownership. Developers, like Wyndham, also sell membership interests to consumers in the form of points, which, in turn, are exchanged for use at Wyndham properties. Wyndham Owners may also belong to a Wyndham program called 'Club Wyndham Plus', which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumers' choices.

43. This concept has allowed consumers an incredible opportunity to enjoy regular vacations at a fraction of the typical cost and without the burdens associated with undivided vacation property ownership. Moreover, in exchange for payment of a regular maintenance fee, timeshare owners receive assurance of high quality resorts every year, while simultaneously avoiding rising future prices.

44. Today, the timeshare industry continues to thrive. As reported by the American Resort Development Association ("ARDA"), "the timeshare industry remains healthy, showing that owners have become increasingly engaged with their timeshares and the timeshare lifestyle, while the industry continues to attract new buyers." As of 2016, 9.2 million households in America were timeshare owners.

### E. THE WYNDHAM ENTITIES & THEIR VALID TIMESHARE CONTRACTS

45. Wyndham is a global leader in the timeshare and vacation ownership industry with a network of resorts spanning the world.

46. Wyndham Vacation Ownership, Inc. ("WVO") is the parent company or ultimate parent company of three entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc. ("WVR"), Wyndham Resort Development Corporation ("WRDC"), and Shell Vacations LLC ("SV").

47. Wyndham devotes substantial resources to advertising and other marketing promotions in an effort to maintain and enhance the value of their established and famous brands.

48. As part of its business, WVR, WRDC and SV enter into Timeshare Contracts with consumers (e.g., the Wyndham Owners). At the time owners purchase timeshares from WVR, WRDC, and/or SV, the owners execute Contracts for Purchase and Sale wherein the

owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to Wyndham for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the owners agree to pay a pro-rated share of the property taxes to Wyndham, which is then submitted by Wyndham to the appropriate local tax collectors. Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement. These Timeshare Contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

F.   **BACKGROUND ON TIMESHARE "EXIT" COMPANIES AND THEIR PREDATORY SCHEMES TO DEFRAUD TIMESHARE OWNERS**

49.     In the aftermath of the late 2007 recession, a select group of individuals saw an opportunity to make fast cash from timeshare owners who no longer preferred to use their timeshare ownership for vacations.

50.     These individuals launched what have become known as "timeshare exit" or "third party exit" (TPE) companies that promote and market the ability to get timeshare owners released or otherwise discharged from their contracts – including the attendant financial obligations – with timeshare developers like Wyndham.

51.     Through various forms of advertising, TPE companies frequently state or imply that they have some sort of "process" or "method" to assist consumers in "canceling" or "exiting" their timeshare contracts. TPE companies suggest that their services are necessary to cancel their timeshare contracts. In reality, though, TPE companies have no method of helping consumers end their timeshare ownership. At most, they merely retain lawyers to threaten litigation on the owners' behalves.

52.     As the price for their "cancellation" services, TPE companies demand exorbitant up-front fees from the timeshare owners – usually several thousand dollars per timeshare interest.

53.     To make matters worse, TPE companies steer consumers away from the free (or much cheaper) programs created by the timeshare developers, such as Wyndham's Ovation® program, designed to resolve genuine problems with an individual's timeshare ownership, including options to lawfully cease that ownership.

54.     Nevertheless, after securing the up-front payments, TPE companies instruct owners to stop communicating with and stop sending payments to the timeshare developers, in order to facilitate the "exit" process.  In this way, TPE companies guide the owners' timeshare interests into default and eventual foreclosure.

55.     The TPE companies then "work" to cancel the timeshare contracts.  What they typically do is retain attorneys to send demand letters to the timeshare developers, demanding that the developers release the individual owners from their contracts.  Usually, these are form demand letters without specifics relating to the particular owners and, in the opinion of the developers, completely without legal merit.

56.     Although the attorneys are retained directly by the TPE companies, *not* by the owners, the demand letters typically (i) state that the attorneys represent the owners and (ii) forbid communication between the developers and the owners (sometimes citing to attorney ethics rules, provisions of the Fair Debt Collection Practices Act, etc.).  By making these representations, TPE companies and their affiliated attorneys prevent the timeshare developers like Wyndham from warning their owners of the consequences of utilizing the TPE companies' fraudulent services.

57. When the attorneys' demands go unmet, the TPE companies prolong their clients' expectations regarding how long a successful "exit" can take.

58. Eventually, though, when the timeshare contract enters foreclosure proceedings, and after the foreclosure concludes, the TPE company will proclaim it helped its client successfully "exit" the timeshare contract.

59. Frequently, the former timeshare owners are not aware that their timeshare interests were actually foreclosed until they later discover their credit ratings were adversely impacted.

60. Another frequent variation of the "exit" scheme is for the TPE companies to fraudulently transfer an owner's timeshare interest via quitclaim deed or similar instrument, without the required approval of the timeshare developer, to a shell entity or strawman buyer who then fails to make payments on the timeshare interest as required. Because the transfer was not approved, the timeshare developer looks to the original owner of the timeshare interest for payment while the original owner is completely unaware that he or she is still the legal owner of the timeshare interest. The Florida Vacation Plan and Timesharing Act specifically prohibits this scheme of fraudulent transfers. *See* Fla. Stat. § 721.17.

61. Under either type of scheme, consumers like Wyndham Owners are deceived and persuaded to pay exorbitant fees to the TPE companies under the auspices that they can and will cancel their timeshare contracts, but the advertised services are impossible, illusory, and illegal.

62. Ultimately, not only are the developer's relationships with its owners irreparably damaged, the developers are dramatically financially impacted by the loss of millions of dollars in contract-based revenue.

63. As for the timeshare owners, they lose their timeshare interests through foreclosure (even if they have fully paid the principal toward timeshare ownership) or deed-in-lieu transfers and suffer significant negative impact on their credit.

64. Consistent throughout all TPE schemes is the underlying reality that TPE companies purposely fail to inform consumers that, by utilizing their so-called methods, the owners actually breach and default on their timeshare contracts rather than achieve any lawful release.

65. As is evident, TPE companies exist for the sole and improper purpose of inducing consumers, including Wyndham Owners, to breach their valid and binding Timeshare Contracts.

66. Wyndham is specifically targeted due to its size, the sheer number of Wyndham Owners, and the number of Wyndham-branded and managed properties throughout the U.S. and world.

67. Defendants Resort Release, Resort Exit, Redemption, Vacation Properties, Timeshare Freedom, and Help4TSO are TPE companies (hereinafter, the "TPE Defendants") that engage in the above tactics with respect to Wyndham Owners.

68. The TPE Defendants are inter-related to each other and to the Totten firm, as set forth in greater detail below, thus they belong as defendants in the same lawsuit. For ease of reference, an Organizational Chart showing the inter-relationship among all the Defendants is attached hereto as Exhibit 1.

**G.** **FALSE ADVERTISING BY THE "THIRD PARTY EXIT" COMPANIES-SUCKERING THE CONSUMER AND TARGETING WYNDHAM**

69. The TPE Defendants carefully curate their advertisements and client communication to hide the true result of their "exit process." By not disclosing the truth of their "process," the advertisements and statements made by Defendants are deceptive and misleading.

As explained above, there is no process or service Defendants can offer that results in the legitimate cancellation of a Timeshare Contract.

### i. Domain Names Used to Advertise

70. Defendant Resort Release owns and operates at least two websites that advertise timeshare-related services:

      a. www.resortrelease.com and

      b. www.americanresourcemanagementgroup.com.

71. Defendant Resort Exit owns and operates www.resortexitteam.com which advertises timeshare-related services.

72. Defendant Redemption owns and operates the following websites that advertise timeshare-related services:

      a. www.redemptionandrelease.com;

      b. www.redemptionandrelease.ca;

      c. www.cancelatimesharecontract.com; and

      d. www.myredemptionservices.com.

73. Defendant Vacation Properties owns and operates a website at www.vacationpropertiesforless.com that advertises timeshare-related services.

74. Defendant Timeshare Freedom owns and operates a website at www.timesharefreedomgroup.com that advertises timeshare-related services.

75. It is likely that the TPE Defendants operate additional websites that engage in timeshare-related advertising for "exit," "cancellation," "release," "redemption," or "transfer" services.

### ii. Content of the Misleading, Online Advertising

76.     As explained above, the TPE Defendants falsely advertise regarding how they supposedly assist timeshare owners with the termination of their timeshare contracts.  In short, TPE Defendants mislead timeshare owners into thinking that TPE Defendants' services and commercial activities will lead to a lawful release, rescission, termination, cancellation, or transfer of a timeshare contract, when in reality, TPE Defendants deceive and induce timeshare owners into breaching the timeshare contracts which unlawfully terminates those contracts.

77.     The TPE Defendants falsely advertise in the following ways:

a.     Misrepresenting their own services or commercial activities as providing an "exit," "cancellation," or "release" of a Timeshare Contract, or by using any other word or phrase (i.e. "get out" or "redeem") that means or implies the lawful termination of a Timeshare Contract. The TPE Defendants cannot truthfully advertise, offer, or provide a Wyndham Owner with a lawful termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise or make a public offer regarding Wyndham's contracts. Examples of this false advertising include, but are not limited to, the following:

i.     https://www.resortrelease.com/faqs/ states, "What does Resort Release do? We are a timeshare release company that helps remove timeshare owners from their unwanted timeshare properties. We guarantee to get you out of your timeshare contract. Period."

ii.     https://americanresourcemanagementgroup.com/ advertises, "Cancel Your Timeshare, Forever . . . " and "Timeshare Release Services"

iii.  https://americanresourcemanagementgroup.com/ and https://www.redemptionandrelease.com/ both ask, "Need Your Contract Cancelled Now?"

iv.  https://resortexitteam.com/ advertises, "Guaranteed Exit" and "Our Resort Exit Team has perfected the process of legally and permanently ending your timeshare."

v.  https://www.redemptionandrelease.com/ states, "If you've tried and failed to get out of your timeshare contract obligations through attempts to sell your timeshare, cancel a timeshare contract, or donate a timeshare, now is the time to find out how to legally redeem your timeshare."

vi.  https://www.redemptionandrelease.com/ states, "Redemption and Release, LLC is the nations premiere Timeshare Redemption company because we offer a no-haggle, low cost, and twice guaranteed timeshare exit solution.  We provide an inexpensive way to get out of a timeshare."

vii.  Not surprisingly, https://cancelatimesharecontract.com/ states, "Cancel A Timeshare Contract."

viii.  https://cancelatimesharecontract.com/get-timeshare-cancellation-help-1/ states, "[W]e have partnered with a timeshare release firm to assist all of our visitors with getting out of their timeshare contracts."

ix.  http://myredemptionservices.com/ states, "The Timeshare Redemption service we offer guarantees our clients a permanent and successful end to their timeshare obligations."

x.  http://myredemptionservices.com/faqs/ states, "What does Redemption Services do? We are a company that helps remove timeshare owners from their timeshare obligations. We offer an affordable, convenient, and guaranteed end to your timeshare contract.

xi.  http://timesharefreedomgroup.com/ states, "Every month, Timeshare Freedom Group helps timeshare owners like yourself eliminate their unwanted, costly timeshares, legally and permanently. No matter your situation, we will fight to help get you out of your contract."

b.  Misrepresenting their own services or commercial activities as providing a

"process" or "method" that results in a timeshare owner being free from

the obligations and benefits of a timeshare contract. The TPE Defendants cannot truthfully advertise to a Wyndham Owner any "process" or "method" that results in a lawful termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise, represent, or even suggest that Wyndham participates in any such process to achieve the advertised result. Examples of this false advertising include, but are not limited to, the following:

i. https://www.resortrelease.com/faqs states, "The fees associated with our services are collected upfront, but only after you have thoroughly reviewed our Transfer Agreement and you understand how our guaranteed process works."

ii. https://americanresourcemanagementgroup.com/ states, "Our intake managers offer free advice and guide you through our tried and proven process resulting in timeshare redemption."

iii. https://resortexitteam.com/ states, "The timeshare exit process is quick, simple and guaranteed."

iv. https://www.redemptionandrelease.com/ states, "We don't just cancel your timeshare – we redeem it. It's a simple and inexpensive process, and the best way to get rid of a timeshare."

v. https://cancelatimesharecontract.com/ states, "After over 7 years in the industry, We've uncovered true and trusted methods for canceling any timeshare."

vi. http://myredemptionservices.com/ states, "Simple, Easy & Fast Process"

vii. http://timesharefreedomgroup.com/ states, "Our "Freedom" Process: 4 Simple Steps to End Your Timeshare Contract for Good" and "We pride ourselves on excellent service, making the process of eliminating your timeshare contract easy and painless."

c.    Misrepresenting their own services or commercial activities as providing a "legal," "lawful," "legitimate," or "safe" means of terminating a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of a timeshare contract. The TPE Defendants falsely equate (i) the termination of a Timeshare Contract through breach, default, and/or foreclosure (the actual result of their "cancellation services") with (ii) a "lawful" or "legitimate" result. Under basic principles of the law, the breach of any contract is an unlawful and illegitimate means of terminating a contract, which typically subjects the defaulting party to resulting damages. In this way, a breach does not "lawfully" or "legitimately" free or release the Wyndham Owner from the Timeshare Contract, but instead triggers the non-defaulting party's (Wyndham's) rights to seek legal and equitable remedies in court for the unlawful termination. The contract is never cancelled; to the contrary, it is fully enforced. Because the Defendants recommend, induce, or persuade the Wyndham Owners into stopping payments on their Timeshare Contracts and thus defaulting on those legal instruments, Defendants cannot truthfully advertise that the resulting termination of the Timeshare Contracts is in any way "lawful" or "legitimate." Examples of this false advertising include, but are not limited to, the following:

i.   https://www.resortrelease.com/ states, "LEGAL CANCELLATION. Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent."

     ii.  https://www.resortrelease.com/faqs/ states, "Is ResortRelease.com a legitimate solution to removing my family from our timeshare contract? We are proud to say that we are one of the only A+ rated, BBB accredited timeshare release companies in the industry. We have already helped thousands of people legally and permanently get out of their timeshare. We always put our clients first and all of our services are guaranteed."

     iii.  https://americanresourcemanagementgroup.com/ states, "Permanent and Legal Transfer Of All Obligations" and "Let us help you legally get rid of your contract, forever."

     iv.  https://resortexitteam.com/ states, "Legal Relief and Permanent Results" and "Getting out of a timeshare has never been easier. With our legally binding and courthouse recorded results, your timeshare transfer is permanent."

     v.  https://www.redemptionandrelease.com/ states, "Terminate your timeshare contract . . . Legally and Permanently."

     vi.  https://cancelatimesharecontract.com/cancel-timeshare-ownership/ states, "If you are tired of your timeshare points, we have partnered with a group of timeshare cancellation experts that specialize in timeshare ownerships. These timeshare experts will walk you through all of the steps to getting rid of your timeshare legally and permanently forever."

     vii.  http://myredemptionservices.com/guarantee/ states, "Our quick and easy process of timeshare redemption typically provides for a legal and permanent transfer of your ownership in well under 90 days."

     viii.  https://www.vacationpropertiesforless.com/ states, "Vacation Properties For Less is licenced brokerage that specializes in timeshares. This means a fast, safe, and secure transfer of ownership."

     ix.  http://timesharefreedomgroup.com/ states, "Our team of timeshare cancellation attorneys and advisors will get you completely out of your timeshare – legally and permanently."

    d.  Misrepresenting their own services or commercial activities as providing a "guaranteed" means of terminating a timeshare contract or otherwise releasing or freeing a timeshare owner from the obligations and benefits of

a timeshare contract. The TPE Defendants cannot truthfully advertise a "guaranteed" termination, release, or rescission of any Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to "guarantee" any lawful termination, release, or rescission regarding Wyndham's Contracts. To the extent a Wyndham Owner's breach or default of a timeshare contract "guarantees" its termination, such result does not owe to any service or commercial activity by the Defendants. To the contrary, a Wyndham Owner can breach a Timeshare Contract without any involvement by Defendants, therefore the fact that Defendants charge exorbitant fees to persuade a Wyndham Owner to breach the Timeshare Contract makes evident the scam they perpetuate. Examples of this false advertising include, but are not limited to, the following:

i. https://www.resortrelease.com/ states, "GUARANTEED RESULTS. We are so confident in our services, we guarantee the results. If we are not able to quickly and permanently transfer your timeshare, you receive a 100% refund."

ii. https://www.resortrelease.com/ also states, "GUARANTEE POLICY: Legally and permanently getting out of your timeshare has never been this easy."

iii. https://www.resortrelease.com/services states, "Guaranteed Contract Termination. Your attorneys will diligently, competently, and effectively represent you in seeking the termination of your timeshare contract."

iv. https://www.resortrelease.com/services also states, "We are so confident in our services that we give you three separate 100% guarantees. Over the past 6 years we have helped over 12,600 desperate families transfer out of their timeshare properties. If you

are not timeshare free at the end of our service, we will refund 100% of your money."

v. https://americanresourcemanagementgroup.com/the-help-you-need/ states, "We offer a low-cost, 100% money-back guaranteed process that frees vacation owners of any and all financial obligation to their resort."

vi. https://resortexitteam.com/ states, "If accepted as a client, we will guarantee the outcome."

vii. https://www.redemptionandrelease.com/timeshare-divestment/ states, "If we are not able to quickly and permanently end your timeshare ownership, you receive a 100% refund."

viii. https://cancelatimesharecontract.com/buyback-timeshare/ states, "Canceling your timeshare will enable you a guaranteed alternative to stop paying all future maintenance fees and legally get out of your timeshare permanently! The best approach would be to work with a company like REDEMPTION & RELEASE LLC that have helped countless individuals cancel their timeshare with a 100% success rate!"

ix. http://myredemptionservices.com/ states, "We have a 100% success rate and our service comes with a 100% Money Back Guarantee!"

e. Misrepresenting their own services or commercial activities as allowing a timeshare owner to stop paying mortgage payments or fees, including maintenance fees, or to otherwise avoid the contractual obligations of a timeshare contract. The TPE Defendants cannot truthfully advertise, offer, or provide a Wyndham Owner with the consequence-free right to stop making payments on a Timeshare Contract, because such result requires the agreement of the other party to such Contract, namely Wyndham, yet Wyndham has never authorized the TPE Defendants to advertise that a Wyndham Owner can stop making payments or otherwise stop fulfilling

the contractual obligations on Wyndham's Contracts. Examples of this false advertising include, but are not limited to, the following:

i. https://www.resortrelease.com/ states, "100% NO MORE FEES"

ii. https://www.resortrelease.com/services states, "Timeshare Cancellation. Still owe a mortgage on your timeshare? We have solutions to get you out of your mortgage payments."

iii. https://www.resortrelease.com/services also states, "No More Fees" and "Never Pay Another Bill"

iv. https://www.resortrelease.com/fees states, "NO FUTURE FEES, GUARANTEED"

v. https://americanresourcemanagementgroup.com/ states, "End All Future Fees"

vi. https://americanresourcemanagementgroup.com/contact-us/ states, "What does American Resource Management Group do? We are a company that helps remove timeshare owners from their timeshare obligations. We offer an affordable, convenient, and guaranteed end to your timeshare contract."

vii. https://americanresourcemanagementgroup.com/the-help-you-need/ states, "We offer a low-cost, 100% money-back guaranteed process that frees vacation owners of any and all financial obligation to their resort."

viii. https://resortexitteam.com/services/ states, "Our Services: End All Timeshare Obligations Guaranteed."

ix. https://www.redemptionandrelease.com/ states, "STOP all annual fees. You will no longer be obligated to pay any annual maintenance fees associated with timeshare ownership. In just 3 easy steps, you will be free of ever-increasing timeshare fees and special assessments…legally AND permanently!"

x. https://www.redemptionandrelease.com/timeshare-divestment/ states, "No More Fees"

xi. https://cancelatimesharecontract.com/resort-lawsuit/ states, "To learn more information on how you can legally stop paying your maintenance fees and permanently get out of your timeshare contract, just request a FREE consultation below!"

- 26 -

      xii.   http://myredemptionservices.com/ states, "No More Maintenance Fees" and "Never Pay Another Fee Again!"

     xiii.   http://myredemptionservices.com/guarantee/ states, "100% GUARANTEE No Future Fees on timeshare ownership"

     xiv.   http://timesharefreedomgroup.com/ states, "We fight for timeshare owners to free them from the financial bondage & perpetual obligations of their timeshare contracts."

78.    The foregoing advertisements are either literally false or they are deceptively misleading. Again, there is no third-party basis to "exit" or "cancel" a timeshare contract. There can certainly be no guaranteed result when such result is dependent on Wyndham's agreement.

79.    The advertisements fail to disclose that TPE Defendants' actual process or method of terminating a timeshare contract is through breach and default, and that a foreclosure and/or fraudulent transfer is what the Defendants consider to be a "successful exit." The advertisements also fail to disclose the severe negative impact on a Wyndham Owner's credit and finances if they follow Defendants' "process."

80.    In addition to the above misrepresentations, the TPE Defendants' websites misrepresent that various individuals have just "enrolled" or retained their services. These are fake announcements, either because the individuals are non-existent or the immediate timing of the announcements is false. Examples of these announcements on www.resortrelease.com are as follows:





81. TPE Defendants further deceive consumers by suggesting or implying that there is some sort of 'qualification' process that timeshare owners must go through, or that Defendants do not accept all consumers into their 'program,' which gives the false assurance that their services or commercial activities are legitimate. The reality is that TPE Defendants accept any consumer who is willing to pay the exorbitant up-front fees. Examples of these false "qualification" statements can be found at

     a. https://www.resortrelease.com/services: "One of our Intake Managers will speak with you about what options may be available to you to terminate your timeshare ownership. If you qualify for this attorney backed service, the attorneys will work with you and pursue a strategy to attempt to terminate your timeshare contract. This service has strict qualification criteria."

     b. https://www.resortrelease.com/services: "The Attorneys Go To Work. Once you are accepted into the timeshare mortgage and ownership cancellation program you will be sent a welcome packet introducing the team of skilled attorneys that will be working towards the termination of your contract."

     c. https://americanresourcemanagementgroup.com/: "If your property does qualify for our release program, we will attend to your case until you are free of all financial obligations to your resort."

     d. http://myredemptionservices.com/faqs/: "If your timeshare is paid off in full and your Maintenance Fees and Special Assessments are current, then yes, you likely qualify for our assistance in removing yourself from your timeshare obligation. However, we do not make any false promises or mislead you. We give it to you straight."

82. TPE Defendants also make false statements about Plaintiffs' products and services. TPE Defendants falsely state or imply that timeshare companies like Wyndham will not release timeshare owners from their contracts. This is untrue because Wyndham has its Ovation® Program and Wyndham Cares™, which are available to assist Wyndham Owners who

may wish to legitimately end their timeshare ownership with Wyndham. By misrepresenting the options available through Wyndham's Ovation® Program and Wyndham Cares™, the TPE Defendants mislead Wyndham Owners into procuring the Defendants' illusory and illegitimate services instead. For example,

    a.   https://www.resortrelease.com/services states, "Unfortunately, many resorts today have placed significant obstacles in front of those wanting to get rid of their timeshare."

    b.   https://resortexitteam.com/ states, "Understanding the legal complexities of timeshare ownership is our specialty. The resorts and their lobbyists have created a system that makes it feel virtually impossible to get rid of your timeshare without expert help."

    c.   https://www.redemptionandrelease.com/how-it-works-2/ states, "You will discover over time that the only option you have is to either keep paying your resort tens of thousands of dollars in maintenance fees over the next number of years, or sign up to use our services which provide you a friendly and professional guaranteed timeshare redemption service."

83. The TPE Defendants engage in other forms of online advertising, such as through search engines, social media platforms, and paid advertisements on unrelated websites.

    a.   For example, Resort Release has published the following advertisements on the Internet:





84. Resort Release also misleads consumers by implying that it has lawyers on staff that will represent timeshare owners. https://americanresourcemanagementgroup.com/the-help-you-need/ states, "American Resource Management Group employs a fully staffed, in-house, legal department that oversees all internal compliance while keeping up with the always changing legal requirements involved with each resort."

85. Resort Exit Team, on the other hand, despite advertising guaranteed legal results, includes a disclaimer at the bottom of its website stating, "Resort Exit Team is not a law firm, and the employees of Resort Exit Team are not attorneys." Redemption, though operated by a different Defendant, uses the same disclaimer: "Redemption and Release is not a law firm, and the employees of Redemption and Release are not attorneys."

86. Therefore, Resort Exit Team and Redemption are improper and illegal lawyer referral services that have not registered with the State of Florida and/or the Florida Bar.

iii. **Payment for the Advertised Services**

- 30 -

87.     Hundreds of Wyndham Owners have each paid TPE Defendants substantial amounts of money – often in the thousands of dollars – to procure Defendants' so-called services advertised online and elsewhere.

88.     As a direct result of TPE Defendants' advertising and subsequent dealings with Wyndham Owners, Wyndham Owners cease making payments on their Timeshare Contracts.

H.     **TOTTEN – A LAW FIRM TO EFFECTUATE THE SCAM**

i.     **Totten exists to provide purported legal representation to the Wyndham Owners lured by the TPE Defendants**

89.     In order to perpetuate the illusion of "working" to cancel a Wyndham Owners' Timeshare Contract, and to perpetuate their scheme of preventing communication, the TPE Defendants must affiliate with, or directly retain, lawyers to purportedly represent the Wyndham Owners for the purpose of demanding that Wyndham agree to cancel the Timeshare Contract or else face litigation from the Wyndham Owner.

90.     Totten was formed on June 27, 2017, by five lawyers: Paul Totten, Esq., Anthony Franqui, Esq., Erica Franqui, Esq., Garry Davis, Esq., and Christopher Burk, Esq.  A copy of the relevant record from the Florida Secretary of State is attached hereto as Exhibit 2.

91.     None of the five lawyers – Totten, A. Franqui, E. Franqui, Davis, or Burk – had ever practiced law in the field of the timeshare industry prior to June 2017.

92.     Yet, these five lawyers from different corners of the country (Totten, A. Franqui and E. Franqui live in South Florida, Davis resides in Ohio, and Burk resides in Nevada) mysteriously and suddenly decided to open a new firm in Fort Lauderdale, Florida practicing an area of law – timeshare – that none of them had ever practiced before.

93.     These five lawyers were oddly successful at their new endeavor.

94. Less than three months after forming their new law firm, WVR began receiving demand letters from Totten.

95. From September 9, 2017 through July 30, 2018, WVR alone, a single developer, received approximately 202 such demand form letters from Totten.

96. Totten also claims to represent individuals from at least 30 states: Texas, California, Pennsylvania, Maryland, Alabama, Ohio, Michigan, Iowa, Missouri, Nebraska, Idaho, Illinois, New York, Tennessee, Kentucky, Delaware, Washington, Arkansas, Oklahoma, Minnesota, Louisiana, North Dakota, North Carolina, South Dakota, New Jersey, Oregon, Kansas, South Carolina, Massachusetts, and Colorado, and two provinces of Canada: British Columbia and Alberta.

97. Yet Totten has engaged in no advertising for timeshare-related representation in its own name during this time. Totten's website, www.tfdblaw.com, is linked to by only one other webpage and receives so little traffic it is not measured by popular web-analytics tools, such as SEM Rush. Totten has purchased no Google AdWords® or other similar advertising, and besides its websites, Totten undertakes no other advertising activity whatsoever.

98. Thus, without using any obvious advertising in its own name, and with no prior experience in the timeshare industry, Totten managed to convince hundreds of Wyndham Owners, plus untold numbers of clients who are customers of other timeshare developers, to retain them from at least 30 states and two Canadian provinces.

99. Totten's sudden volume and geographic diversity of their clients is explainable only by their being fed clients by the TPE Defendant.

100.     Accordingly, the TPE Defendants refer clients to Totten for the purpose of carrying out their timeshare "exit process" and giving an appearance of legitimacy to an otherwise illegitimate enterprise.

ii.     **Totten does little or nothing to represent Wyndham Owners referred by the TPE Defendants**

101.     The demand letters sent by Totten ("Demand Letters") are formulaic and lack individualized factual and legal analysis. A sampling of these form Demand Letters is attached hereto as Exhibit 3.

102.     The Demand Letters do not even threaten a lawsuit of any kind but vaguely state that Totten's representation is "in connection with the rights and alleged obligations" of the timeshare purchase and "shall include defense of any claims asserted or otherwise instituted by the Timeshare [Wyndham], including foreclosure proceeding(s), if any, . . . .  Accordingly, we are presently in the process of investigating the facts and circumstances surrounding" the timeshare purchase(s) by the Wyndham Owner.  Totten promises to "supplement" its Demand Letters with "correspondence in the future with our specific demand and allegations, if any."

103.     The baseless and non-committal nature of Totten's Demand Letters demonstrate that they are for mere appearance to perpetuate the "exit" scam, sent only so that the TPE Defendants can relay to Wyndham Owners that their attorneys have initiated negotiations with Wyndham or otherwise begun the "exit" process.

104.     Contrary to what the Demand Letters state, Totten rarely, if ever, represents a Wyndham Owner in foreclosure proceedings.  Thus, Totten's Demand Letters are fraudulent and meant solely to intimidate with the threat of litigation.

105.     The Demand Letters also demand that Wyndham cease all communication and correspondence with the Wyndham Owners (with limited exceptions).  In this way, Totten

- 33 -

actively interferes with the contractual relationships between Wyndham and the Wyndham Owners.

106. TPE Defendants are sharing with Totten some percentage or amount of the exorbitant fees paid by the Wyndham Owners to the TPE Defendants for the purpose of legal representation.

107. Such an arrangement violates a number of state bar association rules, including, without limitation, Rule 4-7.22 of the Florida Rules of Professional Conduct, which generally prohibits the splitting of attorney fees with referral sources.

108. Totten participates in this scam solely for pecuniary gain and does not act in their so-called clients' best interests, because those clients are defrauded and deceived into paying thousands of dollars merely to breach contracts they could have breached for free and then suffering the consequences of default and foreclosure, including damaged credit.

109. Despite sending over 200 demand letters to Wyndham, Totten has filed only four total lawsuits against WVR, three of which were only filed on the day an applicable statute of limitations would have expired.

110. Furthermore, Totten's website states that the firm's legal practice consists of "bodily/personal injury law," "regulatory and compliance defense," and "general corporate law." A copy of Totten's website is attached hereto as Exhibit 4.

111. Totten has not been involved in any publicly filed cases involving anything other than timeshare law. Rather, when a non-timeshare case appears, the lawyers of Totten handle those cases under their other firm's name, Franqui Totten, LLP. For example:

   a.   *Nearbrook Capital, LLC v. Nosal Funding, LLC*, Case No. 2018-004531-CA-01, Pending in the Circuit Court for the Eleventh Judicial Circuit, in

and for Miami-Dade County, Florida, which was filed by Anthony Franqui, Esq. and Paul Totten, Esq. under the signature block of Franqui Totten, LLP and utilizing their Franqui Totten – not their TFDB Law – emails: Tony@ftlawgroup.com and Paul@ftlawgroup.com;

b. *Unimed International Inc. v. Dermagist, Inc. et al.*, Case No.: 9:18-cv-80148-MIDDLEBROOKS/BRANNON, Pending in the United States District Court for the Southern District of Florida, which was filed by Anthony Franqui, Esq. (as local counsel) under the signature block of Franqui Totten, LLP LLP and utilizing his Franqui Totten – not his TFDB Law – email: Tony@ftlawgroup.com; and

c. *Jagolinzer v. Martinez de Castro et al.*, Case No.: 2018-005816-CA-01, Pending in the Circuit Court for the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, in which Paul Totten, Esq. appeared under the signature block of Franqui Totten, LLP and utilizing his Franqui Totten – not his TFDB Law – email: Paul@ftlawgroup.com.

112. In addition, the Totten lawyers claim to practice or be a partner in more than one law firm, in contradiction with what they have told their respective state bar associations.

a. Paul Totten, Esq. is registered with the Florida Bar as a member of the Totten firm (see Exhibit 5 hereto), yet he is still a partner at Franqui Totten, LLP and appears in lawsuits on behalf of Franqui Totten, LLP.

b. Anthony Franqui, Esq. is registered with the Florida Bar as a member of Franqui Totten, LLP (*see* Exhibit 6 hereto), yet he has appeared in lawsuits as an attorney of Totten and claims to be a partner in Totten;

c.   Erica Franqui, Esq. purports to be the managing partner of Franqui Totten, LLP and registered with the Florida Bar as a member of Franqui Totten, LLP (*see* Exhibit 7 hereto), yet she also claims to be a partner in Totten; and

d.   Christopher Burk, Esq. is listed as a partner in Totten, yet he registered with the Nevada Bar as a member of a firm named Ayon Burk Injury Law (*see* Exhibit 8 hereto).  Burk is also the owner and president of The Patriot Law Firm Corp.  A copy of the relevant record from the Nevada Secretary of State is attached as Exhibit 9.

113.   Finally, despite their threats of litigation, Totten rarely, if ever, files suit against Wyndham on behalf of any Timeshare Owner.  The Demand Letters are mostly for show to deceive Wyndham Owners that a "process" is underway and to block the contractual relationships and communications between Wyndham and the Wyndham Owners

114.   In sum, based on the sudden volume of clients referred by the TPE Defendants, combined with Totten's failure to perform much, if any, legal services on behalf of the Wyndham Owners it purports to represent, Totten is little more than a legal front for the larger TPE Defendants' scam.  Put a different way, Totten was formed either primarily or solely to act as the puppet 'law firm' of the larger TPE conspiracy.

## I.   INDUCING THE TIMESHARE OWNERS TO BREACH

115.   Defendants' so-called "exit process" typically begins and ends with nothing more than the threat of litigation against Wyndham as a means to pressure Wyndham to release their clients, the Wyndham Owners, from the Timeshare Contracts.

116.   Thus, Defendants' promise of "guaranteed" results for their clients (in violation of attorney rules of professional conduct) is based on the gamble that Wyndham will either (1)

eventually lose in court if suit is filed or (2) opt to settle and release the Wyndham Owner from his or her Timeshare Contract rather than litigate an action.

117.    More often, the claims threatened by Defendants are viewed by Wyndham to be meritless or well beyond the statute of limitations, so Wyndham does not settle or offer to voluntarily terminate the Timeshare Contracts.

118.    When the threat of litigation fails, as it usually does, the Defendants' "exit process" requires the Wyndham Owners to breach the Timeshare Contracts and therefore "exit" the Timeshare Contracts by default.

119.    In order to effectuate this outcome, Defendants instruct or convince their clients, the Wyndham Owners, to cease making all payments on the Timeshare Contracts as part of the "exit process."  Defendants do not disclose to their clients the consequences of ceasing payments, or that their "exit" will actually be a breach of the Timeshare Contracts due to non-payment, leading to a judicial foreclosure of their timeshare interests.

120.    When the Timeshare Contract is foreclosed, Defendants then gallantly represent to their clients that they were successful in "canceling" or "exiting" their Timeshare Contracts.

121.    These statements of success are inherently misleading, because the breach of a Timeshare Contract is not a cancellation, release, or "exit" of that contract, but quite the opposite.  In general, when a party breaches a contract, the defaulting party is beholden by the contract for any resulting damages and penalties.  Rather than escape the contract, the breaching party feels the full weight and consequences contemplated by that contract.  In other words, what Defendants deceptively call an "exit" or "cancellation" of the Timeshare Contracts, the law calls a "breach" and "enforcement" of those contracts.

122.     To achieve this semantic subterfuge, Defendants direct their clients not to contact Wyndham and also forbid Wyndham from contacting their clients, the Wyndham Owners, under the guise of Defendants' ongoing legal representation of them.  In this way, Defendants control the flow of information to and from their clients, and they block any information that might otherwise warn their clients of the impending breach and foreclosure until after it is too late.

### J.     RESULTING DAMAGES

123.     Wyndham is damaged by the TPE Defendants' false advertising because the Wyndham Owners are misled into stopping all payments to Wyndham.

124.     Through the advertising and subsequent interaction, including direct and intentional communication to cease making payments, Defendants wrongfully convince and induce Wyndham Owners to breach their Timeshare Contracts, thus negatively impacting Wyndham's revenue and sales (and, though they are generally unaware it is occurring, the Wyndham Owner's credit is negatively impacted as well).

125.     In addition to the lost revenue, Wyndham incurs expenses to bring foreclosure proceedings and take other actions to enforce its rights under the Timeshare Contracts.

### K.     THE CONSPIRACY - THE DEFENDANTS ARE ALL CONNECTED

126.     While Resort Release is, itself, only a single entity, it is interrelated with the other Defendants to form a wide-reaching network intended to defraud timeshare owners, including Wyndham Owners, and cause severe damage to Wyndham by interfering with its Timeshare Contracts.

#### i.     The online connections

127.     Tools exist that allow users to uncover the various webpages that link to a particular domain name.  For example, linking to a particular page is known as 'backlinking' while each link back to one web page from another web page is known as a 'linkback'.

- 38 -

128.    There are many potential uses for linkbacks.  For the Defendants, there are two main objectives:

        a.     first, linkbacks are one of the methods various search engines, such as google.com and bing.com, use to rank a page and determine how close to the top of a list of search results that page will appear; and

        b.     second, linkbacks can show how one web page interacts with, and transmits data to, a second webpage.

129.    Numerous of the TPE Defendants' websites backlink directly to Resort Release's website at the <resortrelease.com> domain name.

130.    These linkbacks can either direct visitors directly to content hosted at www.resortrelease.com or cause information entered on the other TPE Defendants' websites to be captured and sent directly to Resort Release.  The latter is far more common.

131.    For example, the capturing and transmission of information from www.cancelatimesharecontract.com, a website run by Redemption, works in the following way.  On many (if not all) of the individual webpages located at www.cancelatimesharecontract.com is a box or series of boxes, together with a clickable button, that prompt users to enter their contact information to receive a free consultation for timeshare-related services.

132.    However, when a user enters information and clicks on the clickable button, unbeknownst to the user, the information entered is not transferred to Redemption (www.cancelatimesharecontract.com).  It is, instead, transferred to a program running on e.resortrelease.com.  A copy of webpage source code from www.cancelatimesharecontract.com showing this behavior is attached hereto as Exhibit 10.

133.    Thus, when users click on many of the buttons and other items located at www.cancelatimesharecontract.com, instead of sending their information to Redemption, their information is instead sent directly to Resort Release and Resort Release's customer relationship management software (known as Mautic).  A copy of the website a web browser is directed to when attempting to access e.resortrelease.com is annexed hereto as Exhibit 19.  "Mautic provides free and open source marketing automation software available to everyone.  Free email marketing software, lead management software and more."[2]

134.    Additionally, www.canceltimesharecontract.com hosts a website owned and operated by Defendant Helping Timeshare Owners, Inc. f/k/a Helping Timeshare Owners LLC d/b/a canceltimesharecontract.com d/b/a Help4TSO.  A copy of this website is annexed hereto as Exhibit 15.

135.    A    copy    of    the    'About    Us'    page    located    at www.canceltimesharecontract.com/about-us/ is annexed hereto as Exhibit 16.  That page states that Help4TSO was founded by Defendant Bob Howell a/k/a William Howell Jr.  *Id.*

136.    A copy of the Florida Secretary of State records for Help4TSO is annexed hereto as Exhibit 17.  Defendant Howell is the Registered Agent, President, and sole Officer of Help4TSO.

137.    The capturing and transmission of information from canceltimesharecontract.com to Resort Release works in the following way.  On many (if not all) of the individual webpages located at canceltimesharecontract.com is a box or series of boxes, together with a clickable button, that prompt users to enter their contact information to receive a free consultation or other services.    However, when a user enters information and clicks on the clickable button, unbeknownst    to    the    user,    the    information    entered    is    not    transferred    to

---

[2] http://www.mautic.com (last accessed Aug. 6, 2018).

canceltimesharecontract.com or Help4TSO, it is, instead, transferred to a program running on e.resortrelease.com.

138. Thus, when a user clicks on many of the buttons and other items located at canceltimesharecontract.com, instead of sending their information to Help4TSO, that user's information is instead sent directly to Resort Release and Resort Release's customer relationship management software (i.e., Mautic).

139. This behavior of sharing information is purposefully hidden and never disclosed to consumers.

140. The following websites run by the TPE Defendants work in a near identical fashion to www.cancelatimesharecontract.com, capturing consumer information and transmitting it, without the consumer's knowledge, directly to Resort Release:

    a. www.resortexitteam.com

    b. www.redemptionandrelease.com

    c. www.redemptionandrelease.ca

    d. www.myredemptionservices.com

141. In addition to sharing consumer information, the TPE Defendants share content of each other's websites, too. For example, despite being operated by different Defendants, the websites located at https://americanresourcemanagementgroup.com/ and https://www.redemptionandrelease.com/ both ask, "Need Your Contract Cancelled Now?" and have the exact same form to fill out. Copies of these websites are attached as Exhibits 11 & 12. The source code for each webpage shows that both forms send information to e.resortrelease.com.

- 41 -

142. Similarly, one of the websites operated by Redemption, https://cancelatimesharecontract.com/truth-about-maintenance-fees/, promotes a video hosted by Resort Release at www.resortrelease.com/video, stating "This is a link to a video that showcases how this company called Resort Release spent five years researching about the timeshare industry: https://www.resortrelease.com/video/"

143. Redemption even posted a blog entry dated January 5, 2016, available at https://cancelatimesharecontract.com/resort-release-reviews/, that endorsed and recommended Resort Release as a "meticulous" timeshare "release company."

      **ii.**    **The physical and other connections**

144. The websites for Defendant Resort Exit (www.resortexitteam.com) and Defendant Resort Release (www.resortrelease.com and www.americanresourcemanagementgroup.com) advertise the same address at 6785 Weaver Road, Rockford, Illinois 61114. The websites also utilize the same picture of their company "founders" and state that Resort Exit was established on January 22, 2012, the same date as Resort Release.

145. The following facts indicate that Totten is working with the TPE Defendants to effectuate their scheme:

      a.    Totten and Resort Release share or have shared at least one employee. Mr. German Beard previously listed his employment on LinkedIn as a "Law Clerk/Contract Auditor at Resort Release/Totten Franqui Davis & Burk, LLC". A copy of Mr. Beard's prior LinkedIn profile is attached hereto as Exhibit 13. Until recently, Mr. Beard was also listed as a 'law clerk' on the Resort Release webpage, a copy of which is attached hereto as Exhibit 14; and

b.   Totten advertises its address as 1451 W. Cypress Creek Rd., Suite 211, Fort Lauderdale, FL 33309 (available at www.tfdblaw.com).  The "Terms of Use" for www.vacationpropertiesforless.com, a copy of which is attached hereto as Exhibit 15, lists Defendant Vacation Properties' address in the same building at 1451 W. Cypress Creek Rd., Suite 300, Fort Lauderdale, FL 33309.

c.   In the State of North Carolina, Totten operates as a professional limited liability company under the name "Totten Franqui Davis & Burk, PLLC." Attached as Exhibit 16 is a copy of the North Carolina Secretary of State online records for Totten, which lists Totten's principal address as 2455 East Sunrise Boulevard, Suite 411, Fort Lauderdale, Florida 33304.  The 'Terms and Conditions' for Redemption's websites located at www.cancelatimesharecontract.com (available at https://cancelatimesharecontract.com/terms-and-conditions/); www.myredemptionservices.com (available at http://myredemptionservices.com/terms-and-conditions/); and www.redemptionandrelease.com (available at https://www.redemptionandrelease.com/terms-of-service/), copies of which are attached hereto as Composite Exhibit 17, state that Redemption's websites and services "shall be governed by and construed in accordance with the laws of 2455 E Sunrise Blvd, Fort Lauderdale, FL, 33304, United States."  Furthermore, until recently, Redemption registered its principal place of business as 2455 East Sunrise Boulevard, Suite 415,

- 43 -

Fort Lauderdale, Florida 33304. A copy of the Florida Secretary of State records for Redemption's 2017 and 2018 Annual Reports is attached hereto as Exhibit 18, which shows the recent change of address.

d.    In addition to being a partner in Totten and being a partner in Ayon Burk, Christopher Burk, Esq. is also the sole owner and officer of The Patriot Law Firm Corp. in Nevada. (See Exhibit 9.) The Patriot Law Firm Corp. maintains a website at www.fightforthelittleguy.com, advertising personal injury legal services. Until very recently, an entity with a Nevada address known as "Patriot Law Group" advertised TPE services at the website www.patriotlawgroup.com. Since the filing of this lawsuit on August 9, 2018, however, the website at www.patriotlawgroup.com has been deactivated and removed. A copy of the website was recently archived, however, and is attached as Exhibit 19. Nevada has no business records of any entity known as "Patriot Law Group." With such similar names, it is highly probable that Burk is the lawyer involved in the "Patriot Law Group's" TPE activity. Patriot Law Group in Nevada advertised the same telephone number as Defendant Timeshare Freedom advertises for its TPE services – (866) 668-6872 – although Timeshare Freedom has no locations in Nevada.

e.    Finally, one of Timeshare Freedom's locations is in Phoenix, Arizona at 2375 East Camelback Road, Suite 600. Burk's second law firm – Ayon Burk – maintains an office across the street from Timeshare Freedom, at 2415 East Camelback Road, Suite 700, Phoenix, Arizona 85016. Prior to

Burk joining what was previously known as the Ayon Law Firm, Ayon Law did not have an Arizona office. This is another connection between Burk and a TPE Defendant.

146. Based on the above facts, Totten and its attorneys are related to, receiving client referrals from, and/or working on behalf of, Resort Release and the other TPE Defendants.

## L. PERSONAL LIABILITY OF THE INDIVIDUALS RUNNING THE TPE DEFENDANTS AND DIRECTING THE UNLAWFUL CONDUCT

147. Historically, once a TPE company is shutdown via court intervention, a new TPE company with the same principals is created and put in action.

148. Therefore it is imperative that the individual Defendants, Scott Morse, Eric Cline, Shyla Cline, and Jordan Salkin (hereinafter, the "Individual Defendants") be held individually liable for the unlawful conduct alleged herein and thereby prevented from opening new entities to conduct the same or a similar scam.

149. Resort Release has two managers: Defendants Eric Cline and Shyla Cline. A copy of the Florida Secretary of State records for Resort Release is attached hereto as Exhibit 20.

150. According to Resort Release's website:

    a.    Defendant Shyla Cline is the Chief Executive Officer and Founder of Resort Release;

    b.    Eric Cline is the President and Co-Founder of Resort Release; and

    c.    Scott Morse is the Chief Operation Officer of Resort Release (*see* Exhibit 14).

151. Resort Exit has two managers: Defendants Morse and Eric Cline. A copy of the Florida Secretary of State records for Resort Exit is attached hereto as Exhibit 21.

152.    Redemption has a single manager: Defendant Morse.  A copy of the Florida Secretary of State records for Redemption is attached hereto as Exhibit 22.

153.    Vacation Properties has two managers: Defendants Morse and Eric Cline.  A copy of the Florida Secretary of State records for Vacation Properties is attached hereto as Exhibit 23.

154.    Defendants Morse, Eric Cline, and Shyla Cline actively and knowingly cause the false advertising by the above TPE Defendants.  They direct, control, ratify, authorize, personally participate in, and/or are the moving forces behind the false and misleading advertising alleged herein for those TPE Defendants.  For example, Shyla Cline has personally appeared in online advertisements for Resort Release.

155.    More that just being officers and managers of the above TPE Defendants, the individual Defendants Morse, Eric Cline, and Shyla Cline directly participate in the interference of Wyndham Owners' Timeshare Contracts.

156.    Finally,    Defendant    Salkin    is    the    likely    owner    of    the <timesharefreedomgroup.com> domain through which Timeshare Freedom operates and therefore is personally involved in, controls and directs Timeshare Freedom's online false advertising. A copy of the relevant WHOIS information prior to this lawsuit being filed is attached hereto as Exhibit 24.

157.    After this lawsuit was filed on August 9, 2018, the registrant information for the <timesharefreedomgroup.com> domain was placed behind a privacy shield.  A copy of the current WHOIS information prior to this lawsuit being filed is attached hereto as Exhibit 25.

158.    Thus, either Salkin owns and operates www.timesharefreedomgroup.com or he controls and directs another corporate entity, Timeshare Freedom (John Doe #2), which owns and operates www.timesharefreedomgroup.com.

159. Either way, Salkin actively and knowingly causes the false advertising by Timeshare Freedom. He directs, controls, ratifies, authorizes, personally participates in, and/or is the moving force behind the false and misleading advertising by Timeshare Freedom alleged herein.

160. Salkin and Timeshare Freedom share consumer information, including, without limitation, information on Wyndham Owners, with Totten (mainly through Burk) and the TPE Defendants and their respective principals.

## M. WYNDHAM'S RIGHT TO INJUNCTIVE RELIEF

161. Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to and/or persuasion of the Wyndham Owners' to stop making payments on the Timeshare Contracts, including all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation with Plaintiffs, is harming Plaintiffs.

162. Defendants continue to engage and intend to further engage in the unlawful conduct described above.

163. Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

164. The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying. These defaults result in loss of good will and damages to the customer relationship with other Wyndham Owners that are not in default and enjoying their Wyndham Contracts.

165.     Non-defaulting Wyndham Owners are also damaged because the non-payment of taxes and maintenance fees by the defaulting Wyndham Owners force the non-defaulting Wyndham Owners to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

166.     Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

167.     Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity.

168.     The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' relationships outweigh the harm, if any, that an injunction would cause to Defendants.

169.     The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and the interests of the Wyndham Owners, and by restraining the unlawful, disruptive and tortious actions committed by Defendants.

### N.     CAUSES OF ACTION

### COUNT I
### False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)
(against Resort Release, Vacation Properties, Redemption, Resort Exit, Timeshare Freedom, Eric Cline, Shyla Cline, Scott Morse, and Jordan Salkin)

170.     Wyndham adopts and realleges paragraphs 1 through 169 above as if fully set forth herein.

171.     This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

172.     Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The

statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

173. The representations described above were commercial speech made by a Defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Defendants' own financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

174. Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

175. Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to legitimately terminate their timeshare ownership with Wyndham.

176. Defendants deceive the consuming public by knowingly concealing the existence of the Ovation® Program and concealing the legitimate options available to Wyndham Owners, and instead tell consumers that Wyndham will do nothing to help consumers end their timeshare ownership.

177. Defendants' advertised services affect interstate commerce.

178. Defendants are operating as competitors to Wyndham. Once a Wyndham Owner enters into an agreement with a TPE Defendant, the sole purpose of that agreement is to cause that Wyndham Owner to withdraw his or her business from Wyndham, effectively converting that individual from a Wyndham Owner to a customer of the Defendant.

179. Wyndham has been and continues to be injured as a result of Defendants' false and misleading statements.

180. Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising, (ii) Defendants' profits resulting from their false advertising to Wyndham Owners, and (iii) the costs of the action.

181. Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further violations by Defendants of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against the Individual Defendants and the TPE Defendants, as well as their agents, representatives, employees, affiliates, prohibiting Defendants from publishing false and misleading statements in advertising, including but not limited to their websites or in any other electronic or print media or materials, advertising any ability to cancel or end Wyndham Owners' timeshare interests.

**COUNT II**
**Contributory False Advertising in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)**
(against Totten)

182. Wyndham adopts and realleges paragraphs 1 through 138 and 152 through 161 through 171 above as if fully set forth herein.

183. This is an action for a contributory violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

184.    The TPE Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

185.    Wyndham has been and continues to be injured as a result of the TPE Defendants' false and misleading statements.

186.    Totten has contributed and continues to contribute to the TPE Defendants' false advertising by knowingly inducing or causing the conduct, or by materially participating in it.

187.    Totten explicitly or implicitly encourages the false advertising because it accepts legal representation of the consumers deceived by the false advertising.  Without Totten's willingness to accept those consumers as clients, the TPE Defendants could not advertise what they do.

188.    The TPE Defendants' false advertisements are public, serious, and widespread, and Totten has full knowledge of such advertising and condones it.

189.    More than that, Totten financially gains from the false advertisements in the form of client referrals and fee splitting with the TPE Defendants.

190.    In other words, Totten's business derives much, if not all, of its revenue from the consumers solicited through the TPE Defendants' false advertising.

191.    Pursuant to 15 U.S.C. § 1117, Wyndham is entitled to recover (i) its actual damages sustained as a result of the false advertising by the TPE Defendants, (ii) Totten's profits resulting from the TPE Defendants' false advertising to Wyndham Owners, and (iii) the costs of the action.

192.     Pursuant to 15 U.S.C. § 1116, Wyndham seeks an injunction upon such terms as the Court may deem reasonable, to prevent further contributory violations by Totten of 15 U.S.C. 1125(a).

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Totten for damages, corrective advertising, and disgorgement of Totten's profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against Totten, as well as their agents, representatives, employees, affiliates, prohibiting Totten from further contributing to the false and misleading statements in advertising, including accepting any clients solicited by the other Defendants through the false advertisement of any ability to cancel or end Wyndham Owners' timeshare interests.

### COUNT III
### Tortious Interference with Contractual Relations
(against all Defendants)

193.     Wyndham adopts and realleges paragraphs 1 through 169 above as if fully set forth herein.

194.     This is a cause of action for tortious interference with contractual relations.

195.     Wyndham has contractual relationships with its timeshare owners.

196.     Defendants have actual, constructive, and/or specific knowledge of the contractual relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis upon which Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not

for the existence of the contractual relationships between Wyndham and the Wyndham Owners, Defendants would have no reason to exist.

197.    Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused or induced them to breach and/or terminate their contractual relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

198.    In particular, Defendants have intentionally procured the breach of Wyndham's contractual relationships by soliciting Wyndham Owners and persuading them to hire Defendants to help "cancel" (in reality, breach) their Timeshare Contracts. Defendants also procure breaches by directly instructing Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

199.    If Wyndham Owners knew the truth about Defendants' illusory and fraudulent services or about how Defendants' actions would adversely impact them, they would not pay exorbitant fees to Defendants nor unlawfully terminate (through breach resulting in foreclosure) their timeshare interests.

200.    Defendants have utilized improper, fraudulent and/or illegal means to interfere with Plaintiffs' contractual relations.

201.    Defendants' actions were done with an improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

202.    As a direct and proximate result of Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationships

with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts. These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

203.    Defendants did not and do not have any justification or privilege in procuring the breach of such contractual relationships, as Defendants are strangers to the contractual relationships between Wyndham and its Owners, and their interference with Plaintiffs' business is willful and malicious.

204.    Furthermore, Totten profits greatly by accepting significant fees from Wyndham Owners (through the TPE Defendants) then performing little or no actual legal work on their behalf to "cancel" their timeshare contracts. Totten is not privileged to interfere with Wyndham's contractual relationships because Totten acts in their own personal interests and without an honest belief that the strategy of defaulting on the Timeshare Contracts is justified by the exorbitant fees received by Totten or even the best course of action to terminate the Timeshare Contract, considering the Owner could *lawfully* terminate his or her contract for free, or at a much lower cost, by appealing directly to Wyndham. Furthermore, Totten undermines its so-called lawyer privilege to recommend to its clients that the Timeshare Contract may be breached, by rarely filing lawsuits on behalf of those Owners for the equitable rescission of those Timeshare Contracts. Totten's across-the-board strategy to induce its clients to breach their Timeshare Contracts is not sound, individualized legal advice done in the course of representation of any clients, but rather an overall business decision of the law firm itself that is not privileged.

205.    As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

206.    Plaintiffs are entitled to damages against all Defendants jointly and severally.

207.     Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

208.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate. Plaintiffs demand a permanent injunction be entered against Defendants and their agents, representatives, employees, and affiliates, prohibiting Defendants from contacting Wyndham Owners and/or otherwise interfering with Plaintiffs' contractual relationships with such Wyndham Owners.

## COUNT IV
### Civil Conspiracy to Commit Tortious Interference
(against all Defendants)

209.     Wyndham adopts and realleges paragraphs 1 through 169 above as if fully set forth herein.

210.     This is a cause of action for civil conspiracy to interfere with existing contractual relations and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

211.     Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

212. Defendants conspired to do an unlawful act to cause Plaintiffs harm. Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' contractual relations with it owners and collectively causing its owners to breach their Timeshare Contracts with Plaintiffs.

213. Each Defendant committed or engaged in an overt act in furtherance of their unlawful conspiracy to interfere with Plaintiffs' contractual relations or to induce Plaintiffs' customers to breach their Timeshare Contracts.

214. Defendants conspired to interfere with Plaintiffs' contractual relationships with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' contractual relationships with the Wyndham Owners.

215. As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have unlawfully terminated, or have sought to terminate, their Timeshare Contracts with Plaintiffs before the expiration of the terms of those Contracts.

216. Defendants did not have any justification or privilege in procuring the breach of such Timeshare Contracts. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

217. Defendants, acting in concert, have engaged in an unlawful scheme to take advantage of timeshare owners and cause Wyndham and its business millions of dollars in actual damages.

218. Defendants are jointly and severally liable to Plaintiffs for damages.

219. Defendants maliciously and purposefully act, using shell companies and numerous websites, as well as lawyers who only advertise other fields of legal practice, to hide

their misconduct, and to divert and abscond with funds from Wyndham Owners and interfere with the contractual relationships between Wyndham Owners and Wyndham.

220. Defendants acted willfully and with malice in taking these actions.

221. Defendants' conduct therefore entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of injunctive relief, and for such other and further relief as the Court deems appropriate.

### COUNT V
### Violations of Florida's Deceptive and Unfair Trade Practices Act
(against all Defendants)

222. Wyndham adopts and realleges paragraphs 1 through 169 above as if fully set forth herein.

223. This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

224. Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

225. Wyndham Owners are consumers for purposes of FDUTPA.

226. Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.

227. Defendants are engaged in deceptive and unfair practices, including luring Wyndham Owners into procuring Defendants' illusory services with false advertising and using misrepresentations to convince Wyndham consumers to pay substantial fees to "cancel" their contracts with Wyndham, when, in many instances, a lawful termination is only available to

consumers directly from Wyndham, a party to the Timeshare Contracts, through the Ovation®
Program or otherwise.

228.    Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone
aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to
occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149,
1152 (Fla. 5th DCA 2012).

229.    Under Section 501.211(1), Fla. Stat., "anyone aggrieved" includes a broader class
of complainants than merely consumers; the scope of the injunctive remedy is also greater than
the actual damage remedy under § 510.211(2), Fla. Stat. *Id.*; *see also Kinger v. Weekly World
News, Inc.*, 747 F.Supp. 1477, 1480 (S.D. Fla. 1990).

230.    Wyndham is a party aggrieved by Defendants' violation of FDUTPA, Section
501.204(1), Fla. Stat.

231.    As a result of Defendants' actions, Wyndham has suffered financial loss.

232.    Wyndham's losses will increase unless Defendants are permanently enjoined
from continuing their deceptive and unfair business practices.

233.    Wyndham is entitled to recover its attorney's fees and costs from Defendants
under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter injunctive relief against all
Defendants, award Plaintiffs their damages and costs, including their reasonable attorney's fees,
and for such other and further relief as the Court deems appropriate.

Dated: October 18, 2018

/s/ Alfred J. Bennington, Jr.
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**RAYMOND F. TREADWELL, ESQ.**
Florida Bar No. 93834
rtreadwell@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile: (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile: (561) 822-5527

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of October, 2018, the foregoing was filed with the Clerk of the Court using the Court's CM/ECF System, which will serve a copy of the foregoing upon all counsel of record, and on the above-referenced date, I caused the foregoing to be served via U.S. Mail, postage prepaid, upon the following non-CM/ECF participant:

## NON-CM/ECF PARTICIPANT

John Doe #2 d/b/a Timeshare Freedom Group
d/b/a timehsarefreedomgroup.com
23046 Avenida De La Carlota, Suite 600
Laguna Hills, California 92653

*/s/ Alfred J. Bennington, Jr.*_____
Alfred J. Bennington, Jr., Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-81055-Civ-Middlebrooks/Brannon

WYNDHAM VACATION
OWNERSHIP, INC., et al.,

     Plaintiff(s),

v.

TOTTEN FRANQUI DAVIS &
BURK, LLC, et al.,

     Defendant(s).

_____/

**PRETRIAL SCHEDULING ORDER
AND ORDER REFERRING CASE TO MEDIATION**

THIS CAUSE is before the Court upon order of reference from the district court. Pursuant to S.D. Fla. L. R. 16.1(b), the Court **ORDERS** the following:

1.    **Trial:**  This case is set for trial before U.S. District Judge Middlebrooks during the two-week trial period commencing July 8, 2019 at 9:00 a.m., with a calendar call set for July 3, 2019, at 1:15 p.m.  This Court hereby advises the parties of the opportunity to consent to a specially set trial before a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  A fully executed consent form should be filed within 30 days from this Order's date if the parties wish to consent to trial before a U.S. Magistrate Judge.  A sample form is attached as Appendix A to this Scheduling Order.

1

2.      **Pretrial Discovery, Rule 26(f) Conference and Discovery Plan**:      Pretrial

discovery shall be conducted in accordance with S.D. Fla. L.R. 16.1 and 26.1, and the Federal

Rules of Civil Procedure.  The parties are directed to meet and confer pursuant to Federal Rule of

Civil Procedure 26(f).  The parties must consider the nature and basis of their claims and

defenses and the possibilities for promptly settling or resolving the case; make or arrange for the

disclosures required by Rule 26(a)(1); discuss any issues about preserving discoverable

information; and develop a proposed discovery plan.  The parties' joint discovery plan must be

filed by the deadline set forth in paragraph 10 this Order and include:

(1)     an estimated valuation of the case from the perspective of Plaintiff and Defendant;
(2)     the date for exchanging initial disclosures pursuant to Rule 26(a)(1);
(3)     the subjects on which discovery may be needed;
(4)     whether the Parties can agree to limit discovery on particular issues through stipulation;
(5)     what document discovery is needed;
(6)     whether discovery should be conducted in phases;
(7)     whether the Parties expect to have disclosure, discovery, or preservation of electronically stored information, and if so, explain:
        (a) the main information and documents sought;
        (b) the expected costs of e-discovery; and
        (c) whether alternatives to e-discovery are possible.
(8)     what individuals each side intends to depose;
(9)     any issues about claims of privilege or of protection as trial-preparation materials, including—if the parties agree on a procedure to assert these claims after production—whether to ask the court to include their agreement in an order under Federal Rule of Evidence 502;
(10)    what changes should be made in the limitations on discovery imposed by the Federal Rules of Civil Procedure or the Local Rules; and
(11)    whether early mediation or a settlement conference with a Magistrate Judge prior to the close of discovery would be helpful.

No pretrial conference shall be held in this action, unless the parties so request or the

Court determines, *sua sponte*, that a pretrial conference is necessary.  Should a pretrial

conference be set, the deadlines set forth in this Order shall remain unaltered.

2

3.      **<u>Pretrial Stipulation</u>:**  Counsel must meet at least 45 days prior to the beginning of the trial calendar to confer on the preparation of a Joint Pretrial Stipulation.  The Joint Pretrial Stipulation shall be filed by the date set forth below and shall conform to S.D. Fla. L.R. 16.1(e). The Court will not accept unilateral pretrial stipulations, and will strike *sua sponte* any such submissions.   Should any of the parties fail to cooperate in preparing the Joint Pretrial Stipulation, all other parties shall file a certification with the Court stating the circumstances. Upon receipt of such certification, the Court will issue an order requiring the non-cooperating party or parties to show cause why such party or parties (and their respective attorneys) should not be held in contempt for failure to comply with the Court's order.  The pretrial disclosures and objections required under Fed. R. Civ. P. 26(a)(3) should be served, but not filed with the Clerk's Office, as the same information is required to be attached to the parties' Joint Pretrial Stipulation.

4.      **<u>Cases Tried Before A Jury</u>:**   In cases tried before a jury, at least ONE WEEK prior to the beginning of the trial calendar, the parties shall submit A SINGLE JOINT SET of proposed jury instructions and verdict form, though the parties need not agree on the proposed language of each instruction or question on the verdict form.  Where the parties do agree on a proposed instruction or question, that instruction or question shall be set forth in Times New Roman 14 point typeface.  Instructions and questions proposed only by the plaintiff(s) to which the defendant(s) object shall be italicized.   Instructions and questions proposed only by defendant(s) to which plaintiff(s) object shall be bold-faced.  Each jury instruction shall be typed on a separate page and, except for Eleventh Circuit Pattern instructions clearly identified as such, must be supported by citations to authority.  In preparing the requested jury instructions, the parties shall use as a guide the Pattern Jury Instructions for civil cases approved by the Eleventh

3

Circuit, including the directions to counsel contained therein. A copy of the proposed jury instructions and verdict form shall be sent in Word or WordPerfect format to: middlebrooks@flsd.uscourts.gov.

5. **Cases Tried Before The Court:** In cases tried before the Court, at least ONE WEEK prior to the beginning of the trial calendar, a copy of the proposed Findings of Fact and Conclusions of Law shall be sent in Word or WordPerfect format to: middlebrooks@flsd.uscourts.gov. Proposed Conclusions of Law must be supported by citations to authority.

6. **Exhibits:** All exhibits must be pre-marked. A typewritten exhibit list setting forth the number, or letter, and description of each exhibit must be submitted at the time of trial. The parties shall submit said exhibit list on Form AO 187, which is available from the Clerk's office.

7. **Motions to Continue Trial:** A Motion to Continue Trial shall not stay the requirement for the filing of a Pretrial Stipulation and, unless an emergency situation arises, such Motion will not be considered unless it is filed at least 20 days before the date on which the trial calendar is scheduled to commence.

8. **Pretrial Motions:** Any party filing a pretrial motion shall submit a proposed order granting the motion.

9.   **Non-compliance With This Order:**   Non-compliance with any provision of this Order may subject the offending party to sanctions or dismissal.  It is the duty of all counsel to enforce the timetable set forth herein in order to ensure an expeditious resolution of this cause.

10.   **Pretrial Schedule:**   The parties shall adhere to the following schedule, which shall not be modified absent compelling circumstances.  Any motions to modify this schedule shall be directed to the attention of U.S. District Judge Donald M. Middlebrooks.

| | |
|---|---|
| December 21, 2018 | Discovery Plan shall be filed.  *See* Fed. R. Civ. P. 26(f)(3). |
| January 7, 2019 | Joinder of Additional Parties and Amend Pleadings. |
| January 14, 2019 | Any motions for class certification shall be filed. |
| January 28, 2019 | Plaintiff shall provide opposing counsel with a written list with the names and addresses of all expert witnesses intended to be called at trial and only those expert witnesses listed shall be permitted to testify. Plaintiff shall also furnish opposing counsel with expert reports or summaries of its expert witnesses' anticipated testimony in accordance with Fed. R. Civ. P. 26(a)(2). Within the 30 day period following this disclosure, Plaintiff shall make its experts available for deposition by Defendant.  The experts' deposition may be conducted without further Court order. |
| February 25, 2019 | Defendant shall provide opposing counsel with a written list with the names and addresses of all expert witnesses intended to be called at trial and only those expert witnesses listed shall be permitted to testify. Defendant shall also furnish opposing counsel with expert reports or summaries of its expert witnesses' anticipated testimony in accordance with Fed. R. Civ. P. 26(a)(2). Within the 30 day period following this disclosure, Defendant shall make its experts available for deposition by Plaintiff.  The experts' deposition may be conducted without further Court order. |
| Note: | The above provisions pertaining to <u>expert</u> witnesses do not apply to treating physicians, psychologists or other health providers. |

5

| March 25, 2019 | Parties shall furnish opposing counsel with a written list containing the names and addresses of all witnesses intended to be called at trial and only those witnesses listed shall be permitted to testify. |
| April 22, 2019 | All discovery shall be completed. |
| May 6, 2019 | All Pretrial Motions, including summary judgment motions and *Daubert* motions, and motions *in limine* shall be filed. |
| June 10, 2019 | Joint Pretrial Stipulation shall be filed.  Designations of deposition testimony shall be made. |
| June 24, 2019 | Objections to designations of deposition testimony shall be filed. Late designations shall not be admissible absent exigent circumstances. |
| July 1, 2019 | Jury Instructions or Proposed Findings of Fact and Conclusions of Law shall be filed. |
| July 3, 2019 | Calendar Call. |

11.     **Order of Referral to Mediation/Settlement Conference:**  Pursuant to Local Rule 16.2, this case is referred to mediation as follows:

a.     All parties must complete mediation or a settlement conference at least 60 days before the scheduled trial date.

b.     The parties may request a settlement conference before the undersigned Magistrate Judge in lieu of mediation with a certified mediator.  Such conference will satisfy the requirement of court-ordered mediation, assuming good faith participation by the parties.  To make the request, a designated party should contact Judge Brannon's Chambers (561-803-3470) within 60 days of this Order's date with proposed conference dates.  Thereafter, an order will issue setting forth the date, time, place, and procedures for the settlement conference.

6

c.       Otherwise, Plaintiff's counsel, or other designated counsel, shall schedule a mediation conference. The parties are encouraged to avail themselves of the services of any mediator on the List of Certified Mediators, maintained in the office of the Clerk of the Court, but may select any other mediator. The parties shall agree upon a mediator and file a Notice of Mediator Selection within 14 days of this Order.  If there is no agreement, lead counsel shall promptly file a Request for Clerk to Appoint Mediator.  The Clerk of the Court shall then designate, on a blind rotation basis, a mediator from the List of Certified Mediators.  If the parties cannot mutually agree to a place, date, and time for the mediation, they may move the Court for an order dictating the place, date, and time.

d.       The appearance of counsel and each party or representatives of each party with full authority to enter into a full and complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority to settle up to the policy limits or the most recent demand, whichever is lower, shall attend.

e.       The Court may impose sanctions against parties or counsel who do not comply with the attendance or settlement authority requirements. The mediator shall report non-attendance and may recommend imposition of sanctions by the Court for non-attendance.

f.       If the parties elect to proceed to mediation but no complete settlement is reached, they may move for a settlement conference before the undersigned later in the proceedings.

12.   **Settlement:**  If the case is settled, counsel shall promptly inform the Court by calling the chambers of U.S. District Judge Donald M. Middlebrooks at (561) 514-3720 and, within 10 days of notification of settlement to the Court, submit an appropriate Motion and proposed order for dismissal, pursuant to Federal Rule of Civil Procedure 41(a).  The parties

7

shall attend all hearings and abide by all time requirements unless and until an order of dismissal is filed.

     **DONE AND ORDERED** in Chambers at West Palm Beach in the Southern District of Florida, this 10th day of December, 2018.

_Dave Lee Brannon_

DAVE LEE BRANNON
U.S. MAGISTRATE JUDGE

## APPENDIX A

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### NOTICE OF RIGHT TO CONSENT TO DISPOSITION OF A CIVIL CASE
### BY A U.S. MAGISTRATE JUDGE

Counsel shall review this notice with their client(s) before executing their notice of consent to trial before a U.S. Magistrate Judge.

Under 28 U.S.C. § 636(c), a U.S. Magistrate Judge may, upon the consent of all the parties in a civil case, conduct all proceedings, including a trial and all post-judgment proceedings. A consent form is attached and is also available from the Clerk of the Court.

You have a right to trial by a U.S. District Judge. Your decision to consent to the referral of your case to a U.S. Magistrate Judge for disposition is entirely voluntary on your part; your lawyer cannot make this decision for you. You may, without adverse substantive consequences, withhold your consent, but this will prevent the Court's jurisdiction from being exercised by a Magistrate Judge. If any party withholds consent, the identity of the parties consenting or withholding consent will not be communicated to any Magistrate Judge or to the District Judge to whom the case has been assigned.

Parties cannot withdraw their consent once given, although a District Judge may vacate a referral upon a showing of extraordinary circumstances by a party. An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the U.S. Court of Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this District Court.

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. [            ]-Civ-Middlebrooks/Brannon

[                              ],

      Plaintiff(s),

v.

[                              ],

      Defendant(s).

_____/

NOTICE OF CONSENT TO EXERCISE OF
JURISDICTION BY A U.S. MAGISTRATE JUDGE

      In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties in this case consent to have a U.S. Magistrate Judge conduct any and all proceedings in this case, the Parties consent to the exercise of jurisdiction by the Magistrate Judge over all further proceedings in this case, including trial and all post-judgment proceedings.

Party                  Signatures                        Date

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

10

**EXHIBIT 18**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

In re: REDEMPTION AND RELEASE, LLC
(DE),                                                    Case No. 19-14609-RBR

       Debtor.                                      Chapter 11
_____/

**ORDER DIRECTING APPOINTMENT OF CHAPTER 11 EXAMINER AND**
**CONTINUING THE EMERGENCY INTERIM MOTION OF WYNDHAM VACATION**
**OWNERSHIP, INC., WYNDHAM VACATIONS RESORTS, INC., WYNDHAM**
**RESORT DEVELOPMENT CORPORATION,  AND SHELL VACATIONS, LLC FOR**
**AN ORDER APPOINTING AN INTERIM CHAPTER 11 TRUSTEE OR EXAMINER**

      This matter came before the Court on _____ at _____ upon the Emergency

Interim Motion of Wyndham Vacation Ownership, Inc., Wyndham Vacations Resorts, Inc.,

Wyndham Resort Development Corporation, and Shell Vacations, LLC (collectively,

"Wyndham") For an Order Appointing an Interim Chapter 11 Trustee or Examiner (the

"Motion") (ECF ____).  The Court, considering the facts of this case, having heard the

arguments of counsel for the Debtor, counsel for Wyndham, and counsel for the United States

Trustee, taking judicial notice of the entire contents of the Court file, and as further stated on the

record, it is:

      **ORDERED AND ADJUDGED** as follows:

      1.      The Motion is GRANTED.

2.      The Court directs the United States Trustee to appoint a Trustee in this case pursuant to §1104(d) with the power and duties set forth under 11 U.S.C. §1106(a).

3.      The Chapter 11 Trustee shall have the sole and exclusive authority to make all business decisions for the Debtor, including decisions regarding the employment and compensation of employees, the retention of professionals, and the decision to enter into a contract, or assume or reject a contract.

4.      Compensation of the Chapter 11 Trustee shall be allowed by separate order pursuant to 11 U.S.C. § 326. No compensation shall be paid to the Chapter 11 Trustee in this case from any source whatsoever without prior order of the Court.

5.      The Debtor (including its officers, directors, and management) is directed to provide full and complete cooperation with the Chapter 11 Trustee to be appointed including providing access to all computers for any offsite offices containing data of Debtor's operations.

***

James A. Timko, Esq. is directed to serve a copy of this order on all creditors and parties in interest.

ORLDOCS 16834649 1 48430.0001

2

Label Matrix for local noticing
113C-0
Case 19-14609-JKO
Southern District of Florida
Fort Lauderdale
Fri Apr 12 13:16:49 EDT 2019

Redemption and Release, LLC (DE)
1401 W Cyress Creek RD, Suite 101
Fort Lauderdale, FL 33309-1969

Berger Singerman LLP, Gavin Gaukroger
350 East Los Olas Blvd, Ste 1000
Fort Lauderdale, FL 33301-4215

Bilzin Sumberg, LLP
Attn Michael N. Kreitzer
1450 Brickell Ave, Suite 2300
Miami, FL 33131-3456

Bluegreen Vacations Unlimited, Inc.
C/O Christian Leger, GreyRobinson, PA
Wells Fargo Bldg, Suite 3200
333 SE 2nd Ave
Miami, FL 33131-2176

Internal Revenue Service
PO Box 7346
Central Insolvency Ops
Philadelphia, PA 19101-7346

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614

Wyndham Vacation Ownership, Inc
C/O Alfred J. Bennington, Jr.
Shutts & Bowen, Keens Point
6114 Greatwater Drive
Windermere, FL 34786-5600

Tate M Russack
7999 North Federal Hwy
Suite 100 A
Boca Raton, FL 33487-1645

End of Label Matrix
Mailable recipients      8
Bypassed recipients      0
Total                    8