**IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL DIVISION**

**DULENE AMILCAR, BARBARA
COLOGGI, CRISTINE GALVIN,
MARTHA HASSALL, BRUCE
KNECHT, JODY KNECHT,
CHARLES LANGDON, SHELLY
LIGHTSEY, JAMES "MARK"
TERRELL, and PATRICIA
THOMPSON,**

**Case No.:**

    **Plaintiffs,**

**vs.**

**WYNDHAM VACATION
OWNERSHIP, INC., a foreign
profit corporation,**

    **Defendants.**

_____/

## COMPLAINT

COME NOW, Plaintiffs, DULENE AMILCAR, BARBARA COLOGGI, CRISTINE GALVIN, MARTHA HASSALL, BRUCE KNECHT, JODY KNECHT, CHARLES LANGDON, SHELLY LIGHTSEY, JAMES "MARK" TERRELL, and PATRICIA THOMPSON, by and through their undersigned counsel, and sue Defendant, WYNDHAM VACATION OWNERSHIP, INC., a foreign profit corporation, and state as follows:

## JURISDICTION AND VENUE

1.     This is an action for damages in excess of Fifteen Thousand Dollars ($15,000), excluding interest and costs.

1

2.     Defendant, WYNDHAM VACATION OWNERSHIP, INC., (hereinafter "WYNDHAM") is a Delaware corporation licensed to and doing business in Clearwater, Pinellas County, Florida.

3.     Venue is proper because a substantial part of the events or omissions giving rise to this claim occurred in this Judicial District.

## PARTIES

4.     Plaintiffs were employed at Defendant, WYNDHAM's, Clearwater Beach Resort.

5.     Plaintiffs were employed by Defendant, WYNDHAM, as Sales Representatives, with the exceptions of Plaintiffs DULENE AMILCAR, who was employed as Business Operations Coordinator, and BARBARA COLOGGI, who was employed as a Community Marketing Agent.

6.     At all times material hereto, Plaintiffs reported to supervisors John Topolosky, Director of Sales; Brandon Narain, Frontline Manager; Steven Pinta, In-House Manager; Sabrina Manghir, Community Marketing Agent Manager; Tara Wiles, Director of Marketing; and Susan Klein, Business Operations Manager (collectively, in whole or in part, "Supervisors").

7.     Plaintiffs' job duties as Sales Representatives included giving tours and selling timeshares at Defendant, WYNDHAM's, Clearwater Beach Resort property.

8.     Plaintiff, DULENE AMILCAR's, job duties as Business Operations Coordinator, included running the tour reception area, validating all work flow pertaining to the tour receptionist, and assigning the potential buyers to Sales Representatives to receive tours through the use of Defendant, WYNDHAM's, "rotation wheel" system.

9.     Plaintiff, BARBARA COLOGGI's, job duties as Community Marketing Agent included recruiting potential timeshare buyers off the street in the vicinity of Defendant WYNDHAM's Clearwater Beach Resort to receive tours from the Sales Representatives.

10.    Throughout the course of their employment with Defendant, WYNDHAM, Plaintiffs objected to and/or refused to participate in various illegal sales practices which their supervisors engaged in and/or instructed Plaintiffs to engage in, in violation of Fla. Stats. 475.42(1)(a), 475.42(1)(e), 475.42(1)(m), and 475.42(1)(n).

## GENERAL ALLEGATIONS

11.    Defendant, WYNDHAM, opened its Clearwater Beach Resort property in 2017.

12.    Before their employment with Defendant, WYNDHAM, Plaintiff Sales Representatives were employed in various timeshare sales positions around the country.

13.    Plaintiff Sales Representatives were recruited by Vice President Richard Wieczerzak and were enticed by a supposed once-in-a-lifetime opportunity to be part of the opening sales team for Defendant's Clearwater Beach Resort where they were promised yearly profits in excess of Five Hundred Thousand Dollars ($500,000.00).

14.    In reliance on these representations, Plaintiff Sales Representatives left companies and communities in which they had strong, established roots.

15.    However, beginning on the first day, and over the course of several months, it became clear to Plaintiffs that the promises which were made to them were empty, as they were earning only a fraction of what was represented to them by Mr. Wieczerzak, while at the same time being forced to engage in, or otherwise resist, unlawful sales practices at the direction of their Supervisors. After a training course which Plaintiffs participated in, Supervisor Narain advised Plaintiffs to "forget everything [they] just learned" as they would never make a sale that way. Instead, the Supervisors instructed them on various unlawful, unethical, and fraudulent means by which to sell Defendant, WYNDHAM's, timeshares.

3

### *Violations of Laws, Rules, or Regulations*

16.     Supervisors Narain and Pinta were engaged in the unlicensed practice of real estate, in violation of Fla. Stat. 475.42(1)(a), (c), & (l), by directly making sales of timeshares to purchasers.

17.     Supervisors hired non-Plaintiff sales representatives who engaged in the practice of real estate but were not licensed to practice real estate in the State of Florida or elsewhere, in violation of Fla. Stat. 475.42(1)(a), (c), & (l). These employees were paid hourly wages higher than those of the Plaintiffs, who were licensed; received monthly wage increases if they met their sales expectations; and they were often placed before the Plaintiffs on the "rotation wheel" so they would receive tours before the Plaintiffs.

18.     Supervisors regularly instructed Plaintiffs to intentionally confuse and mislead buyers or "wear them down" so they would buy property, in violation of Fla. Stat. 475.42(1)(e).

19.     Supervisors directed Plaintiffs to misrepresent the price of the timeshare through the use of points charts (See Exhibits A and B). Specifically, the "Clearwater Beach Resort Points Chart" (attached hereto as Exhibit A; hereinafter "CBR Points Chart") accurately depicts the cost and value of points buyers can buy from Defendant to use at the Clearwater Beach Resort. However, Supervisors removed the CBR Points Chart from the sales floor and instructed Plaintiffs to instead fraudulently show buyers the "RCI Points Chart" (attached hereto as Exhibit B), which depicts substantially cheaper points—in many cases less than half of the actual cost. Supervisors engaged in this conduct themselves as well. This practice was in violation of Fla. Stat. 475.42(1)(e).

4

20.     Supervisors regularly instructed Plaintiffs to fraudulently advise buyers that the timeshare was an investment and its value would increase over time, in violation of Fla. Stat. 475.42(1)(e).

21.     Supervisors regularly instructed Plaintiffs to advise potential buyers that the property they would be touring was not a timeshare, in violation of Fla. Stat. 475.42(1)(e).

22.     Supervisors regularly instructed Plaintiffs to fraudulently misrepresent to buyers the effect of completing a credit application, which was a necessary step in the sale process as it was required to show buyers the pricing. To wit, Plaintiffs were instructed to advise buyers that the credit application would not hurt their credit score, that it would only be a "soft hit," or that it was not a credit application at all. Supervisors also personally engaged in this conduct directly with the buyers. This practice was in violation of Fla. Stat. 475.42(1)(e).

23.     Supervisors regularly instructed Plaintiffs to fraudulently alter the buyers' income level on their credit application if needed for them to be approved for credit financing. Supervisors also personally engaged in this activity. This practice was in violation of Fla. Stat. 817.03 and/or 817.16.

24.     Supervisors regularly instructed Plaintiffs to fraudulently advise buyers that Defendant, WYNDHAM, would buy back their property if they were not satisfied with it, in violation of Fla. Stat. 475.42(1)(e).

25.     Supervisors intentionally preyed upon the elderly in the use of their unethical and illegal sales tactics, in violation of Fla. Stat. 475.42(1)(e).

26.     Out-of-state residents from certain states were not eligible to purchase timeshares at Defendant, WYNDHAM's, Clearwater Beach Resort. Thus, to sell to these buyers, Supervisors directed Plaintiffs to fraudulently advise such buyers that they could purchase a product called

"Club Wyndham Access," that doing so would give them access to various other Wyndham properties, and that once the buyer's state was eligible the buyer could transfer their interest to Wyndham Clearwater Beach Resort. Supervisors even had a form letter they would give to buyers explaining this, knowing it was not true. This practice was in violation of Fla. Stat. 475.42(1)(e).

27.    Supervisors directed Plaintiffs to sell Club Wyndham Access to ineligible out-of-state residents under the fraudulent misrepresentation that the buyer was actually buying a Wyndham Clearwater Beach Resort timeshare, in violation of Fla. Stat. 475.42(1)(e).

28.    Supervisors routinely and fraudulently advised potential buyers of the availability of the timeshares which were being sold. Specifically, they advised that since there were 105 units available and 52 weeks in the year, there were about 5,406 timeshares to be sold. In reality, however, there were far less available units at any given time, as Defendant, WYNDHAM, also rented rooms to hotel guests, which resulted in many owners not being able to use their timeshare due to overbooking. This practice was in violation of Fla. Stat. 475.42(1)(e).

29.    Supervisors directed Plaintiffs to fraudulently advise current timeshare owners on their refinancing options. Specifically, Plaintiffs were instructed to advise owners who wanted to purchase more points that they could keep making the same monthly payments they were currently making and pay off their loan by the same time, when in actuality Defendant, WYNDHAM, simply extended the repayment term. This practice was especially used against elderly owners. Supervisors also engaged in this practice themselves. This practice was in violation of Fla. Stat. 475.42(1)(e).

30.    Supervisors regularly instructed Plaintiffs to do "whatever they have to do" to close deals, even if it was unlawful or unethical, and used intimidation tactics to make sure Plaintiffs complied with their demands, in violation of Fla. Stat. 475.42(1)(e).

31.     Many of the above fraudulent practices were already engaged in by this Defendant in California and were the subject of a recent whistleblower lawsuit (*Williams vs. Wyndham,* Case No. CGC-12-526187) against Defendant, WYNDHAM, along with other related corporate entities. WYNDHAM timeshare sales associates in that jurisdiction were similarly instructed to fraudulently misrepresent: (1) the effect or even existence of a credit application; (2) that current owners could increase their points at no cost; (3) that Defendant, WYNDHAM, would buy back points or property in certain circumstances; (4) that monthly payments would be reduced when they were simply being deferred; and (5) that current owners were making smaller payments than they actually were, in an effort to persuade them to purchase more. Additionally, unlicensed sales associates were also alleged to have been engaging in the unlicensed practice of real estate. Defendant, WYNDHAM's, fraudulent sales practices were also alleged in that lawsuit to have specifically targeted senior citizens.

### *Protected Activity and Retaliation*

32.     Plaintiffs objected to and refused to participate in the illegal practices described in Paragraphs sixteen (16) through thirty-one (31). To wit, Plaintiffs complained numerous times, both verbally and in writing, to each Supervisor, Human Resources, and eventually to corporate attorneys and investigators.

33.     At least one Supervisor, John Topolosky, threatened Plaintiffs who objected and/or complained that if they did not do what he told them to do, he would fire them.

34.     Supervisor Topolosky expressly stated on at least one occasion that he will "starve out" Plaintiffs that objected to or refused to participate in the illegal practices he was directing them to take part in, as Plaintiffs were paid by commission. He and other Supervisors did so in fact by manipulating the "rotation wheel", which determined which sales representative received each

tour, in order to withhold tours and therefore commission, from Plaintiffs who complained. This retaliatory practice was also alleged to have been used by Defendant, WYNDHAM, in *Williams*.

35.     Plaintiffs were constructively terminated from their employment with Defendant, WYNDHAM, in that they were required to either participate in illegal practices or be stripped of the opportunity to earn commission and therefore earn a living.

### *Negligent Supervision and Retention*

36.     In addition to Plaintiffs reporting the illegal and unethical business practices of Supervisors to Defendant, WYNDHAM, numerous buyers and potential buyers complained to Defendant regarding the same. Despite voluminous complaints of unlawful business practices, no corrective action was taken by Defendant, WYNDHAM.

37.     Due to the volume of complaints received, Defendant, WYNDHAM, initiated a supposed internal investigation into the allegations, which consisted of interviews of each of the Sales Representatives. Still, no remedial action was taken. On the contrary, Supervisor Topolosky received a promotion.

38.     Defendant, WYNDHAM, was on advanced notice of its employees engaging in similar unlawful conduct by way of the allegations presented in the *Williams* lawsuit.

### *Allegations Specific to Dulene Amilcar*

39.     Plaintiff, DULENE AMILCAR (hereinafter, "AMILCAR"), witnessed on numerous occasions Supervisor Narain fraudulently advising buyers that the credit application they were completing would not affect their credit score, when he knew in fact that it would.

40.     Plaintiff, AMILCAR, reported this fraudulent conduct to Supervisors Topolosky and Klein.

41.     In response to Plaintiff, AMILCAR, reporting the fraudulent conduct, Supervisor Topolosky told her each time to "mind her own business."

42.     In response to Plaintiff, AMILCAR, reporting the fraudulent conduct, Supervisor Klein simply said she would talk to Supervisor Topolosky about it, yet the conduct continued.

43.     Plaintiff, AMILCAR, resigned from her position with Defendant, WYNDHAM, and was thereby constructively terminated as she was being required to participate and be complicit in Defendant's unlawful business practices.

### *Allegations Specific to Barbara Cologgi*

44.     Supervisors Manghir and Wiles instructed Plaintiff, BARBARA COLOGGI (hereinafter, "COLOGGI"), to fraudulently advise potential buyers that the property she was attempting to have them tour was not a timeshare, and to insist instead that it was "vacation ownership."

45.     Supervisors Manghir and Wiles instructed Plaintiff, COLOGGI, to fraudulently advise potential buyers that the credit application would not affect their credit score, when they knew that was not true.

46.     Plaintiff, COLOGGI, expressly refused to participate in the fraudulent practices, and instead chose to be honest with the potential buyers. She did so in the presence of Supervisor Manghir, who responded by openly scolding and ridiculing Plaintiff in front of other employees and guests.

47.     Plaintiff, COLOGGI, complained on multiple occasions to Human Resources Representative Sara Rojas regarding the deceptive practices her supervisors were instructing her to engage in, yet the conduct continued.

48.     Supervisor Manghir began writing up Plaintiff, COLOGGI, for frivolous things in retaliation for her objections to and refusals to participate in the illegal activity promoted by her Supervisors.

49.     On or around August 20, 2017, Plaintiff, COLOGGI, had oral surgery. Thereafter, Supervisors refused to allow her to return to work, despite her doctor providing Plaintiff and Defendant, WYNDHAM, with clearance to work.

50.     Supervisor Wiles terminated Plaintiff, COLOGGI, via text message, wherein she instructed Plaintiff not to return to work.

### *Allegations Specific to Cristine Galvin*

51.     Supervisors Topolosky and Pinta directed Plaintiff, CRISTINE GALVIN (hereinafter, "GALVIN"), to sell Club Wyndham Access to an elderly New Mexico resident, who was not eligible to purchase a property at Defendant, WYNDHAM's, Clearwater Beach Resort, under the misrepresentation that the buyer would have access to the Clearwater Beach Resort. Supervisors knew that was not true.

52.     Supervisors instructed Plaintiff, GALVIN, to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

53.     Supervisors Topolosky and Pinta directed Plaintiff, GALVIN, to fraudulently advise buyers that the credit application they were to complete would not affect their credit score. Supervisors knew that was not true.

54.     Supervisors instructed Plaintiff, GALVIN, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or

reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

55.    Plaintiff, GALVIN, witnessed Supervisor Pinta engage in the unlicensed practice of real estate by selling properties to buyers. Specifically, he discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

56.    Plaintiff, GALVIN, complained to Supervisors Topolosky and Pinta, yet no actions were taken to correct the unlawful conduct.

57.    Plaintiff, GALVIN, also complained to Human Resources Representative Sara Rojas regarding Defendant's unlawful conduct, yet no corrective action was taken.

58.    Plaintiff, GALVIN, resigned and was thereby constructively terminated from her position as Sales Representative with Defendant, WYNDHAM, as she was being coerced into engaging in unlawful activity which put her real estate license in jeopardy.

### *Allegations Specific to Martha Hassall*

59.    Supervisors directed Plaintiff, MARTHA HASSALL (hereinafter, "HASSALL"), to fraudulently advise buyers that the credit application would not affect their credit score or that it would only be a "soft hit" of one or two points. They knew this was not true.

60.    Supervisors instructed Plaintiff, HASSALL, to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

61.    Supervisors instructed Plaintiff, HASSALL, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

62.     Supervisors instructed Plaintiff, HASSALL, to sell Club Wyndham Access to buyers who were ineligible for Clearwater Beach Resort property under the fraudulent misrepresentation that they were actually being sold Clearwater Beach Resort property.

63.     Supervisors instructed Plaintiff, HASSALL, to sell Club Wyndham Access to buyers who were ineligible to purchase Clearwater Beach Resort property under the fraudulent misrepresentation that they could transfer their ownership into a Clearwater Beach Resort property for free once they were eligible, when it would actually cost them about $20,000.

64.     Plaintiff, HASSALL, witnessed Supervisors Narain and Pinta engage in the unlicensed practice of real estate by directly making sales of timeshares to purchasers. Specifically, they discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

65.     Plaintiff, HASSALL, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

66.     Supervisor Topolosky told Plaintiff, HASSALL, and the other Plaintiffs that he only wanted younger sales representatives and that he was going to replace the older sales representatives one at a time.

67.     Plaintiff, HASSALL, objected to and refused to participate in the above-described illegal activity. She complained and made her objections to Supervisor Topolosky, Human Resources, and Defendant, WYNDHAM's, internal investigators and attorneys.

68.     In response to Plaintiff, HASSALL, objecting to and refusing to participate in the unlawful business practices, Supervisor Topolosky ridiculed Plaintiff by telling her that she was "useless" and that she would "be out of a job," and by writing her up for frivolous things that would trigger HR reviews.

69.     Plaintiff, HASSALL, resigned from her position and was thereby constructively terminated from Defendant, WYNDHAM, in that she was being coerced into engaging in unlawful activity which put her real estate license in jeopardy.

### *Allegations Specific to Bruce Knecht*

70.     Supervisors instructed Plaintiff, BRUCE KNECHT, to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

71.     Supervisors instructed Plaintiff, BRUCE KNECHT, to have buyers sign the credit application by placing it among a pile of other documents they were told to sign in an effort to deceive them into signing it without asking any questions about it. If a buyer did ask questions, Supervisors instructed Plaintiff to fraudulently advise the buyer that the credit application would not affect their credit score. Supervisors knew this was not true.

72.     Supervisors instructed Plaintiff, BRUCE KNECHT, to deceive buyers by fraudulently misrepresenting to them that the timeshare was an investment which would increase in value over time. Supervisors knew this was not true.

73.     Supervisors instructed Plaintiff, BRUCE KNECHT, to fraudulently advise the buyers regarding unit availability. Buyers were advised that the timeshare owners had exclusive access to the units, when in actuality Defendant, WYNDHAM, was renting the rooms to hotel guests which further limited availability for the timeshare owners.

74.    Supervisors instructed Plaintiff, BRUCE KNECHT, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

75.    Plaintiff, BRUCE KNECHT, witnessed Supervisor Pinta engage in the unlicensed practice of real estate by directly making sales of timeshares to purchasers. Specifically, he discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

76.    Plaintiff, BRUCE KNECHT, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

77.    Plaintiff, BRUCE KNECHT, objected to and refused to participate in this illegal conduct, including stating his objections to Human Resources.

78.    Plaintiff, BRUCE KNECHT, resigned from his position as Sales Representative for Defendant, WYNDHAM, and was thereby constructively terminated as he was being coerced into engaging in unlawful conduct which put his real estate license in jeopardy.

### *Allegations Specific to Jody Knecht*

79.    Supervisor Topolosky instructed Plaintiff, JODY KNECHT, to lie to customers to get them to buy a timeshare. On one occasion specifically, Topolosky repeatedly and fraudulently assured a reluctant couple that they could sell back one of their Wyndham properties if they needed to because it qualified as a buyback. After Plaintiff, JODY KNECHT, told Topolosky that it did

14

not qualify, he continued to assure the buyers that it did, leading them to buy the timeshare in reliance upon his fraudulent misrepresentation.

80.     Plaintiff, JODY KNECHT, witnessed Supervisor Pinta engage in the unlicensed practice of real estate by directly making sales of timeshares to purchasers. Specifically, he discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

81.     Plaintiff, JODY KNECHT, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

82.     Supervisors instructed Plaintiff, JODY KNECHT, to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

83.     Supervisors Topolosky and Pinta regularly instructed Plaintiff, JODY KNECHT, to intentionally confuse and mislead buyers and "wear them down" until they bought a property. If she refused to do this she was publicly chastised.

84.     Plaintiff, JODY KNECHT, frequently witnessed Supervisors Topolosky and Pinta fraudulently misrepresenting the value of timeshares and fraudulently advising buyers that the timeshares' value would increase over time, when they knew this was not true.

85.     Supervisors regularly instructed Plaintiff, JODY KNECHT, to fraudulently misrepresent to buyers the effect of completing a credit application, advising them that it would only be a "soft hit" or even that it was not a credit application at all.

86.     Plaintiff, JODY KNECHT, witnessed Supervisors fraudulently alter buyers' income levels on their credit applications if it was needed to have them approved for credit financing.

87.     Supervisors directed Plaintiff, JODY KNECHT, to sell Club Wyndham Access to ineligible out-of-state residents under the misrepresentation that the buyer was actually buying Wyndham Clearwater Beach Resort property, or that they would be able to transfer their ownership from the former to the latter. Supervisors Topolosky and Pinta even had a form letter they would give to buyers stating this, even though it was not true.

88.     Supervisors instructed Plaintiff, JODY KNECHT, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

89.     Plaintiff, JODY KNECHT, on numerous occasions objected to and refused to participate in the above unlawful conduct, voicing her concerns to Supervisors Topolosky, Pinta, and Richard Weizerzak. Her objections were met with hostility. At one point, Supervisor Topolosky told Plaintiff that she should understand what they're doing since she had previously been a manager.

90.     Plaintiff, JODY KNECHT, also reported this illegal activity to Human Resources Representative Sara Rojas, yet no corrective action was taken.

91.     Plaintiff, JODY KNECHT, resigned from her position as Sales Representative for Defendant, WYNDHAM, and was thereby constructively terminated as she was being coerced into engaging in and being complicit in unlawful conduct which put her real estate license in jeopardy.

*Allegations Specific to Charles Langdon*

92.     Supervisors Topolosky, Narain, and Pinta instructed Plaintiff, CHARLES LANGDON (hereinafter, "LANGDON"), to fraudulently misrepresent to buyers that the credit application would not affect their credit score. Supervisor Topolosky knew that was not true.

93.     Supervisors Topolosky, Narain, and Pinta instructed Plaintiff, LANGDON, to fraudulently advise customers that the timeshare is an investment which will increase in value over time. Supervisor Topolosky knew this was not true.

94.     Supervisors Topolosky, Narain, and Pinta instructed Plaintiff, LANGDON, to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

95.     Supervisors Topolosky, Narain, and Pinta instructed Plaintiff, LANGDON, to "grind" on the buyers to "wear them down" by keeping them on the property as long as possible with high pressure to buy until they "caved."

96.     Supervisor Topolosky told Plaintiff, LANGDON, that he would be replaced if he didn't fall in line with management's directives.

97.     Supervisor Topolosky told Plaintiff, LANGDON, that he gives up too easily because he refused to use Supervisor Topolosky's high-pressure tactics to coerce the buyers into purchasing a timeshare.

98.     Plaintiff, LANGDON, witnessed Supervisors Narain and Pinta engage in the unlicensed practice of real estate by directly making sales of timeshares to purchasers. Specifically, they discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

99.     Plaintiff, LANGDON, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

100.    Supervisors instructed Plaintiff, LANGDON, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

101.    Plaintiff, LANGDON, objected to and refused to participate in the above-described illegal activity, including making a report to Human Resources Representative Sara Rojas. She told him she had received numerous complaints about the managers and that corporate was performing an investigation, yet nothing seemed to be done to remedy the situation.

102.    Plaintiff, LANGDON, resigned from his position as Sales Representative and was thereby constructively terminated from Defendant, WYNDHAM, as he was being coerced into engaging in unlawful conduct which placed his real estate license in jeopardy.

*Allegations Specific to Shelly Lightsey*

103.    Supervisor Topolosky, Narain, and Pinta instructed Plaintiff, SHELLY LIGHTSEY (hereinafter, "LIGHTSEY"), to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

104.    Supervisors Topolosky and Pinta instructed Plaintiff, LIGHTSEY, to confuse and "wear down" the buyers, especially elderly buyers, into purchasing a timeshare or amenities.

105.    Supervisors instructed Plaintiff, LIGHTSEY, to fraudulently misrepresent to buyers that the credit application would not affect their credit score. Supervisors knew this was not true.

106.    Supervisors Topolosky and Pinta instructed Plaintiff, LIGHTSEY, to fraudulently advise out-of-state buyers who were ineligible to purchase a timeshare from Defendant, WYNDHAM's, Clearwater Beach Resort that they could purchase Club Wyndham Access and then transfer their ownership to a Clearwater Beach Resort property when they became eligible. Supervisors knew this was not true.

107.    Plaintiff, LIGHTSEY, witnessed Supervisors Narain and Pinta engage in the unlicensed practice of real estate by directly making sales of timeshares to purchasers. Specifically, they discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

108.    Plaintiff, LIGHTSEY, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

109.    Supervisors instructed Plaintiff, LIGHTSEY, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

110.    Plaintiff, LIGHTSEY, witnessed Supervisor Narain fraudulently advising a buyer, a former police officer, that the credit application would not affect his credit score. She objected to it, to which Supervisor Pinta responded by calling her into his office and scolding her.

111.    The next day, Plaintiff, LIGHTSEY, witnessed Supervisor Narain engage in the same fraudulent conduct with another buyer who had told him they did not want their credit score to be affected by a credit check. Plaintiff also witnessed him fraudulently misrepresenting the value of points to the buyer. After Plaintiff objected again, Supervisor Topolosky scolded her in his office, telling her that her negativity will not be tolerated and instructed her to go home.

112.    Plaintiff, LIGHTSEY, complained on numerous occasions to Human Resources Representative Sara Rojas regarding the unlawful conduct of the Supervisors, yet no corrective action was taken.

113.    Plaintiff, LIGHTSEY, resigned from her position as Sales Representative and was thereby constructively terminated from Defendant, WYNDHAM, as she was being coerced into participating in and being complicit in unlawful conduct which placed her real estate license in jeopardy.

### *Allegations Specific to James "Mark" Terrell*

114.    Supervisors instructed Plaintiff, JAMES "MARK" TERRELL (hereinafter, "TERRELL"), to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

115.    Supervisor Narain instructed Plaintiff, TERRELL, to fraudulently advise buyers that the credit application was not actually a credit application, or that the credit application would either be only a "soft hit" to the buyer's credit or that it would not affect their credit at all. Supervisor Narain knew this was not true.

20

116.    Supervisor Narain fraudulently misrepresented to buyers that they could purchase a timeshare with no down payment, which was untrue. After the credit application was complete, he would put the amount of credit for which the buyer was approved onto a credit card which the buyer had to pay.

117.    Supervisors Topolosky and Narain on numerous occasions fraudulently advised buyers that Defendant, WYNDHAM, would buy the property back from the buyer if the buyer was not satisfied. Supervisors knew this was not true.

118.    Supervisors Topolosky and Pinta, instructed Plaintiff, TERRELL, to fraudulently advise out-of-state residents who were not eligible to purchase Defendant, WYNDHAM's, Clearwater Beach Resort property that they could purchase Club Wyndham Access and then transfer ownership to the Clearwater Beach Resort when they became eligible. Supervisors knew this was not true.

119.    Supervisors Topolosky, Pinta, and Narain instructed Plaintiff, TERRELL, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

120.    Plaintiff, TERRELL, witnessed Supervisors Narain and Pinta engage in the unlicensed practice of real estate by directly making sales of timeshares to purchasers. Specifically, they discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

121.    Plaintiff, TERRELL, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales

Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

122.    Plaintiff, TERRELL, refused to participate in the unlawful conduct and objected to it by complaining to Human Resources as well as Supervisors Topolosky and Narain.

123.    Plaintiff, TERRELL, resigned from his position as Sales Representative and was thereby constructively terminated from Defendant, WYNDHAM, as he was being directed to participate in and be complicit in unlawful conduct that placed his real estate license in jeopardy.

### *Allegations Specific to Patricia Thompson*

124.    Supervisors instructed Plaintiff, PATRICIA THOMPSON (hereinafter, "THOMPSON"), to fraudulently misrepresent the price of the timeshare to buyers by showing them the "RCI Points Chart" rather than the "CBR Points Chart."

125.    At the Grand Opening on the first day of business, Plaintiff, THOMPSON, witnessed Supervisor Topolosky unlawfully and fraudulently deceive a married couple into removing their children from their deed and then charge them extra to add them back on. When Plaintiff, THOMPSON, objected to the practice before the deal closed, Supervisor Topolosky sent her home for the day and told her he would close the deal himself.

126.    Plaintiff, THOMPSON, witnessed Supervisor Pinta engage in the unlicensed practice of real estate. Specifically, he discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License. When she objected to it, he said he had a license, which was not true at the time.

127.    Plaintiff, THOMSPON, also witnessed Supervisor Narain engage in the unlicensed practice of real estate. Specifically, he discussed pricing and finance terms with the buyers and closed deals without a Florida Real Estate License.

128.    Plaintiff, THOMPSON, also witnessed other employees selling properties without real estate licenses. These employees were paid hourly wages higher than those of the licensed Sales Representatives, received monthly wage increases if they met their sales expectations, and they were placed before the licensed Sales Representatives on the "rotation wheel" so they would receive tours before the licensed Sales Representatives would.

129.    Supervisors Topolosky, Pinta, and Narain directed Plaintiff, THOMPSON, to fraudulently advise buyers that the credit application was not in fact a credit application, or that it would only be a "soft hit" or would not affect their credit score at all. Supervisors also directed Plaintiff to hurry them through it with the other paperwork so they wouldn't ask questions.

130.    When Supervisor Topolosky caught Plaintiff, THOMPSON, disobeying his orders by correctly advising the buyers of the true effect of the credit application, he berated her, called her an "old fool," and told her that Defendant, WYNDHAM, will never make a sale if she keeps doing it.

131.    On one occasion, Plaintiff, THOMPSON, was directed to give a tour to a visibly intoxicated guest. This guest became frustrated during the tour, pulled out a large knife, and threatened to slit her throat if she didn't let him leave. She immediately reported this to Supervisor Topolosky, who, rather than calling police or security, first laughed at her and then yelled at her to get back to the tour and get the guest to buy a timeshare. Plaintiff, THOMPSON, went back to the guest, who then told her he had a gun and lifted his shirt to show her his firearm. Plaintiff,

being too shaken and traumatized to finish her shift, then called security herself and left work for the day. Supervisor Topolosky nor any other Supervisor did anything to help her.

132.    Supervisors instructed Plaintiff, THOMPSON, to sell Club Wyndham Access to buyers who were ineligible to purchase Clearwater Beach Resort property under the fraudulent misrepresentation that they could transfer their ownership into a Clearwater Beach Resort property for free once they were eligible. Supervisors knew this was not true.

133.    Supervisors instructed Plaintiff, THOMPSON, to fraudulently advise owners who already have a mortgage that they could reduce the number of years left on their mortgage or reduce their cost if the buyer bought more property from Defendant, WYNDHAM, when in fact they just transferred the current balance to the new mortgage and extended the repayment term.

134.    Plaintiff, THOMPSON, refused to participate in the illegal conduct and objected to it on numerous occasions to Human Resources and Topolosky.

135.    Supervisor Topolosky wrote up Plaintiff, THOMPSON, for "insubordination" because she refused to participate in the illegal conduct she was being instructed to engage in.

136.    Plaintiff, THOMPSON, resigned from her position as Sales Representative at Defendant, WYNDHAM, and was thereby constructively terminated as she was being directed to engage in unlawful conduct which placed her real estate license in jeopardy.

## COUNT I
### *Dulene Amilcar – Florida Private Whistleblower*

137.    Plaintiff adopts and realleges Paragraphs one (1) through forty-three (43) as if set out in full herein.

138.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

24

139.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

140.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

141.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

    a.   Back pay and benefits;

    b.   Interest on back pay;

    c.   Front pay and/or lost earning capacity;

    d.   All other compensatory damages allowable at law;

    e.   Attorneys' fees and costs.

**COUNT II**
*Dulene Amilcar – Negligent Supervision and Retention*

142.    Plaintiff adopts and realleges Paragraphs one (1) through forty-three (43) as if set out in full herein.

143.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

144.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

145.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

146.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

147.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

        a.  Severe emotional distress;

        b.  Embarrassment;

        c.  Humiliation;

        d.  Mental anguish;

        e.  Loss of capacity for the enjoyment of life;

        f.  Impairment of working ability;

        g.  Loss of dignity;

        h.  Loss of or diminution of earning or earning capacity.

## COUNT III
### Barbara Cologgi – Florida Private Whistleblower

148.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and forty-forty-four (44) through fifty (50) as if set out in full herein.

149.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

150.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

151.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

152.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

        a.  Back pay and benefits;

        b.  Interest on back pay;

    c.   Front pay and/or lost earning capacity;

    d.   All other compensatory damages allowable at law;

    e.   Attorneys' fees and costs.

## COUNT IV
### *Barbara Cologgi – Negligent Supervision and Retention*

153.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and forty-forty-four (44) through fifty (50) as if set out in full herein.

154.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

155.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

156.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

157.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

158.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

    a.   Severe emotional distress;

    b.   Embarrassment;

    c.   Humiliation;

    d.   Mental anguish;

    e.   Loss of capacity for the enjoyment of life;

    f.   Impairment of working ability;

    g.   Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT V
### *Cristine Galvin – Florida Private Whistleblower*

159.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and fifty-one (51) through fifty-eight (58) as if set out in full herein.

160.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

161.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

162.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

163.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

    a.  Back pay and benefits;

    b.  Interest on back pay;

    c.  Front pay and/or lost earning capacity;

    d.  All other compensatory damages allowable at law;

    e.  Attorneys' fees and costs.

## COUNT VI
### *Cristine Galvin – Negligent Supervision and Retention*

164.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and fifty-one (51) through fifty-eight (58) as if set out in full herein.

165.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

166.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

167.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

168.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

169.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

    a.  Severe emotional distress;

    b.  Embarrassment;

    c.  Humiliation;

    d.  Mental anguish;

    e.  Loss of capacity for the enjoyment of life;

    f.  Impairment of working ability;

    g.  Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT VII
### *Martha Hassall – Florida Private Whistleblower*

170.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and fifty-nine (59) through sixty-nine (69) as if set out in full herein.

171.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

172.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

173.     Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

174.     As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

        a.   Back pay and benefits;

        b.   Interest on back pay;

        c.   Front pay and/or lost earning capacity;

        d.   All other compensatory damages allowable at law;

        e.   Attorneys' fees and costs.

## COUNT VIII
### *Martha Hassall – Negligent Supervision and Retention*

175.     Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and fifty-nine (59) through sixty-nine (69) as if set out in full herein.

176.     Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

177.     Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

178.     Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

179.     Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

180.     As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

        a.   Severe emotional distress;

    b.  Embarrassment;

    c.  Humiliation;

    d.  Mental anguish;

    e.  Loss of capacity for the enjoyment of life;

    f.  Impairment of working ability;

    g.  Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT IX
### *Bruce Knecht – Florida Private Whistleblower*

181.   Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and seventy (70) through seventy-eight (78) as if set out in full herein.

182.   At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

183.   At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

184.   Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

185.   As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

    a.  Back pay and benefits;

    b.  Interest on back pay;

    c.  Front pay and/or lost earning capacity;

    d.  All other compensatory damages allowable at law;

    e.  Attorneys' fees and costs.

## COUNT X
### *Bruce Knecht – Negligent Supervision and Retention*

186.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and seventy (70) through seventy-eight (78) as if set out in full herein.

187.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

188.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

189.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

190.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

191.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

        a.  Severe emotional distress;

        b.  Embarrassment;

        c.  Humiliation;

        d.  Mental anguish;

        e.  Loss of capacity for the enjoyment of life;

        f.  Impairment of working ability;

        g.  Loss of dignity;

        h.  Loss of or diminution of earning or earning capacity.

## COUNT XI
### *Jody Knecht – Florida Private Whistleblower*

192.   Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and seventy-nine (79) through ninety-one (91) as if set out in full herein.

193.   At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

194.   At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

195.   Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

196.   As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

      a.   Back pay and benefits;

      b.   Interest on back pay;

      c.   Front pay and/or lost earning capacity;

      d.   All other compensatory damages allowable at law;

      e.   Attorneys' fees and costs.

## COUNT XII
### *Jody Knecht – Negligent Supervision and Retention*

197.   Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and seventy-nine (79) through ninety-one (91) as if set out in full herein.

198.   Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

199.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

200.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

201.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

202.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

    a.  Severe emotional distress;

    b.  Embarrassment;

    c.  Humiliation;

    d.  Mental anguish;

    e.  Loss of capacity for the enjoyment of life;

    f.  Impairment of working ability;

    g.  Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT XIII
### *Charles Langdon – Florida Private Whistleblower*

203.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and ninety-two (92) through one hundred two (102) as if set out in full herein.

204.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

205.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

206.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

207.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

      a.    Back pay and benefits;

      b.    Interest on back pay;

      c.    Front pay and/or lost earning capacity;

      d.    All other compensatory damages allowable at law;

      e.    Attorneys' fees and costs.

## COUNT XIV
### Charles Langdon – Negligent Supervision and Retention

208.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and ninety-two (92) through one hundred two (102) as if set out in full herein.

209.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

210.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

211.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

212.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

213.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

      a.    Severe emotional distress;

    b.  Embarrassment;

    c.  Humiliation;

    d.  Mental anguish;

    e.  Loss of capacity for the enjoyment of life;

    f.  Impairment of working ability;

    g.  Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT XV
### *Shelly Lightsey – Florida Private Whistleblower*

214.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and one hundred three (103) through one hundred thirteen (113) as if set out in full herein.

215.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

216.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

217.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

218.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

    a.  Back pay and benefits;

    b.  Interest on back pay;

    c.  Front pay and/or lost earning capacity;

    d.  All other compensatory damages allowable at law;

    e.  Attorneys' fees and costs.

## COUNT XVI
### *Shelly Lightsey – Negligent Supervision and Retention*

219.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and one hundred three (103) through one hundred thirteen (113) as if set out in full herein.

220.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

221.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

222.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

223.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

224.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

    a.  Severe emotional distress;

    b.  Embarrassment;

    c.  Humiliation;

    d.  Mental anguish;

    e.  Loss of capacity for the enjoyment of life;

    f.  Impairment of working ability;

    g.  Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT XVII
### *James "Mark" Terrell – Florida Private Whistleblower*

225.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and one hundred fourteen (114) through one hundred twenty-three (123) as if set out in full herein.

226.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

227.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

228.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

229.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

    a.   Back pay and benefits;

    b.   Interest on back pay;

    c.   Front pay and/or lost earning capacity;

    d.   All other compensatory damages allowable at law;

    e.   Attorneys' fees and costs.

## COUNT XVIII
### *James "Mark" Terrell – Negligent Supervision and Retention*

230.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and one hundred fourteen (114) through one hundred twenty-three (123) as if set out in full herein.

231.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

232.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

233.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

234.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

235.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

    a.  Severe emotional distress;

    b.  Embarrassment;

    c.  Humiliation;

    d.  Mental anguish;

    e.  Loss of capacity for the enjoyment of life;

    f.  Impairment of working ability;

    g.  Loss of dignity;

    h.  Loss of or diminution of earning or earning capacity.

## COUNT XIX
### *Patricia Thompson – Florida Private Whistleblower*

236.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and one hundred twenty-four (124) through one hundred thirty-six (136) as if set out in full herein.

237.    At all times material hereto, Defendant was an employer as defined by Fla. Stat. 448.101.

238.    At all times material hereto, Plaintiff was an employee of Defendant as defined by Fla. Stat. 448.101.

39

239.    Plaintiff engaged in protected activity pursuant to Fla. Stat. 448.102 relating to Defendant's violation of Florida law.

240.    As a result of Defendant's conduct, Plaintiff is entitled to the following past and future damages:

      a.    Back pay and benefits;

      b.    Interest on back pay;

      c.    Front pay and/or lost earning capacity;

      d.    All other compensatory damages allowable at law;

      e.    Attorneys' fees and costs.

### COUNT XX
*Patricia Thompson – Negligent Supervision and Retention*

241.    Plaintiff adopts and realleges Paragraphs one (1) through thirty-eight (38) and one hundred twenty-four (124) through one hundred thirty-six (136) as if set out in full herein.

242.    Defendant owed Plaintiff a duty to exercise reasonable care in retaining safe and competent employees.

243.    Plaintiff was subjected to the illegal actions of Defendant's employees as a direct consequence of Plaintiff's employment relationship with Defendant.

244.    Defendant had actual or constructive notice that Plaintiff was being harmed as a result of its employees' illegal conduct.

245.    Defendant breached the duty owed to Plaintiff by retaining the employees who were illegally causing Plaintiff harm, despite having actual or constructive notice of their unfitness.

246.    As a direct and proximate result of the negligence of Defendant, Plaintiff sustained the following past and future damages:

      a.    Severe emotional distress;

b.  Embarrassment;

c.  Humiliation;

d.  Mental anguish;

e.  Loss of capacity for the enjoyment of life;

f.  Impairment of working ability;

g.  Loss of dignity;

h.  Loss of or diminution of earning or earning capacity.

## PUNITIVE DAMAGES

Plaintiff hereby reserves the right to request this Honorable Court's leave to amend this complaint to add a claim for punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

**FLORIN ROEBIG, P.A.**

**WIL H. FLORIN, ESQUIRE**
Florida Bar No.: 0337234
Primary Email:  WHF@FlorinRoebig.com
Secondary Email:  Lisa@FlorinRoebig.com
**THOMAS D. ROEBIG, JR., ESQUIRE**
Florida Bar No.: 0651702
Primary Email:   TDR@FlorinRoebig.com
Secondary Email:  Lisa@florinroebig.com
**PARKER Y. FLORIN, ESQUIRE**
Florida Bar No.: 0127139
Primary Email:      PFlorin@FlorinRoebig.com
Secondary Email:  Lisa@FlorinRoebig.com
**TAYLOR D. ROEBIG, ESQUIRE**
Florida Bar No.: 1002817
Primary Email:   TaylorRoebig@FlorinRoebig.com
Secondary Email:  Lisa@FlorinRoebig.com
777 Alderman Road

41

Palm Harbor, Florida 34683
Telephone No.: (727) 786-5000
Facsimile No.: (727) 772-9833
Attorneys for Plaintiff

# Points Chart    Clearwater Beach Resort

| Season | Weeks | Nights | 1 BR | 1 BR Deluxe | 2 BR | 2 BR Deluxe | 1 BR Presidential | 2 BR Presidential | 4 BR Presidential | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | UNIT TYPE | | | | |
| Prime | 1-34, 40-43, 46-47, 51-52 | Fri-Sat | 45,500 | 50,000 | 60,000 | 65,000 | 65,000 | 90,000 | 130,000 | Per Night |
| | | Full Week | 231,000 | 250,000 | 300,000 | 325,000 | 325,000 | 450,000 | 650,000 | Per Week |
| High | 35-39, 44-45, 48-50 | Fri-Sat | 42,500 | 44,500 | 55,000 | 60,000 | 60,000 | 80,000 | 120,000 | Per Night |
| | | Sun-Thur | 25,000 | 27,000 | 33,000 | 36,000 | 36,000 | 48,000 | 72,000 | Per Night |
| | | Full Week | 210,000 | 224,000 | 275,000 | 300,000 | 300,000 | 400,000 | 600,000 | Per Week |

Note: Prime also has Sun-Thur row: 28,000 | 30,000 | 36,000 | 39,000 | 39,000 | 54,000 | 78,000 | Per Night

• Full week stays require check-in and check-out on Friday, Saturday or Sunday. • 3- or 4-night stays in Prime season require check-in or check-out on Friday, Saturday or Sunday.

EXHIBIT "A"

CLUB WYNDHAM Plus Point Values for RCI Nightly Stay Resorts

| ROOM TYPE | DEMAND | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PRIME | | | HIGH | | | VALUE | | | QUIET | | |
| | Nightly | | Weekly | Nightly | | Weekly | Nightly | | Weekly | Nightly | | Weekly |
| | Sun-Thur | Fri-Sat | Point per 7-night Stay | Sun-Thur | Fri-Sat | Point per 7-night Stay | Sun-Thur | Fri-Sat | Point per 7-night Stay | Sun-Thur | Fri-Sat | Point per 7-night Stay |
| | Points Per Night | | | Points Per Night | | | Points Per Night | | | Points Per Night | | |
| Studio | 10,800 | 18,000 | 90,000 | 9,240 | 15,400 | 77,000 | 6,240 | 10,400 | 52,000 | 4,200 | 7,000 | 35,000 |
| 1 BR | 15,120 | 25,200 | 126,000 | 12,600 | 21,000 | 105,000 | 9,240 | 15,400 | 77,000 | 7,560 | 12,600 | 63,000 |
| 2 BR | 24,600 | 41,000 | 205,000 | 19,800 | 33,000 | 165,000 | 15,120 | 25,200 | 126,000 | 9,240 | 15,400 | 77,000 |
| 3 BR or More | 36,000 | 60,000 | 300,000 | 27,840 | 46,400 | 232,000 | 19,080 | 31,800 | 159,000 | 13,440 | 22,400 | 112,000 |

EXHIBIT "B"